940 P.2d 1293 (1997)
132 Wash.2d 852
STATE of Washington, Respondent,
v.
Martin Shaw PANG, Petitioner.
No. 64786-1.
Supreme Court of Washington, En Banc.
Argued April 8, 1997.
Decided July 31, 1997.
*1294 Browne & Ressler, John H. Browne, Mark T. Dole, Allen M. Ressler, Seattle, for petitioner.
Norm Maleng, King County Prosecutor, Marilyn B. Brenneman, Timothy A. Bradshaw, Deputies, Seattle, for respondent.
SMITH, Justice.
Petitioner Martin Shaw Pang seeks review of a King County Superior Court decision which denied his motion to dismiss or sever four counts of murder in the first degree from one count of arson in the first degree based upon his claim that the Federal Supreme Court of Brazil approved his extradition from that country for prosecution in the *1295 State of Washington only for the crime of arson in the first degree. We reverse.

QUESTION PRESENTED
The basic question in this case is whether the State of Washington may prosecute Petitioner Martin Shaw Pang for four counts of murder in the first degree and one count of arson in the first degree when the Federal Supreme Court of Brazil, ruling on the State's petition for extradition, granted his extradition for prosecution in the State of Washington "for the crime of arson in the first degree, resulting in four deaths .... without the additional charge of four counts of first degree murder." To answer the basic question, we must answer these additional questions:
(1) Does Petitioner Pang have standing to object to violation by the State of Washington of the terms of the order on extradition issued by the Federal Supreme Court of Brazil?
(2) Did the United States of Brazil explicitly or implicitly waive any objection it could have made to prosecution by the State of Washington of Petitioner Pang for murder in the first degree contrary to the specific terms of the extradition order issued by the Federal Supreme Court of Brazil?
(3) Does the "specialty doctrine" in international extradition law prohibit the State of Washington from prosecuting Petitioner Pang for crimes specifically excluded in the extradition order?
(4) Does the Extradition Treaty between the United States of America and the United States of Brazil prohibit the State of Washington from prosecuting Petitioner Pang for crimes not authorized in the extradition order?
(5) Is the State of Washington obligated to follow the decision of the Federal Supreme Court of Brazil which ruled that, as a condition for extraditing Petitioner Pang to the State, he can be prosecuted only "for the crime of arson in the first degree resulting in four deaths .... without the additional charge of four counts of first degree murder"?

STATEMENT OF FACTS
On January 5, 1995, four firefighters died while fighting a fire at the Mary Pang Products, Inc. warehouse at 811 Seventh Avenue South in Seattle, Washington.[1] Fire investigators later determined the fire had been deliberately set. Martin Shaw Pang became a suspect. A fugitive warrant was issued for his arrest.[2] On March 3, 1995 the King County Prosecuting Attorney by Information charged Petitioner Pang with four counts of murder in the first degree as follows:

COUNT I
I, Norm Maleng, Prosecuting Attorney for King County in the name and by the authority of the State of Washington, do accuse MARTIN S. PANG of the crime of Murder in the First Degree, committed as follows:
That the defendant MARTIN S. PANG, together with another, in King County, Washington on or about January 5, 1995, while committing and attempting to commit the crime of Arson in the First Degree, and in the course of and in furtherance of said crime and in immediate flight therefrom, did cause the death of Lieutenant Walter Kilgore, a human being who was not a participant in the crime, and who died on or about January 5, 1995;
Contrary to RCW 9A.32.030(1)(c), and against the peace and dignity of the State of Washington.

COUNT II
And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse MARTIN S. PANG of the crime of Murder in the First Degree, a crime of the same or *1296 similar character as another crime charged herein, and committed as follows:
That the defendant MARTIN S. PANG, together with another, in King County, Washington on or about January 5, 1995, while committing and attempting to commit the crime of Arson in the First Degree, and in the course of and in furtherance of said crime and in immediate flight therefrom, did cause the death of Lieutenant Gregory A. Shoemaker, a human being who was not a participant in the crime, and who died on or about January 5, 1995;
Contrary to RCW 9A.32.030(1)(c), and against the peace and dignity of the State of Washington.

COUNT III
And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse MARTIN S. PANG of the crime of Murder in the First Degree, a crime of the same or similar character as another crime charged herein, and committed as follows:
That the defendant MARTIN S. PANG, together with another, in King County, Washington on or about January 5, 1995, while committing and attempting to commit the crime of Arson in the First Degree, and in the course of and in furtherance of said crime and in immediate flight therefrom, did cause the death of Firefighter James T. Brown, a human being who was not a participant in the crime, and who died on or about January 5, 1995;
Contrary to RCW 9A.32.030(1)(c), and against the peace and dignity of the State of Washington.

COUNT IV
And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse MARTIN S. PANG of the crime of Murder in the First Degree, a crime of the same or similar character as another crime charged herein, and committed as follows:
That the defendant MARTIN S. PANG, together with another, in King County, Washington on or about January 5, 1995, while committing and attempting to commit the crime of Arson in the First Degree, and in the course of and in furtherance of said crime and in immediate flight therefrom, did cause the death of Firefighter Randall R. Terlicker, a human being who was not a participant in the crime, and who died on or about January 5, 1995;
Contrary to RCW 9A.32.030(1)(c), and against the peace and dignity of the State of Washington.
NORM MALENG
Prosecuting Attorney
By: [s] Marilyn B. Brenneman

MARILYN B. BRENNEMAN, WSBA # 91002 [sic]
Senior Deputy Prosecuting Attorney
By: [s] Timothy A. Bradshaw

Timothy Bradshaw, WSBA # 91002 [sic]
Senior Deputy Prosecuting Attorney[[3]]
A Certification for Determination of Probable Cause was attached to the Information.[4]
On March 16, 1995, Petitioner Martin Shaw Pang was arrested in Rio de Janeiro, Brazil.[5] The following day the Prosecuting Attorney of King County by amended information added a charge of arson in the first degree. The Amended Information, after repeating the four counts of murder in the first degree, then stated:

COUNT V
And I Norm Maleng, Prosecuting Attorney aforesaid further do accuse MARTIN S. PANG of the crime of Arson in the First Degree, a crime of the same or similar character and based on a series of acts connected together with another crime charged herein, which crimes were part of a common scheme or plan, and which crimes were so closely connected in respect with time, place and occasion that it would be difficult to separate proof of *1297 one charge from proof of the other, committed as follows:
That the defendant MARTIN S. PANG in King County, Washington on or about January 5, 1995, did knowingly and maliciously cause a fire or explosion located at 811 Seventh Avenue South (the Mary Pang Warehouse), Seattle, which was manifestly dangerous to any human life, including firemen;
Contrary to RCW 9A.48.020(1)(a), and against the peace and dignity of the State of Washington.[[6]]
In July 1995 the United States of America requested the United States of Brazil to extradite Petitioner Pang to the State of Washington for trial on four counts of murder in the first degree and one count of arson in the first degree.[7] The Affidavit in Support of Request for Extradition states:
STATE OF WASHINGTON
COUNTY OF KING
I, MARILYN B. BRENNEMAN, being duly sworn, hereby depose and say:
1. I am a citizen of the United States and a resident of the State of Washington.
2. I have been engaged in the practice of law in the State of Washington since 1980.
3. Since May 1, 1980 I have been employed by the King County Prosecuting Attorney's Office as a Deputy Prosecuting Attorney. I was appointed Senior Deputy Prosecuting Attorney on January 2, 1985. My duties are to prosecute persons charged with criminal violations of the laws of the State of Washington. In the course of such prosecutions, I have become knowledgeable about the state criminal statutes and case law, including those related to the crime of Murder in the First Degree and Arson in the First Degree. I am responsible for prosecuting the case of State of Washington vs. Martin Shaw Pang, King County Superior Court Cause Number XX-X-XXXXX-X. I am therefore familiar with the evidence and charges in this case and the contents of the relevant files of the King County Superior Court and the Office of the King County Prosecuting Attorney.
4. On March 3, 1995, an Information was filed in King County Superior Court charging the defendant with the crimes of Murder in the First Degree, Counts I, II, III, and IV, Class "A" Felonies, carrying the potential penalty of life imprisonment. On March 17, 1995, an Amended Information was filed in King County Superior Court adding the charge of Arson in the First Degree, Count V, also a Class "A" Felony, carrying the potential penalty of life imprisonment.
5. The statutes cited in the Information and Amended Information are Revised Code of Washington 9A.32.030(1)(c) and 9A.48.020(1)(a). These statutes are as follows:
9A.32.030. Murder in the first degree.
(1) A person is guilty of murder in the first degree when:
(a) With a premeditated intent to cause the death of another person, he causes the death of such person or of a third person; or
(b) Under circumstances manifesting an extreme indifference to human life, he engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person; or
(c) He commits or attempts to commit the crime of either (1) robbery, in the first or second degree, (2) rape in the first or second degree, (3) burglary in the first degree, (4) arson in the first, and (5) kidnapping, in the first or second degree, and; in the course of and in furtherance of such crime or in immediate flight therefrom, he, or another participant, causes the death of a person other than one of the participants: except that in any prosecution under this subdivision (1)(c) in which the defendant was not the only participant in the underlying crime, if established by the defendant by a preponderance of the evidence, it is a defense that the defendant:

*1298 (i) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and
(ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and
(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and
(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.
(2) Murder in the first degree is a class A felony.
9A.48.020. Arson in the first degree.
(1) A person is guilty of arson in the first degree if he knowingly and maliciously:

(a) Causes a fire or explosion which is manifestly dangerous to any human life, including firemen; or
(b) Causes a fire or explosion which damages a dwelling; or
(c) Causes a fire or explosion in any building in which there shall be at the time a human being who is not a participant in the crime; or
(d) Causes a fire or explosion on property valued at ten thousand dollars or more with intent to collect insurance proceeds.
(2) Arson in the first degree is a class A felony.

9A.20.021. Maximum sentences for crimes committed July 1, 1984, and after
(1) Felony. No person convicted of a classified felony shall be punished by confinement or fine exceeding the following:
(a) For a Class A felony, by confinement in a state correctional institution for a term of life imprisonment, or by a fine in an amount fixed by the court of fifty thousand dollars, or by both such confinement and fine;

(b) For a class B felony, by confinement in a state correctional institution or a term of ten years, or by a fine in an amount fixed by the court of twenty thousand dollars, or by such confinement and fine;
(c) For a class C felony, by confinement in a state correctional institution for five years, or by a fine in an amount fixed by the court of ten thousand dollars, or by both such confinement and fine.
(2) Gross misdemeanor. Every person convicted of a gross misdemeanor defined in Title 9A RCW shall be punished by the imprisonment in the county jail for a maximum term fixed by the court of not more than one year, or by a fine in an amount fixed by the court of not more than five thousand dollars, or by both such imprisonment and fine.
(3) Misdemeanor. Every person convicted of a misdemeanor defined in Title 9A RCW shall be punished by imprisonment in the county jail for a maximum term fixed by the court of not more than ninety days, or by a fine in an amount fixed by the court of not more than one thousand dollars, or by both such imprisonment and fine.
(4) This section applies to only those crimes committed on or after July 1, 1984.
6. Violations of these statutes are felonies under Washington state law. These statutes were the duly enacted laws of the State of Washington at the time the offenses were committed, at the time the Informations were filed, and are now in full force.
7. The Statute of Limitations on prosecuting these offenses is Revised Code of Washington 9A.04.080 which states as follows:
Prosecutions for the offenses of murder, and arson where death ensues, may be commenced at any period after the commission of the offense, for offenses the punishment of which may be imprisonment in a state correctional institution, committed by any public officer in connection with the duties of his office or *1299 constituting a breach of his public duty or a violation of his oath of office, and arson where death does not ensue, within ten years after their commission; for violations of RCW 9A.44.070, 9A.44.100(1)(b), within seven years after their commission; for violation of RCW 9A.82.060 or 9A.82.080, within seven years after their commission; for bigamy, within three years of the time specified in RCW 9A.64.010; for all other offenses the punishment of which may be imprisonment in the state correctional institution, within three years after their commission; two years for gross misdemeanors, and for all other offenses, within one year after their commission: Provided, That any length of time during which the party charged was not usually and publicly resident within this state shall not be reckoned within the one, two, three, five, seven, and ten years respectively: And further provided, That where an indictment has been found, or complaint or an information filed, within the time limited for the commencement of a criminal action, if the indictment, complaint or information be set aside.
8. I have reviewed the facts of these offenses and attest that the allegations in the offenses are not time barred.
9. The Information charges that the defendant Martin Pang, together with another, in King County, Washington on or about January 5, 1995, while committing or attempting to commit the crime of Arson in the First Degree, and in the course of and in furtherance of said crime and in immediate flight therefrom, did cause the deaths of Lieutenant Walter Kilgore, Lieutenant Gregory A. Shoemaker, Firefighter James T. Brown, and Firefighter Randall R. Terlicker.
10. According to the Certification for Determination of Probable Cause filed in this case the Seattle Fire Department responded to a fire on January 5, 1995, at the Mary Pang Products warehouse in Seattle, King County, Washington. While attempting to extinguish the fire, several firefighters entered the first floor of the engulfed warehouse. Without warning, the floor collapsed, dropping the firefighters to the sub-basement. Some of the firefighters were able to escape the buildingfour were not. Lieutenant Walter D. Kilgore, Lieutenant Gregory A. Shoemaker, Firefighter James T. Brown, and Firefighter Randall R. Terlicker died in the fire. The King County Medical Examiner has determined that Lieutenant Shoemaker died from smoke inhalation, and the other three died from suffocation.
On December 13, 1994, Special Agent Sheryl Bishop of the United States Bureau of Alcohol, Tobacco and Firearms ("ATF") was contacted by a citizen/witness who told her that Mary Pang's business, located in the warehouse, was in decline, and that the warehouse was to be "torched" sometime between December 16, 1994 and December 18, 1994.
On December 14, 1994, [Agent] Bishop met with another witness who stated that on several occasions in the month prior to December 14, 1994, the defendant told the witness that the warehouse was going to burn down and advised the witness to get personal items out of the warehouse. On other occasions during the month, the defendant told the witness how the warehouse would be burned down. His scenarios of how it would happen, which the witness diagrammed for [Agent] Bishop, almost exactly described how the fire actually occurred.
On another occasion, in the month prior to the fire, the defendant spoke with yet another witness and cryptically suggested the witness remove personal items from the warehouse. That witness also helped the defendant remove the defendant's personal items from the warehouse and transport them to storage lockers that he had rented on November 11, 1994.
On January 21, 1995, a search warrant was served on the defendant's storage lockers. Inside the lockers, investigators found many personal items belonging to the defendant, including photographs, trophies and awards, family mementos, and financial records. The investigators, based on their training and experience, indicate that persons who intend to burn down *1300 their homes or businesses often remove items which cannot be replaced, such as photographs and personal momentos.
In December 1994, the defendant took a close friend and confidant to the warehouse. The defendant told the witness that the business (Mary Pang's Food Products, Inc.) had lost major clients and was not doing well. He complained that his parents were old and feeble, yet would not sell the business. He went on to tell the witness that the warehouse would burn down in the next month, and that it would look like transients set the fire.
Yet another witness and the defendant have been friends for about six years. During the summer of 1994, the defendant told the witness that he would like to have the business burn, and that it would go up like a tinderbox. The defendant also said that he thought about doing it. The defendant also indicated to the witness that if the business burned down "it would kill my parents."
On numerous other occasions over the last six years, the defendant has told friends of his that the warehouse would be burned down. These friends have detailed the defendant's statements in their statements given to investigators. Several witnesses have given detailed, independent statements that the defendant asked them to burn the Mary Pang warehouse, as recently as last year.
During conversations with witnesses immediately after the fire, the defendant told them how a person he described as a transient must have lighted the fire in the warehouse. The defendant's description of how the fire must have been lighted describes how the fire actually occurred and was made prior to the expert's determination that the fire had been deliberately set.
After the fire, the defendant told a witness his scenarios of how the fire must have been lighted. The witness then gave the information to homicide investigators. The fire investigators assigned to identify the cause of the fire had just begun sifting the remains of the business. They did not reach, or announce, their conclusions as to how the fire started until several days after the defendant described his scenarios of how the fire must have been lighted. The fire investigators were not told by homicide investigators about the scenarios that the defendant described to the witness.
The day after the fire a different witness had a conversation with the defendant in which the defendant asked the witness if a transient had started the fire at the warehouse would it be considered homicide? The defendant also attempted to throw suspicions on his ex-wife Rise Pang and her current husband, Joseph. The witness noticed throughout their conversation that the defendant appeared very nervous and worried about criminal charges.
The defendant later telephoned this witness and said that he had been "framed" for the fire and was going to take a "long vacation". The defendant began crying, and told the witness that he (defendant) would never see his friends again. The defendant continued to claim that he had been set up by Joseph, and then said to the witness, in a very strained voice, "Nobody was supposed to get hurt, the building was just supposed to burn down."
The day after the fire, the ATF National Response Team, in conjunction with the Seattle Fire Department's Fire Investigation Unit, began investigating what caused the warehouse fire. The ATF National Response Team is composed of ATF agents who are Certified Fire Investigators. They have become Certified Fire Investigators by completing hundreds of hours of training in determining the cause and origin of fires. Each Certified Fire Investigator has personally investigated, in order to determine the cause and origin of fires, over one hundred fire scenes.
Based upon the investigators' examination of the warehouse fire scene, including burn patterns, liquids and physical evidence, it has been determined that this fire was deliberately set.
The investigators also learned that the arsonist(s) entered the basement area either by using a key or entering a code into the alarm keypad. Firefighters who were first on the scene found that all exteriors *1301 [sic] doors not secured by the keypad were locked.
Once inside the pallets area where the fire was set, the investigators found that the interior door leads to an exterior door which also does not have a keypad. This interior door's padlock had been pried off, as if to look like the fire-setter had entered the pallet area through the un-alarmed doors. Additionally, a gasoline can which did not belong to the warehouse was found in the room between these two doors. However, a closer examination showed that the pry marks on the interior door were made from the inside, not the outside, as someone gaining entry through un-alarmed doors from the outside would do. And, as stated above, this mirrors the defendant's statements to witnesses about how a transient was responsible for the fire that burned the warehouse.
In addition, the investigators found that the person who lit this fire worked rapidly. The last person to leave the warehouse basement reports leaving at approximately 6:30 p.m. He saw nothing to indicate a fire. A witness whose band rented space in the warehouse basement, entered the basement shortly before 7:00 p.m. and saw thick smoke. He removed some items from his space, then ran to a telephone booth to call 911. When fire units arrived shortly thereafter, the basement area was fully engulfed in flames. The investigators estimate, based on training and experience, that it took approximately twenty minutes from the time this fire was lit to the time the basement was fully engulfed. This indicates that the arsonist was probably familiar with the warehouse and the occupants' schedules.
The investigators have interviewed dozens of defendant's friends and business associates. Through these interviews the investigators have learned that the defendant has, for the most part, been supported by his parents. Other than a time spent working for his parent's business, the defendant has been frequently unemployed. His parents paid for defendant's short-lived auto racing career, and were helping support him while he pursued an acting career. They gave him gifts of money on all major holidays, paid for his cars; paid for his house and made his child support payments. The defendant had access to, and used checks and credit cards belonging to the business.
Additionally, as described above, the once-successful business, in the last several years, had been failing. Several major accounts, such as Safeway Stores, had been lost. Suppliers indicate that checks written on company accounts, some for as little as $150 would bounce. When that happened the suppliers would have to contact the defendant's parents, who would provide a personal check to cover the amounts owed. The defendant repeatedly expressed to friends and associates his frustration with both the business's decline as well as his parents' continual refusal to sell it or relinquish control to him. The defendant's parents have two children, the defendant and his sister Marlys. Marlys is estranged from the family and has not spoken with them for many years. Harry and Mary Pang, both in their 70's, have no life insurance, their policy having recently lapsed. However, the business, although failing, was well insured. Additionally, the defendant had expressed to various friends over years his plans to use the warehouse property, valued at over $400,000 for his own business.
According to statements made by the defendant to numerous witnesses, he fled the state to avoid prosecution in this matter. One witness has given a statement that the defendant was researching countries without extradition treaties with the United States.
11. On March 3, 1995, the defendant was charged in the above King County Superior Court cause with the crimes of Murder in the First Degree, Counts I, II, III, and IV, and a warrant was issued for his arrest setting bail in the amount of $5,000,000.00. Martin Pang is identified as an Asian male; Date of Birth: November 12, 1955; Place of Birth: Hong Kong; Citizenship: United States citizen; Height: 6'0"; Weight 175 lbs [sic]; Black hair; Brown eyes; Scar below his throat.

*1302 12. On March 16, 1995, the defendant was arrested in Rio de Janeiro, Brazil, and is currently being held in that jurisdiction pending extradition proceedings. On March 17, 1995, an Amended Information was filed in the above cause adding an additional charge of Arson in the First Degree, Count V.
13. The defendant fled the United States to avoid prosecution and was arrested by Brazilian authorities in Rio De [sic] Janeiro on March 16, 1995. Two agents from the United States Federal Bureau of Investigation accompanied Brazilian authorities during the arrest. The defendant immediately initiated conversation with Special Agent Schoenlein enroute to the Brazilian police station. Agent Schoenlein answered questions the defendant had about extradition and the defendant then initiated conversation about the arson of Mary Pang's in Seattle. Agent Schoenlein advised the defendant that they could discuss those matters later at the police station if the defendant chose to do so. Agent Schoenlein also advised the defendant of his Miranda rights. The defendant told Agent Schoenlein that he wanted to waive his Miranda rights to tell his "side of the story".
14. At the police station the defendant once again indicated his desire to speak with Agents Schoenlein and Burroughs and he signed a form that listed and waived his Miranda rights. After conversation in which the defendant attempted unsuccessfully to convince Agents Schoenlein and Burroughs he had nothing to do with the arson the defendant was advised by the agents to tell the truth. At that point the defendant admitted starting the fire on January 5, 1995 at the Mary Pang business. The defendant gave a four page statement describing his actions which was written for him by Agent Schoenlein. The defendant read and initialed each page of the handwritten statement and signed the statement.
15. I have attached a true copy of the Information and Certification for Determination of Probable Cause in the case of State of Washington vs. Martin Shaw Pang, King County Superior Court Cause Number XX-X-XXXXX-X as Exhibit 1. I have also attached a true copy of the Motion and Order Determining the Existence of Probable Cause, Directing Issuance of Warrant and Fixing Bail as Exhibit 2. The Deputy Clerk of the King County Superior Court Clerk's Office is able to make this certification because he is an officer of the King County Superior Court and the original document is maintained in a file in the King County Superior Court Clerk's Office.
16. I have also attached a true copy of the Arrest Warrant and this is attached as Exhibit 3. In this jurisdiction it is the practice that the Clerk of the Superior Court issues the arrest warrant following the filing of the court's order to issue the warrant (refer to above Exhibit 2). The Chief of the Seattle Police Department is able to make this certification of the arrest warrant as his department maintains records of unserved [sic] arrest warrants in Seattle.
17. I have also attached a true copy of the Motion, Certification and Order Permitting Filing of an Amended Information as Exhibit 4.
18. I have also attached a true copy of the Amended Information as Exhibit 5.
19. I have also attached to this affidavit the statements of the following witnesses:
Affidavit of Kim Kirkendall, Exhibit 6;
Affidavit of Kevin C. Hook, Exhibit 7;
Affidavit of Richard D. Binzer, Exhibit 8;
Affidavit of Paul H. Bentley, Exhibit 9;
Affidavit of Wayne E. McFall, Exhibit 10;
Affidavit of Karlyn Byham, Exhibit 11;
Affidavit of Robert S. King, Exhibit 12;
Affidavit of Cleave Odegard, Exhibit 13;
Affidavit of Marjorie G. Newman, Exhibit 14;
Affidavit of Rise Pang, Exhibit 15;
Affidavit of Charles T. Graves, Exhibit 16;
Affidavit of Richard C. Harruff, Exhibit 17;
Affidavit of Terri Haddix, Exhibit 18;

*1303 Affidavit of Michael J. Shannon, Exhibit 19;
Affidavit of Gary D. Schoenlein, Exhibit 20;
20. The above affidavits, Exhibit 6 through 20, were signed and sworn before a Notary Public who is authorized to administer an oath. I have thoroughly reviewed these statements and the attachments to them, and attest that the evidence indicates that Martin Pang is guilty of the offenses charged in the Amended Information.
[s] Marilyn B. Brenneman
MARILYN B. BRENNEMAN
Senior Deputy Prosecuting Attorney
SUBSCRIBED and SWORN to before me this 6th day of April, 1995.
[s] Brian D. Gain
BRIAN D. GAIN
SUPERIOR COURT JUDGE
KING COUNTY SUPERIOR COURT
I, NORM MALENG, Prosecuting Attorney for King County, Washington, do hereby certify that Marilyn B. Brenneman is a duly appointed Senior Deputy Prosecuting Attorney for King County, Washington.
SIGNED this 6th day of April, 1995. [Seal.]
[s] Norm Maleng
NORM MALENG
King County Prosecuting Attorney[[8]]
This affidavit was amended by a Supplemental Affidavit in Support of Request for Extradition on July 21, 1995. It states:
STATE OF WASHINGTON
COUNTY OF KING
I, TIMOTHY A. BRADSHAW, being duly sworn, do hereby depose and say:
1. I am a citizen of the United States and a resident of the State of Washington.
2. I have been engaged in the practice of law in the State of Washington since 1986.
3. Since September 01, 1988 I have been employed by the King County Prosecuting Attorney's Office as a Deputy Prosecuting Attorney. I was appointed Senior Deputy Prosecuting Attorney on January 01, 1994. My duties are to prosecute persons charged with criminal violations of the State of Washington. In the course of such prosecutions, I have become knowledgeable about the state criminal statutes and case law, including those related to the crime of Murder in the First Degree and Arson in the First Degree, and have prosecuted both Murder and Arson cases.
4. My co-counsel, Marilyn Brenneman, and I are responsible for prosecuting the case of State of Washington vs. Martin Shaw Pang, King County Superior Court Cause Number XX-X-XXXXX-X. I am wholly familiar with the evidence and charges in this case filed by Ms. Brenneman and myself [sic], and with the contents of the relevant files of the King County Superior Court and the Office of the King County Prosecuting Attorney. I am additionally familiar with all previous submissions, affidavits, statutes, and exhibits filed by Marilyn Brenneman in support of our request for extradition,
5. Co-counsel Brenneman is currently out of the State of Washington attending her father's funeral and family duties.
6. On April 6, 1995, my co-counsel, Marilyn Brenneman, signed an affidavit in support of request for extradition of Martin Shaw Pang to stand trial for four counts of Murder in the first degree and one count of Arson in the first degree.
7. It is my understanding that the certification of the statute has been challenged by the defense and that minor amendments made to the murder statute in 1990 were omitted. The omissions do not bear directly on the specific charges against Martin Shaw Pang. However, although these statutes were duly certified and authenticated in the body of the prior affidavit in support of the request for extradition, I am providing this supplemental affidavit to provide the court with a true and correct copy of current statutory language for Murder in the first degree, pursuant to Article IX, item 2, of the United States/Brazil extradition treaty. The text *1304 of all applicable statutes/legislation, the text of the appropriate statute of limitations, and the applicable penalties are attached as Supplemental Exhibit A, which I have also signed and dated.
8. I know of no other pertinent omissions, clerical or otherwise, in the affidavits and information previously provided in support of extradition of Martin Shaw Pang.
[s] Timothy A. Bradshaw
TIMOTHY A. BRADSHAW
Senior Deputy Prosecuting Attorney
SUBSCRIBED and SWORN to before me
this 21st day of July, 1995.
[s] G. T. Mattson
GEORGE T. MATTSON,
Superior Court Judge
King County Superior Court
State of Washington
United States[[9]]
On December 18, 1995, the Federal Supreme Court of Brazil granted extradition on the single count of arson in the first degree, but not on the four counts of murder in the first degree.[10] A summary provided by the Federal Supreme Court states:
Summary.
1. Extradition.
2. U.S. citizen charged, by the Superior Court of King County, Seattle, Washington, U.S.A., as the perpetrator of four acts of murder in the first degree "by committing and attempting to commit the crime of arson in the first degree and in the course of and in furtherance of such crime, as well as in immediate flight therefrom." A charge was later added, accusing the person being sought of arson in the first degree as well, a class A felony.
3. Inasmuch as the acts are covered under two distinct offenses, the majority of the Court decided, for purposes of the extradition, that the case is one of arson in the first degree under the law of the requesting State, corresponding in the Brazilian Penal Code to the crime of arson defined in Article 250, combined with its Paragraph 1, Section I, and with Article 258 of that same Code because of the resulting death of four persons.

4. Consequently, the decision by the majority of the Court did not hold that the situation as described was one of arson in the first degree, plus four separate first-degree murders.

5. Therefore, the Court, by majority vote, granted the requested extradition in part, for the crime of arson in the first degree, resulting in four deaths and the consequences thereof under U.S. law. However, the Court did so without the additional charge of four counts of first-degree murder.

6. The minority of the Court, as expressed in the opinion of the Rapporteur, granted the extradition under the terms of the petition by the Requesting State, so that the person being sought may be tried and judged according to the charge and addendum, under U.S. law. It did not stipulate any reservation.
7. Lastly, the decision of the Court did not include any restriction as to the possibility of life imprisonment.

DECISION
The case files having been reviewed and the case stated and discussed, the Justices of the Federal Supreme Court, meeting in plenary session and acting by majority vote in accordance with the minutes of the judgment and the transcript thereof, grants the extradition in part, on the grounds that the charges of arson in the first degree and murder in the first degree, as described in the extradition request, correspond in Brazil to the single crime that is defined in the main part of Article 250 and in Article 258 of the Brazilian Penal Code. Therefore, they exclude from the grant of extradition the charges of *1305 murder in the first degree. Also by majority vote, the Court decided to reject the need to condition surrender of the person sought on a pledge to commute life imprisonment to a maximum of 30 years imprisonment.
Brasília, December 18, 1995
[Signatures]
Sepúlveda Pertence, Chief Justice
Néri da Silveira, Rapporteur[[11]]
The United States through its Embassy on February 22, 1996 requested written authorization from the Brazilian Ministry of Foreign Affairs to prosecute Petitioner Pang "in accordance with the revised code of Washington, Title 9A, Sections 48.020 and 32.030(1)(c), which provide for punishment of an individual who commits arson, and in the course of that crime, causes the death of a person who was not a participant in the crime."[12] The letter, which mentioned "arson," but did not mention "murder," stated:
The Government of the United States respectfully requests that, pursuant to Article XXI of the Extradition Treaty between Brazil and the United States of America, done at Rio de Janeiro on January 13, 1961, or any other legal basis, the Government of the Federal Republic of Brazil provide written authorization, to the United States to prosecute MARTIN SHAW PANG in accordance with the revised code of Washington, Title 9A, Sections 48.020 and 32.030(1)(C), which provide for the punishment of an individual who commits arson, and in the course of that crime, causes the death of a person who was not a participant in the crime. As recognized by the Brazilian Supreme Court, these provisions of the Revised Code of Washington criminalize the same conduct as described in Sections 250 and 258 of the Brazilian Penal Code.[[13]]
By letter of February 27, 1996 the Brazil Ministry of Foreign Affairs denied the request, indicating it did not have jurisdiction to interfere with the extradition order of the Federal Supreme Court of Brazil.[14] After reiterating a portion of the ruling of the Federal Supreme Court, the letter read:
The Ministry of Foreign Affairs points out to the Embassy of the United States of America that, pursuant to the provisions of the Federal Constitution on the separation of powers in the government, the Executive Branch does not have jurisdiction to interpret or establish limits regarding the scope of the decision handed down by the Judicial Branch, which has exclusive jurisdiction with respect to any interpretation of judicial acts.[[15]]
On February 28, 1996, Petitioner Martin Shaw Pang was surrendered by Brazil into custody of United States of America authorities. He was immediately returned to the United States and the State of Washington.[16]
The United States appealed to the Federal Supreme Court of Brazil seeking clarification of the extradition order.[17] The appeal states in its Summary:
By granting extradition only on the basis of the Washington arson statute, the Brazilian Supreme Court's decision in the case of Martin Shaw Pang would have the unfortunate effect of preventing United States authorities from prosecuting Mr. Pang for the consequences of the arson; namely, the resulting deaths. The arson statute in the State of Washington is equivalent only to Article 250 (simple arson) of the Brazil Penal code; it penalizes only the arson itself, but not the resulting deaths. As such, the Washington arson *1306 does not punish the crime in the same way that Article 258 (aggravated arson) of the Brazilian Penal Code would. Rather in the State of Washington, the only law that truly corresponds to Article 258, by taking into proper consideration the deaths of the four firefighters, is the "felony murder" law (which, although codified within the first degree homicide statute, is different from the other first degree homicides because it does not require premeditated intent to kill). Accordingly, the approval of extradition only for arson would be equivalent to granting extradition only for the offense punished under Article 250, but not the offense punished under Article 258.
Such limitation would be significant because of the potentially minimal sentence [Mr.] Pang could receive if prosecuted only under Washington arson statute. Although the crime of arson theoretically carries a punishment of life in prison, because of the existence of mandatory sentencing guidelines under Washington State law, the presumptive sentence for [Mr.] Pang would be only 21 to 27 months in prison. Such a penalty for a crime in which four men lost their lives would be grossly unfair and disproportionate to the gravity of the offense. It is for this reason that the Government of the United States and the people of the State of Washington are so concerned about the way in which the Court's decision is framed. It would be extremely unfortunate if a merely technical difference in our respective legal systems were to result in a severe injustice. The United States therefore respectfully requests that the Court clarify its ruling, so as to permit the prosecution of Pang for the two Washington State offensesarson and felony murderthat most closely correspond to Article 250 and 258 of the Brazilian Penal Code.[[18]]
On March 27, 1996, the Federal Supreme Court rejected the appeal, holding that its extradition order unambiguously excluded the charges of murder in the first degree from the grant of extradition.[19] The court stated:
SUMMARY. [1.] Extradition. Appeal for clarification.
2. U.S. citizen charged, in the State of Washington, U.S.A., with the crime of arson in the first degree and with four acts of murder in the first degree, the victims being firefighters who assisted in fighting the fire.
3. By majority of votes, this Court, inasmuch as the acts are covered under two distinct offenses, decided that the case is one of arson in the first degree under the law of the requesting State, corresponding in the Brazilian Penal Code to the crime of arson as defined in Article 250, combined with its Paragraph 2, Section I, and with Article 258 of that same Code because of the resulting death of four persons.
4. Appeal for clarification by the requesting State arguing the existence of contradictions and obscurities in the decision.
5. It is alleged in the appeal for clarification that the facts as set forth in the request for extradition describe a case of arson that resulted in the deaths of four firefighters; however, the definition of the offense adopted in the decision now being appealed does not encompass the resulting deaths, only the threat against the life of any person or firefighter. [The decision held that] the crime of arson in the first degree, according to the Revised Code of Washington, is equivalent solely to the crime of arson in Article 250 of the Brazilian Penal Code and does not include the hypothesis found in Article 258 of said Code. The appeal for clarification further argues that the crime of arson in the first degree and the crime of murder in the first degree (termed "felony murder") are considered by the Revised Code of Washington as being independent criminal offenses and that the latter is equivalent to the crime described in Article 258 of the Brazilian Penal Code. It is also alleged in the *1307 appeal that if the terms of the decision now being appealed were upheld, the requesting State would be unable to prosecute and try the person whose extradition is being sought for the deaths resulting from the fire.
6. Regulatory and procedural limits on appeals for clarification according to Federal Supreme Court case law. Appeals for clarification must not infringe upon the judgment. The greater degree of flexibility that is allowed them, as an exception in cases of obvious material error or manifest nullity of the decision, does not justify their inappropriate use to challenge the correctness of a judgment on the merits and to achieve its modification.
7. The absence of any doubt or obscurity as regards the denial of the extradition with respect to the charges of the four crimes of murder in the first degree is demonstrated in the terms of the decision, which did not consider the facts, as described in the request, as characterizing independent crimes of arson in the first degree and murder in the first degree. The extradition was granted without any restrictions as to the possibility of life imprisonment; but only on the crime of first-degree arson with the results it produced (four deaths) and all the consequences thereof pursuant to United States law without, however, the added charge of four counts of murder in the first degree.

8. Nor is there any contradiction in the decision under appeal. The contradiction would have to have arisen unexpectedly among the parts of the judgment itself, in the logical composition thereof. The position of the majority of the Court, reflected in the decision, did not acknowledge the occurrence, in the case at hand, of independent crimes but only the crime of arson in the first degree with its results and consequences (four deaths) according to U.S. law. It should be noted, furthermore, that Article 258 of the Brazilian Penal Code does not define an independent crime other than the one described in Article 250 thereof. Only the results described therein (physical injury or death) were considered by the legislator [sic] to serve as qualifying circumstances in crimes of common peril, including arson, aggravating the penalty.
9. Likewise there is no mistake or obvious error in the decision now being appealed. The decision resulted from a thorough discussion by the members of this Court that took the facts and their legal context into account.

10. The Federal Supreme Court is not insensitive to the serious concerns expressed in the appeal for clarification as regards potential restrictions on the amount of the penalty that could be imposed in the requesting State on the person whose extradition is sought, by virtue of the limits established in the granting of the request on a partial basis only. However, it is not appropriate in a decision on extradition to give primary consideration in the requested State to the aspect of the cases involving the amount of the penalty that the requesting State may, under its legislation, impose on the person being sought, unless there is a specific restriction in the requested State, as in Brazil with the rejection of the death penalty.
11. Apart from that reservation, given the limited scope of the appeal for clarification, it is not possible in the appeal to evaluate the merits of the controversy regarding the penalties which the requesting State might, by application of its domestic laws, impose on the person whose extradition is being sought. This position is not ascribable to a lack of interest on the part of the Court as regards the need for cooperation on the international level between the governments of different countries for purposes of combating crime. Rather, it results from the legal impossibility, under Brazilian procedural law, to reconsider a matter already discussed in the court record of the judgment on the extradition.

12. Appeal for clarification rejected.

DECISION
The case files having been reviewed and the case stated and discussed, the Justices of the Federal Supreme Court, meeting in plenary session and in accordance with the minutes of the judgment and the transcript *1308 thereof, unanimously agree to deny the appeal.
Brasília, March 27, 1996
[Signatures]
Sepúlveda Pertence, Chief Justice
Néri da Silveira, Rapporteur[[20]]
The King County Prosecuting Attorney issued a statement on February 29, 1996 asserting the opinion of the Federal Supreme Court of Brazil is ambiguous, but, at the same time, acknowledging that the Court declined to reconsider or to "clarify" its opinion. The statement, contrary to the record, also asserts certain promises or agreements by Brazilian officials to waive objection to prosecution of Petitioner Pang for murder in the first degree. The statement reads:
Statement of King County Prosecuting Attorney Norm Maleng on the Return of Martin Pang:
At this very moment, Martin Pang is airbornehe is on the final leg of his trip back to Seattle, where he will stand trial for the crime that killed four firefighters.
As of today, the opinion from the Brazilian Supreme Court does not clearly authorize the prosecution of Martin Pang for felony murder. The opinion must be clarified before we proceed.
Our fight to clarify this decision continues on two fronts:
First, the State Department will file tomorrow a motion asking the Brazilian Supreme Court to reconsider and clarify its ruling;
Second, Secretary of State Warren Christopher, who arrives in Brazil tomorrow, will personally ask the Brazilian government to extradite Martin Pang without restriction.
Let me outline some recent events in the case:
* Attorney General Janet Reno called her counterpart in Brazil, Justice Minister Nelson Jobiem [sic], two weeks ago. Minister Jobiem [sic] assured the United States that his government would grant our request for extradition of Martin Pang without restrictions;

* Last month a delegation from the United States, led by Ambassador Lavitsky [sic:] [Levitsky], met with the Brazilian Minister of Justice and reached agreement in principle that Brazil would waive any objections to the full prosecution of Martin Pang under Washington law;

The U.S. delegation worked together with Brazilian officials to draft the promised waiver and diplomatic note.
Our delegation left Brazil with the assurance that Pang would be extradited with no restrictions.
* Despite these assurances, we have been waiting for action on the waiver;
* Last Friday, the Brazilian Supreme Court issued its written opinion on the case. The court's opinion is ambiguous.

Some portions of the summary opinion seem to limit the prosecution to a single count of arson, yet other portions of the summary opinion seem to defer to the consequences under American law for an arson that results in death, making the summary ambiguous and in need of clarification.
That is why the United States will file a motion for reconsideration tomorrow.
* On Monday, the United States Department of State transmitted an official diplomatic note to the government of Brazil, requesting a specific waiver under the extradition treaty, lifting all restrictions.
* On Tuesday of this week, the Brazilian government responded, officially denying the request from the United States.

We have not yet succeeded in our goal to have Martin Pang tried for felony murder.
I say today what I said two months ago:
This is unjust and unfair.
We have not given up the fight.
Two avenues remain to try and turn this result around:
* First, the United States will file a motion for reconsideration tomorrow, urging the Supreme Court of Brazil to reconsider and clarify their opinion.
* Second, Secretary of State Warren Christopher arrives in Brazil on Friday for *1309 a series of meetings with Brazilian officials. The Pang case is on his agenda.
He will express the strong disappointment of the United States government and ask that the Executive branch grant the waiver requested by the United States allowing unrestricted prosecution.
Martin Pang is returning today because we are nearing the end of the 60 day period for his return as required under the treaty.
We have not given up on either the diplomatic or legal avenues to correct this injustice.
Arraignment will be scheduled within two weeks from today.[[21]]
On April 5, 1996 the King County Prosecuting Attorney filed in the King County Superior Court the Affidavit of Timothy A. Bradshaw in Support of the State's Response to Motion to Dismiss which states:
STATE OF WASHINGTON COUNTY OF KING
I, TIMOTHY A. BRADSHAW, Senior Deputy Prosecuting Attorney for King County, hereby declares and says:
1. I am familiar with the facts in this matter. As one of the two Senior Prosecutors assigned to this case, I have been in routine contact with the United States attorneys assigned to this extradition matter of Martin Shaw Pang. I have also been advised about the actions of the United States government pertinent to the extradition of the defendant.
2. As a member of the United States delegation to Brazil, I obtained direct knowledge of Brazilian Jurisprudence and extradition procedures applicable to the Pang case. The delegation was comprised of United States Ambassador [Melvyn] Levitski [sic:] [Levitsky], U.S. Justice Department Attorneys Gregory Stevens and Thomas Snow, U.S. State Department Legal Advisor Paulo Di Rosa, and myself.
3. On January 23, 1996, the delegation met personally with the Brazilian Minister of Justice, Nelson Jobim. In that meeting, the Minister stated his position, as a representative of the Executive, on the Pang extradition, and requested (and received) my personal assurance that [Mr.] Pang would be taken from his country by March 01, 1996.

4. Justice Minister Jobim stated that Brazil has no objection to our prosecution of [Mr.] Pang on the charges of Murder and Arson. Additionally, the Minister told me that "if I were you, I would prosecute on MurderThe United States system must decide."

5. The United States appealed the decision of the Brazilian Court, published February 23, 1996. The Request For Declaration [sic:] [Clarification] (Embargo Declaracao [sic]) was filed March 01, 1996 with the Supreme Court of Brazil, sitting in Brasilia, according to Mr. Di Rosa, Mr. Steven, and the U.S. Embassy in Brazil.
6. I personally spoke with the Deputy Secretary of Justice for Brazil on February 29, 1996. The Secretary [of] Justice advised me, yet again, that Brazil does not object to the Murder charges.

7. Also on February 29, 1996, the day the defendant was returned to the United States, a local TV station caught up with Minister Jobim at the University of Texas Law Center. [Justice Minister] Jobim stated for the news camera that "[Mr.] Pang's extradition was granted, he has been returned, and he is now subject to American Law."

8. On March 27, 1996, The Brazilian Supreme court ruled on the Embargo de Declaracao. The Court voted unanimously to deny the request for clarification. The American Embassy of Brazil has informed us of the following specifics. The Court ruled that its original decision required no clarification. Several Justices noted that the decision was procedurally dictated; that is, the Court could not now address the merits of the case, just the technical issue of clarification. Several Justices also expressed regret if the Court's decision is held to prevent [Mr.] Pang's prosecution for the consequences of his criminal actions.

*1310 Justice Neri [sic] Da Silveira, the Rapporteur for the Pang case, requested the opinion of the Prosecutor-General Geraldo Brindeiro at the open-court session. [Mr.] Brindeiro responded that [Mr.] Pang should be extradited without any restriction for the most comparable and appropriate charges: Felony Murder. Justice Silveira then explained the procedural limitations of the current appeal to matters of clarificationrather than reconsideration of the original judgmentand that a contradiction does not appear. [Justice] Silveira maintained, without contradiction from the other nine Justices, that the Brazilian Court's decision does not prevent Washington State from trying [Mr.] Pang for the consequences of his alleged crime, the deaths of four firefighters.
In the same proceeding, Justice Resek [sic] spoke at some length. [Justice] Resek [sic] noted that the appeal contained excellent arguments which he would have used were he Washington State's lawyer. Justice Resek [sic] noted a "grave incongruence" between what the Court had intended, and what would apparently happen as a result of the Court's decision. Four firefighters had died in Seattle, he said, and their deaths must be taken into consideration in [Mr.] Pang's trial. [Justice] Resek [sic] then expressed great concern about the presumed leniency of [Mr.] Pang's sentence should he be convicted only of Arson in the First Degree; he noted that the presumed Brazilian sentence for the same criminal conduct is far greater that [sic] Washington State's. [Justice] Resek ended by declaring that he has now decided to advocate for revamping the entire extradition process in Brazil.
9. While the Court has not provided its written opinion, A [sic] complete transcription of the court proceedings is expected after April 16, 1996.
10. I am informed by the Justice and State Departments that diplomatic efforts are continuing in an effort to obtain the written consent of the Brazilian executive branch to try the defendant for the charges he was arraigned on, pursuant to the Brazil/United States Treaty.
I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge.
DATED this 05th day of April, 1996.
[s] Timothy A. Bradshaw
TIMOTHY A. BRADSHAW
WSBA No. 17983[[22]]
The affidavit and its content was referred to in at least four documents submitted to the trial court by the King County Prosecuting Attorney.[23] However, on November *1311 12, 1996, the State withdrew the affidavit from the Court's consideration, stating that because the "United States, [sic] has been provided written authorization, a signed document from the Minister of Justice from Brazil, it's no longer necessary to attempt to prove a non-objection or acquiescence from verbal statements.... [W]e'd be happy to withdraw that affidavit from the Court's consideration on the motion today."[24] Even though this affidavit was previously withdrawn, it was submitted to the Supreme Court as a supporting document on January 8, 1997.[25]
The Honorable William J. Clinton, President of the United States of America, on May 21, 1996 wrote to the Honorable Fernando Henrique Cardoso, President of the United States of Brazil, seeking his "personal assistance" in overcoming the extradition ruling of the Federal Supreme Court of Brazil.[26] His letter stated the "Brazilian Supreme Court, based on technical differences in our laws, has twice issued decisions that permit Pang's prosecution on charges of arson but not of murder."[27] The letter then stated:
Such a limitation will prevent justice from being done in this case. Attorney General [Janet] Reno has worked closely with members of your Administration, but all avenues of judicial relief have been exhausted. Although some in your government interpret it more restrictively, our extradition treaty may be read to legally permit the Government of Brazil to agree to prosecution of [Mr.] Pang for all charges against him. Our respective legal experts have already prepared a mutually acceptable statement that would serve the purpose. Should you be unable to provide us with such a statement, as an alternative please consider providing a more limited written statement simply saying that your government would not object to [Mr.] Pang's prosecution on all charges.[28]
On September 26, 1996, Minister of State for Justice Nelson A. Jobim wrote to United States Attorney General Janet Reno stating:[[29]]
In response to the inquiry by the Department of Justice, I am writing to Your Excellency to discuss the extradition proceeding of U.S. citizen Martin Shaw Pang.
In Brazil, as in the United States of America, the concept of the separation of the three branches of the national government derives from the text of the Federal Constitution itself. Under this system, the Judicial Branch alone is responsible for interpreting any legal instrument in force in the country, including those derived from international agreements and treaties (Article 102(III)(b) of the Federal Constitution), which, once incorporated into the domestic legal system, are equivalent to federal statutes (Article 105(III)(a) of the Federal Constitution).
The exclusive jurisdiction of the Federal Supreme Court to process and rule on any extradition request by a foreign State derives, in turn, from Article 102(I)(g) of the Federal Constitution. Decisions granting or denying extraditions may not be appealed, and the Executive Branch may not limit or make comments of any kind regarding the content or scope of *1312 rulings handed down by that Court, which is the highest authority of an independent branch of government. Consequently, any interpretive statement the Executive Branch might make would be unenforceable.
As for your concern regarding possible limits on the requesting State's right to punish vis-à-vis the extradited defendant, it should be emphasized, on the basis of fundamental precepts of public international law, that legally binding international acts are the only legal instrument capable of binding two or more sovereign States together. Thus, provided that the terms of the Treaty of Extradition between Brazil and the United States of America of January 13, 1961, are respected, it will be incumbent upon the justice system of the United States of America to establish a suitable punishment for the crime of arson in the first degree, resulting in four deaths and the consequences thereof, under U.S. law. It goes without saying that the precise interpretation of this language, used by the Brazilian court in its decision, and the determination of how it might best be adapted to U.S. law, are for the justice system of your country to decide.

Very truly yours,
[Signature]
Nelson A. Jobim
Minister of State for Justice
On October 25, 1996, the King County Prosecuting Attorney filed a second amended information. Most significantly, it changed the wording of the charge of arson in the first degree in Count V of the amended information to include reference to subsection (d) of the arson statute and to add new assertions. It states:
I, Norm Maleng, Prosecuting Attorney for King County in the name and by the authority of the State of Washington, do accuse MARTIN S. PANG of the crime of Arson in the First Degree, committed as follows:
That the defendant MARTIN S. PANG in King County, Washington on or about January 5, 1995, did knowingly and maliciously and with intent to collect insurance proceeds cause a fire or explosion on property valued at ten thousand dollars located at 811 Seventy [sic] Avenue South, Seattle (the Mary Pang Warehouse), which was manifestly dangerous to human life, including firemen;

Contrary to RCW 9A.48.020(1)(a) and (d), and against the peace and dignity of the State of Washington.[[30]]
Other changes in the second amended information included the order of the counts. Count I was assigned to the charge of arson in the first degree and Counts II-V were assigned to the charges of murder in the first degree. There was also deletion of the phrase "together with another" in the charges of murder in the first degree, thus making Petitioner Pang solely responsible.
By letter of October 29, 1996, President Cardoso responded to President Clinton's letter of May 21, 1996, stating that in Brazil the executive branch could not alter the scope of the extradition decision of the Federal Supreme Court.[31] The letter stated:
Despite the personal interest I took in the issue, the consideration of the alternatives at hand clearly indicated that room for action by the Executive branch is very limited, since a decision has already been taken by the Supreme Court.
I have referred the case back to Minister of Justice Nelson Jobim, who recently wrote to Attorney General Janet Reno on the subject. I understand his letter provides the American government with a broad and clear picture of the Brazilian legal position on the issue.[[32]]
On November 12, 1996, the Honorable Larry A. Jordan, King County Superior Court, denied a motion by Petitioner Martin *1313 Shaw Pang to dismiss or sever the murder charges from the arson charge which Petitioner urged was required by the limitation in the extradition order issued by the Federal Supreme Court of Brazil and denial of the appeal by the United States of America for clarification. In rendering his decision, Judge Jordan stated "it appears to this Court reasonably clear that Brazil did not extradite for felony murder."[33] However, he held that because of Brazil's implicit waiver, Petitioner Pang lacked standing to assert a violation of Article XXI of the Treaty in his effort to limit his prosecution to arson in the first degree. In denying Petitioner Pang's motion, Judge Jordan stated in part:
Now, the response by Minister Jobim certainly is not an express agreement or express waiver as that term is used in law. However, his conduct and his words in my judgment, are an implicit waiver or a consent or assent by words or conduct. By not objecting and by communicating as he did in the last paragraph and last sentence, stating that the determination of how it best be adapted to U.S. law, it seems to this Court is tantamount to a waiver of the provision of Article XXI[[34]] of the Treaty.
I conclude and find that on this record, because of that implicit waiver that Mr. Pang lacks standing to assert a violation of Article XXI and he may be tried for all counts, including the four counts of murder, and that this Court has jurisdiction.[[35]]
The order denying Petitioner's motions, signed by Judge Jordan on January 13, 1997, reads in its entirety:
The court, having considered the filed motion, memoranda, exhibits and arguments by defense counsel, in support of the motion to dismiss, and by the State, in opposition to the motion to dismiss, and having conducted independent legal research, hereby enters the following finding and order:
The court has jurisdiction over the defendant on all counts in the Second Amended Information. The defendant's motion to dismiss Counts II-V of the Second Amended Information is denied for the reasons articulated in the court's oral ruling of November 12, 1996.
DONE IN OPEN COURT this 13 day of January, 1997.
[s] Larry A. Jordan
THE HONORABLE LARRY JORDAN
SUBMITTED BY:
Browne & Ressler
Attorneys for
Martin Shaw Pang
[s] John H. Browne
JOHN HENRY BROWNE
WSBA # 4667
[s] M. Timothy Dole
M. TIMOTHY DOLE
WSBA # 25372
COPY RECEIVED; AS TO FORM:
Deputy Prosecuting Attorneys
for King County
[no signature]
TIMOTHY A. BRADSHAW
WSBA # 17983
[no signature]
MARILYN B. BRENNEMAN
WSBA # 10700
[no signature]
STEPHEN P. HOBBS
WSBA # 18935[[36]]
*1314 By letter of January 14, 1997, Dr. Celso Spitzcovsky and Dr. Roberto B. Dias (da Silva) wrote to Brazil Justice Minister Jobim on behalf of Petitioner Pang, the letter stating in part:[37]
Also added to the American case was an affidavit of Timothy A. Bradshaw, on behalf of the King County Prosecutor's Office, in which a conversation with Your Excellency is related, with the following content:
"The Justice Minister Jobim affirmed that Brazil has no objection to our prosecution of [Mr.] Pang on the charges of homicide and arson. Additionally, the Minister told me, `If I were you, I would prosecute on homicidethe justice system of the United States should decide.'"
On November 12, 1996, adopting the theory of the Prosecutor's Office, Judge Larry A. Jordan interpreted the fourth paragraph of the letter that Your Excellency forwarded to the Attorney-General as implicit permission, from the Brazilian Executive Branch to the American justice system, to transgress Article 21 of the Treaty of Extradition and Additional Protocol between Brazil and the U.S.A.ratified by Brazil on August 25, 1964thus permitting a violation of the extradition order issued by the Federal Supreme Court.[[38]]
By letter of February 26, 1997, Brazil Minister of Justice Jobim responded to the September 26, 1996 letter from Dr. Spitzcovsky and Dr. Dias (da Silva) stating:
With reference to the Fax dated last January 14th, where you comment on the extradition of the North-American citizien [sic] Martin Shaw Pang, I'd like to inform you that at no time did I provide any type of interpretation on the content and reach of the decision passed by the Federal Supreme Court. Thus, I ratify all the words used in said correspondence, its only objective being to clarify to Ms. Janet Reno, Attorney-General of the United States, some aspects of the Brazilian Constitutional system.

3. [sic] I'd like to stress once again that the criteria in judging the case, in light of the Treaty of Extradition currently used between the two countries and the decision of the Federal Supreme Court on extradition, are the exclusive interpretation of the North-American Judicial System, which must apply the norm to the concrete case.

Sincerely,
[Signature illegible]
Nelson A. Jobim
State Ministry of Justice[[39]]
On December 4, 1996, Petitioner filed a motion for direct discretionary review by this Court, which we granted on February 6, 1997.

DISCUSSION

APPLICABLE WASHINGTON LAW
Petitioner Martin Shaw Pang is now charged in the King County Superior Court by Second Amended Information in Count I with arson in the first degree, a class A felony, under RCW 9A.48.020(1)(a) and (d) and in Counts II-V with four counts of murder in the first degree, a class A felony, under RCW 9A.32.030(1)(c).
RCW 9A.48.020(1)(a) and (d) states in part:
(1) A person is guilty of arson in the first degree if he knowingly and maliciously:
(a) Causes a fire or explosion which is manifestly dangerous to any human life, including firemen; or
. . . .

*1315 (d) Causes a fire or explosion on property valued at ten thousand dollars or more with intent to collect insurance proceeds.
(2) Arson in the first degree is a class A felony.
RCW 9A.32.030(1)(c) states in part:
(1) A person is guilty of murder in the first degree when:
. . . .
(c) He or she commits or attempts to commit the crime of either (1) robbery in the first or second degree, (2) rape in the first or second degree, (3) burglary in the first degree, (4) arson in the first or second degree, (5) kidnapping in the first or second degree, and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants: Except that in any prosecution under this subdivision (1)(c) in which the defendant was not the only participant in the underlying crime, if established by the defendant by a preponderance of the evidence, it is a defense that the defendant:
(i) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and
(ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and
(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and
(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.
(2) Murder in the first degree is a class A felony.
(Emphasis added.)
Under the Sentencing Reform Act of 1981, RCW 9.94A.310, arson in the first degree has a seriousness score of VIII. If convicted of that crime, Petitioner, with an offender score of zero, under the guidelines would be subject to a standard sentence range of 21 to 27 months. However, under RCW 9.94A.390 a sentencing court may in its discretion depart from the guidelines and impose an aggravated exceptional sentence above the standard range if statutory criteria are met and the sentencing court identifies them:
The following are illustrative factors which the court may consider in the exercise of its discretion to impose an exceptional sentence. The following are illustrative only and are not intended to be exclusive reasons for exceptional sentences.
. . . .
(2) Aggravating Circumstances
(a) The defendant's conduct during the commission of the current offense manifested deliberate cruelty to the victim.
. . . .
(d) The current offense was a major economic offense or series of offenses, so identified by a consideration of any of the following factors:
(i) The current offense involved multiple victims or multiple incidents per victim;
(ii) The current offense involved attempted or actual monetary less substantially greater than typical for the offense;
(iii) The current offense involved a high degree of sophistication or planning or occurred over a lengthy period of time; or
(iv) The defendant used his or her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense.
. . . .
(i) The operation of the multiple offense policy of RCW 9.94A.400 results in a presumptive sentence that is clearly too lenient in light of the purpose of this chapter, as expressed in RCW 9.94A.010.
(j) The defendant's prior unscored misdemeanor or prior unscored foreign criminal history results in a presumptive sentence that is clearly too lenient in light of the purpose of this chapter as expressed in RCW 9.94A.010.
Under RCW 9A.20.021 the maximum sentence Petitioner Pang could receive if he is found guilty of arson in the first degree, a *1316 class A felony, is "confinement in a state correctional institution for a term of life imprisonment, or by a fine in an amount fixed by the court of fifty thousand dollars, or by both such confinement and fine[.]" This was a factor considered by the Federal Supreme Court of Brazil in its decision on extradition.

STANDING
(1) Does Petitioner Pang have standing to object to violation by the State of Washington of the terms of the order on extradition issued by the Federal Supreme Court of Brazil?
The State argues that Petitioner Pang does not have standing to assert any post-extradition limitations on his prosecution because the Brazilian Executive, through Minister of Justice Nelson A. Jobim, does not object to King County prosecuting Petitioner on four counts of murder in the first degree. The State correctly recognizes the exception to the doctrine of specialty which allows the requesting state to prosecute an accused for a crime other than that for which the accused was extradited when the asylum state consents.[40] However, in the absence of that consent by the asylum state, an extradited person may raise any objections to post-extradition proceedings which might have been raised by the rendering country.[41]
The rule in at least three United States circuit courts is that an extraditee has standing "to raise any objections which the requested nation might have asserted," subject to the limitation that "the requested nation may waive its right to object to a treaty violation and thereby deny the defendant standing to object to such action."[42] At least four other circuits have left the question of standing unanswered, with some indicating approval of the prevailing rule.[43]
The State also asserts that a minority of United States circuit courts deny standing absent affirmative protest by the surrendering State. However, this purported split in the circuits is illusory. Two of the three cases the State cited for this proposition are not standing cases at all, but were resolved against the extraditees on the merits.[44] The third case merely noted the defendant's standing was questionable before reaching the merits.[45]
The State urges this Court to find that Brazil's Executive, through Minister of Justice Nelson A. Jobim, "implicitly consented" to prosecution of Petitioner Pang by the State of Washington on four counts of murder in the first degree. We agree with *1317 the rule expressed in Najohn that only express consent to prosecution will be considered a waiver of the doctrine of specialty.[46] The letter from Brazil Minister of Justice Jobim to United States Attorney General Janet Reno cannot logically be interpreted as either an implicit waiver or an explicit waiver. The subsequent letter of February 26, 1997 from Minister Jobim unequivocally explains the meaning and intent of his letter to Attorney General Reno. It completely contradicts the interpretation urged by the State. That letter states in part:
I'd like to inform you that at no time did I provide any type of interpretation on the content and reach of the decision passed by the Federal Supreme Court. Thus, I ratify all the words used in said correspondence, its only objective being to clarify to Ms. Janett [sic] Reno, Attorney-General of the United States, some aspects of the Brazilian Constitutional system.[[47]]
While some United States circuit courts have questioned whether an extraditee has standing to assert limitations on post-extradition prosecution, and other courts have declined to address the issue, no court has dismissed such a claim because an extraditee did not have standing. The only firm decisions on this issue agree that an extraditee may raise any objection the surrendering State could make, as long as that country has not waived its right to object.[48] From the entire record in this case, we cannot conclude that the United States of Brazil has said, done or implied by words, action or inaction anything which would require this Court to deny Petitioner Pang the right to make post-extradition objections to his prosecution by the State of Washington in violation of the conditions of his extradition from Brazil. We conclude that Petitioner Pang does have standing to assert limitations on his post-extradition prosecution in King County.

WAIVER
(2) Did the United States of Brazil explicitly or implicitly waive any objection it could have made to prosecution by the State of Washington of Petitioner Pang for murder in the first degree contrary to the specific terms of the extradition order issued by the Federal Supreme Court of Brazil?
The trial court concluded that the United States of Brazil, by not objecting when it had numerous opportunities to do so, "implicitly waived objection," thereby defeating Petitioner Pang's standing.[49] "The State urges this Court to adopt that implicit waiver rationale, arguing that Justice Minister Jobim's letter of September 26, 1996 to Attorney General Reno indicates that Brazil does not object to Petitioner Pang being prosecuted for four counts of murder in the first degree. Nothing in the entire record before this Court supports such a conclusion. We reject it as being completely unsound and totally contrary to the record.
The United States of Brazil has from the outset expressed its position that Petitioner Pang should not be charged with murder in the first degree by the State of Washington. The Federal Supreme Court of Brazil fully considered and unequivocally rejected extradition of Petitioner on the murder charges as requested by the State of Washington. That position was reaffirmed when the court uncategorically rejected the appeal filed by the United States and the motion for clarification filed by the State of Washington. Despite repeated requests through diplomatic channels, Brazil has not only affirmatively denied permission to charge Petitioner with murder, but its President and Minister of Justice affirmatively declined in no uncertain terms the request of President Clinton that Brazil waive its right to object to prosecution *1318 of Petitioner Pang by the State of Washington for murder in the first degree following the extradition order.
The State's insistence that Justice Minister Jobim waived objection on behalf of Brazil to the State of Washington charging Petitioner Pang with murder distorts the facts established in this case. The letter from Minister Jobim to Attorney General Reno merely reiterated that Petitioner Pang was extradited to stand trial "for the crime of arson in the first degree, resulting in four deaths and the consequences thereof under U.S. law."[50] This is only a portion of the words used in the extradition order issued by the Federal Supreme Court of Brazil. In that same statement the Federal Supreme Court of Brazil continued its words to specifically exclude "the additional charge of four counts of first-degree murder."[51]
From a reading of the complete series of opinions from the Federal Supreme Court of Brazil it is evident beyond question that the point of disagreement between the majority and the dissenting minority was on the question whether the extradition order would exclude punishment beyond the 30-year maximum under Brazilian law or whether the order would allow the maximum punishment of life imprisonment for arson in the first degree as allowed under Washington law. There was no disagreement among the Brazilian justices on the question whether the extradition order would allow prosecution of Petitioner Pang for even a single count of murder in the first or any degree.[52]
We are not convinced an implied waiver, even if made, would overcome the standing of Petitioner Pang to object in this case.[53] The United States Court of Appeals for the Ninth Circuit has held that an express waiver of objection does divest an extraditee of standing.[54] We conclude from the record in this case that Brazil has not expressly consented to nor implicitly or explicitly waived objection to the State of Washington charging Petitioner with murder in the first degree. We therefore conclude that Petitioner Pang does have standing to object.

SPECIALTY DOCTRINE
(3) Does the "specialty doctrine" in international extradition law prohibit the State of Washington from prosecuting Petitioner Pang for crimes specifically excluded in the extradition order?
The United States Court of Appeals for the Ninth Circuit has stated "We review de novo whether extradition of a defendant satisfies the doctrines of `dual criminality' and `specialty.'"[55] The specialty doctrine has been explained:
The requested state retains an interest in the fate of a person whom it has extradited, so that if, for example, he is tried for an offense other than the one for which he was extradited, or is given a punishment more severe than the one applicable at the time of the request for extradition, the rights of the requested state, as well as the person, are violated.[[56]]
Under international law, the "specialty doctrine" generally prohibits a requesting State from prosecuting an extraditee "for an offense other than the one for which surrender was made."[57] This doctrine "is designed to prevent prosecution for an offense for *1319 which the person would not have been extradited."[58]
"`As a matter of international comity, "[t]he doctrine of `specialty' prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed to extradite."'"[59] "To guarantee limited prosecution by nations seeking extradition of persons from the United States, the United States has guaranteed, pursuant to the treaty, that it will honor limitations placed on prosecution in the United States."[60]
In United States v. Rauscher,[61] the United States Supreme Court addressed the question whether the extradition treaty between England and the United States prohibited prosecution of the defendant for a crime other than that for which he was extradited. This was the first case in which the Supreme Court recognized the specialty doctrine. In that case an American merchant ship officer had been extradited from Great Britain, under an extradition treaty, to be charged with murder of a crew member. He was subsequently convicted of assault and inflicting cruel and unusual punishment, neither of which were listed as extraditable offenses in the treaty. The Court held the defendant could be tried only for the offense "with which he is charged in the extradition proceedings, and for which he was delivered up."[62]
The Court in Rauscher was guided by principles of comity which prevailed in the absence of treaties, under which a receiving country would not prosecute a fugitive for any offense other than those for which the fugitive had been surrendered by the asylum country.[63] The Court rejected the argument that the treaty did not expressly limit the offenses that could be charged by the requesting country.[64] The Court reasoned that there was no indication the treaty intended to depart from principles of comity.[65]
The Supreme Court concluded that the treaty, by listing certain extraditable offenses, implicitly excluded the right of extradition for any other offenses.[66] The Court stated: "[A] person who has been brought within the jurisdiction of the court by virtue of proceedings under an extradition treaty, can only be tried for one of the offences described in that treaty, and for the offence with which he is charged in the proceedings for his extradition."[67] The Court based its conclusion upon the terms and history of the treaty; extradition practices of states; case law; and the writings of jurists. In part, the court considered the Revised Statutes §§ 5272, 5275, which dealt with this country's roles as both requested state and requesting state in extradition proceedings. Section 5275 is now codified in 18 U.S.C. § 3192 and differs only in that the words "crimes or offences" have been replaced with the word "offenses." It provides as follows:
Whenever any person is delivered by any foreign government to an agent of the United States, for the purpose of being brought within the United States and tried for any offense of which he is duly accused, the President shall have power to take all necessary measures for the transportation and safekeeping of accused person, and for his security against lawless violence, until the final conclusion of his trial for the offenses specified in the warrant of extradition, and until his final discharge from custody or imprisonment for or on account of such offenses, and for a reasonable time thereafter, and may employ such portion of *1320 the land or naval forces of the United States, or the militia thereof, as may be necessary for the safe-keeping and protection of the accused.[[68]]
In United States v. Alvarez-Machain the Supreme Court noted that federal statutes impose the doctrine of specialty upon all extradition treaties to which the United States is a party.[69]
Under Rauscher, for an extradited defendant to be charged with a crime, that crime must be specified in the treaty (the approval of which is within the sole discretion of the asylum state), and be included in the extradition petition (the content of which is within the sole discretion of the requesting state). The defendant has the right to "be tried only for the offence with which he is charged in the extradition proceedings and for which he was delivered up."[70] "It is unreasonable that the country of the asylum should be expected to deliver up such a person to be dealt with by the demanding government without any limitation, implied or otherwise, upon its prosecution of the party."[71] The doctrine of specialty was not explicitly stated in the treaty between the United States and Great Britain. The court in Rauscher interpreted in treaty with consideration of the specialty doctrine which had previously been recognized in international law.[72]
The Court examined the treaty and the history of relations between the United States and Great Britain to determine whether the parties, in the absence of express incorporation, nevertheless intended the doctrine of specialty to be part of the treaty.[73] Under Rauscher the specialty doctrine may be implied where a treaty is silent on the issue and there is no reason to assume the signatory nations did not abide by the principles of comity.
Petitioner Pang argues that, because the extradition order specifically excluded the charges of murder in the first degree requested by the State of Washington, under the specialty doctrine the State may not prosecute him on these charges. He argues that under Rauscher the specialty doctrine is implied in every treaty.[74]
The State argues that any limitations on post-extradition prosecution are defined only by the terms of the treaty and the doctrine of specialty applies only when it is expressly incorporated into the terms of the treaty. In determining whether there has been a violation to the specialty doctrine, courts have consistently examined the terms of the treaty for any limitations on prosecution.[75] The *1321 United States Court of Appeals for the Ninth Circuit observed in a recent case that "[w]e look to the language of the applicable treaty to determine the protection an extradited person is afforded under the doctrine of specialty."[76]
In this case, the doctrine of specialty is incorporated into the terms of the Treaty of Extradition Between the United States of America and the United States of Brazil (Treaty) through Article XXI which provides:[77]
A person extradited by virtue of the present Treaty may not be tried or punished by the requesting State for any crime or offense committed prior to the request for his extradition, other than that which gave rise to the request, nor may he be re-extradited by the requesting State to a third country which claims him, unless the surrendering State also agrees or unless the person extradited, having been set at liberty within the requesting State, remains voluntarily in the requesting State for more than 30 days from the date on which he was released. Upon such release, he shall be informed of the consequences to which his stay in the territory of the requesting State would subject him.
This provision, read in conjunction with Articles I and II, requires that the crime must be enumerated in the treaty and must satisfy the doctrine of dual criminality, thus incorporating the doctrine of specialty into the Treaty. Because the doctrine is codified in federal statute, 18 U.S.C. § 3192, federal law requires acceptance of the requirement of Brazil that an offense must be extraditable under its interpretation of applicable domestic and international law.
The United States Court of Appeals for the Ninth Circuit recognizes that the doctrine of specialty is embodied in all extradition treaties.[78] That court has recognized Rauscher as providing an "implicit rule of specialty."[79] It has also recognized that, under the doctrine of specialty, an extradited person may be prosecuted only for offenses specified in the order of extradition.[80]
The Federal Supreme Court of Brazil specifically "exclude[d] from the grant of extradition the charges of murder in the first degree."[81] The Court

granted extradition without any restriction as to the possibility of life imprisonment; but only on the crime of first degree arson with the results it produced (four deaths) and all the consequences thereof pursuant to United States law without however, the added charge of four counts of murder in the first-degree.[[82]]
After considering the appeal for clarification from the United States, the Federal Supreme Court of Brazil unanimously denied it, stating,
The absence of any doubt or obscurity as regards the denial of the extradition *1322 with respect to the charges of the four crimes of murder in the first degree is demonstrated in the terms of the decision, which did not consider the facts, as described in the request, as characterizing independent crimes of arson in the first degree and murder in the first degree.[[83]]
King County Superior Court Judge Jordan in his oral decision stated, "it appears to this Court reasonably clear that Brazil did not extradite for felony murder."[84] He was absolutely correct in that conclusion. But he was in error in his conclusion that Brazil had "implicitly waived" any objection to the State of Washington ignoring the order on extradition. Under the treaty and the doctrine of specialty, King County may not prosecute Petitioner Pang for any crime but arson in the first degree as specified in the extradition ruling by the Federal Supreme Court of Brazil. "The doctrine of specialty is satisfied if the extraditing country honors the limitations placed on the prosecution by the surrendering state."[85]

EXTRADITION TREATY
(4) Does the Extradition Treaty between the United States of America and the United States of Brazil prohibit the State of Washington from prosecuting Petitioner Pang for crimes not authorized in the extradition order?
International law is incorporated into our domestic law.[86] Treaties are the supreme law of the land. They are binding on the states as well as the federal government.[87] Courts must interpret treaties in good faith.[88] In the 1907 case of Johnson v. Browne[89] the United States Supreme Court stated:
While the escape of criminals is, of course, to be very greatly deprecated, it is still most important that a treaty of this nature between sovereignties should be construed in accordance with the highest good faith, and that it should not be sought, by doubtful construction of some of its provisions, to obtain the extradition of a person for one offense and then punish him for another and different offense. Especially should this be the case where the government surrendering the person has refused to make the surrender for the other offense, on the ground that such offense was not one covered by the treaty.[[90]]
We adopt that statement as appropriate declaration of good faith which our courts must maintain in interpreting the terms and conditions of an extradition proceeding between signatory nations to a treaty.
The right "to demand and obtain extradition of an accused criminal is created by treaty."[91] The treaty must ordinarily list the offense complained of in a request for extradition as an extraditable offense.[92] Additionally, under the doctrine of dual criminality, an accused person may be extradited only if the conduct complained of is considered criminal by the jurisprudence or under the laws of both requesting and asylum *1323 states.[93] The doctrine of dual criminality is specifically incorporated into the Treaty between the United States and Brazil through Article I, which states:
Each Contracting State agrees, under the conditions established by the present Treaty and each in accordance with the legal formalities in force in its own country, to deliver up, reciprocally, persons found in its territory who have been charged with or convicted of any of the crimes or offenses specified in Article II of the present Treaty and committed within the territorial jurisdiction of the other, or outside thereof under the conditions specified in Article IV of the present Treaty: provided that such surrender shall take place only upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his commitment for trial if the crime or offense had been there committed.[[94]]
Article II of the Treaty states in part:
Persons shall be delivered up according to the provisions of the present Treaty for prosecution when they have been charged with, or to undergo sentence when they have been convicted of, any of the following crimes or offenses:
1. Murder (including crimes designated as parricide, poisoning and infanticide, when provided for as separate crimes); manslaughter when voluntary.
. . . .
7. Arson.
. . . .[[95]]
Article XI of the Treaty provides that:
The determination that extradition based upon the request therefor should or should not be granted shall be made in accordance with the domestic law of the requested State, and the person whose extradition is desired shall have the right to use such remedies and resources as are authorized by such law.[[96]]
The Federal Supreme Court of Brazil, the highest court in the United States of Brazil, has rendered its decision in good faith compliance with extradition procedures in the Treaty. "[D]etermination of whether a crime is within the provisions of an extradition treaty is within the sole purview of the requested state."[97]
We agree with the United States Court of Appeals for the Ninth Circuit in its interpretation of international treaty law. From the extensive record in this case, we cannot conclude that the Federal Supreme Court of Brazil misinterpreted its own laws in rendering its decision on extradition of Petitioner Pang under the Treaty. We conclude without question that under the Treaty, Brazil, as the requested state, has sole authority to determine whether a particular offense is extraditable.
The Treaty provides that "[a] person extradited by virtue of the present Treaty may not be tried or punished by the requesting State for any crime or offense committed prior to the request for his extradition, other than that which gave rise to the request."[98]
The State argues it requested Petitioner's extradition on one count of arson in the first degree and four counts of murder in the first degree and reasons there is no violation of the Treaty because Petitioner is only being prosecuted for those offenses. Petitioner Pang argues that the semantic distinction between the Treaty in this case and those limiting prosecution to offenses "for which extradition was granted" is not meaningful. Two courts have affirmed convictions on charges other than those for which extradition was granted because the express language in the treaties in those cases allowed it.
*1324 In Fiocconi v. Attorney General, the United States Court of Appeals for the Second Circuit denied habeas corpus relief to an extraditee who had been convicted of crimes other than those for which extradition was granted.[99] The court examined the applicable United States-Italy extradition treaty which provided that "the person ... delivered up for the crimes enumerated ... shall in no way be tried for any ... crime, committed previously to that for which his ... surrender is asked."[100] The court observed:
If the countries had intended that the requesting government could not try the accused for any crime committed before the time of his surrender other than the crime for which he was extradited, they could have accomplished this by adopting one of the standard clauses to that end.[[101]]
In United States v. Sensi the defendant was convicted of charges other than those for which he was extradited.[102] The United States Court of Appeals for the District of Columbia upheld the convictions for the reason that the United States-United Kingdom Treaty only prohibited prosecution for offenses other than those "established by the facts in respect of which his extradition has been granted."[103] The court reasoned that, although the crimes charged were not those for which extradition was granted, the charges were based upon the same underlying facts and that therefore there was no treaty violation.[104]
The United States Court of Appeals for the Ninth Circuit in United States v. Khan ruled to the contrary.[105] The defendant was charged with conspiring to import drugs and with using a communication facility in furtherance of the conspiracy. The United States requested his extradition from Pakistan for trial on both charges. The Pakistani Commissioner directed that the defendant be "surrendered over to the authorities in the U.S.A. for trial under the relevant American Law," but made no direct reference to the underlying charges.[106] Other documents in the case referred to the conspiracy charge, but not to the communication facility charge. The court held that because Pakistan did not unambiguously agree to extradite the defendant on the communication facility charge, his conviction on that charge must be reversed.[107] The court distinguished Sensi, pointing out that the treaty language in that case did not limit prosecution to those offenses for which extradition was granted. The court noted by contrast that "[t]he operative treaty in [the] case contain[ed] the following language: `A person surrendered can in no case be [prosecuted] ... for any other crime or offence, or on account of any other matters, than those for which the extradition shall have taken place.'"[108]
(5) Is the State of Washington obligated to follow the decision of the Federal Supreme *1325 Court of Brazil which ruled that, as a condition for extraditing Petitioner Pang the State, he can be prosecuted only "for the crime of arson in the first degree resulting in four deaths .... without the additional charge of four counts of first degree murder"?
Under all the established facts in this case and the application of international law, treaty law, United States law, Washington law, and common logic, we must give good faith recognition to the lawful determination of the Federal Supreme Court of Brazil, the highest court of that sovereign democracy, that Petitioner Martin Shaw Pang was extradited only for prosecution in the State of Washington for the crime of arson in the first degree, resulting in four deaths, but not for prosecution for the four charges of murder in the first degree. We therefore answer the question in the affirmative.

SUMMARY AND CONCLUSIONS
(1) Petitioner Pang has standing to object to violation by the State of Washington of the terms of the order on extradition issued by the Federal Supreme Court of Brazil. The only firm decisions on the issue of standing agree that an extraditee may raise any objection the surrendering State could make, as long as that country has not waived its right to object. From the entire record in this case, we cannot conclude that the United States of Brazil has said, done or implied by words, action or inaction, anything which would require this Court to deny Petitioner Pang the right to make post-extradition objections to his prosecution by the State of Washington in violation of the conditions of his extradition from Brazil.
(2) The United States of Brazil did not explicitly or implicitly waive any objection it could have made to prosecution by the State of Washington of Petitioner Pang for murder in the first degree contrary to the specific terms of the extradition order issued by the Federal Supreme Court of Brazil. We are not convinced an implied waiver, even if made, would overcome the standing of Petitioner Pang to object in this case. We conclude from the record in this case that Brazil has not expressly consented to nor implicitly or explicitly waived objection to the State of Washington charging Petitioner with murder in the first degree. We therefore conclude that Petitioner Pang does have standing to object.
(3) The "doctrine of specialty" in international extradition law prohibits the State of Washington from prosecuting Petitioner Pang for crimes specifically excluded in the extradition order. In this case the doctrine is incorporated into the Treaty through Article XXI. The doctrine of specialty is satisfied if the extraditing country honors the limitations placed on the prosecution by the surrendering state.
(4) The Extradition Treaty between the United States of America and the United States of Brazil prohibits the State of Washington from prosecuting Petitioner Pang for crimes not authorized in the extradition order. Good faith must be maintained in interpreting the terms and conditions of an extradition proceeding between signatory nations to a treaty. We conclude that under the Treaty, Brazil, as the requested state, has sole authority to determine whether a particular offense is extraditable.
(5) The State of Washington is obligated to follow the decision of the Federal Supreme Court of Brazil which ruled that, as a condition for extraditing Petitioner Pang to the State of Washington, he can be prosecuted only "for the crime of arson in the first degree resulting in four deaths .... without the additional charge of four counts of first degree murder."
We reverse the King County Superior Court which denied the motion of Petitioner Martin Shaw Pang to dismiss or sever four counts of murder in the first degree from one count of arson in the first degree. The trial court erroneously concluded that the record in this case establishes Brazil Minister of Justice Nelson A. Jobim implicitly waived the provisions of Article XXI of the Treaty, thus depriving Petitioner Pang of standing to assert a violation of Article XXI and allowing the State of Washington to proceed to trial on all counts, including the four counts of murder in the first degree. The State may proceed to trial only on Count I of the second *1326 amended information which charges Petitioner Martin Shaw Pang with the crime of arson in the first degree alleged to have been committed in King County, Washington on or about January 5, 1995.
GUY, JOHNSON, SMITH, MADSEN and SANDERS, JJ., concur.
DURHAM, Chief Justice (dissenting).
Four Seattle firefighters died while fighting a fire at Pang's parents' warehouse. After fire investigators determined that the fire had been deliberately set, a fugitive warrant was issued for Martin Pang, who fled to Brazil. Pang was charged with first degree arson and four counts of first degree felony murder, and the United States requested that Brazil extradite him on these charges. However, the Brazilian Supreme Court determined that Pang's alleged act would be classified in Brazil as the single crime of aggravated arson. Therefore, Brazil granted extradition on the arson count alone.
The question before us is whether the State may prosecute Pang for the felony murder given that Brazil extradited him only for arson. The plain language of the United States/Brazil extradition treaty expressly permits prosecution for offenses included in the extradition request. Yet, the majority erroneously concludes that a doctrine of international law called specialty prohibits the State from prosecuting Pang for anything other than the arson count for which he was extradited. The majority's conclusion is based on a misunderstanding of the specialty doctrine and is inconsistent with the vast weight of authority, which holds that the scope of any specialty limitations on prosecution is determined solely by the language of the applicable treaty.
Unless Pang is prosecuted for murder, he cannot be punished for the firefighters' deaths because the codification of the "real facts doctrine" in our state sentencing laws excludes from sentencing consideration facts that establish the elements of a more serious crime. Thus, the majority's decision not only violates the State's unambiguous rights under the treaty, but also fails even to effectuate Brazil's expectation that Pang will be held accountable for the deaths he may have caused.

ANALYSIS
THE SPECIALTY DOCTRINE
Absent a treaty, the obligation to surrender a fugitive has never been recognized as a principle of international law.[1] In order to ensure that criminal fugitives are brought to justice, many nations, including the United States, have entered into extradition treaties to facilitate the surrender and prosecution of fugitives. In order to guard against indiscriminate prosecution, particularly of political crimes, extradition treaties usually include provisions that limit prosecution for separate crimes unrelated to the extradition request.[2] Such limitations on prosecution are collectively referred to as the "specialty doctrine" and serve to discourage nations from requesting extradition for one offense as a ruse for obtaining jurisdiction on a different offense. However, the precise form of the specialty doctrine varies because nations have negotiated different limits on post-extradition prosecution.
For example, some extradition treaties prohibit prosecution for any offenses other than those for which extradition is specifically granted. In this most restrictive version of the specialty doctrine, the asylum country dictates the scope of permissible prosecution by its grant of extradition. It was this version of the rule that was applied in the Supreme Court's first specialty doctrine case, Rauscher, and the rule that the majority erroneously suggests is implied in every extradition treaty to which the United States is a party.
Although some nations adhere strictly to this version of specialty in all extradition matters, "[i]n other states, including the United States, the prosecution may go forward *1327 if it is based on the same facts as those set forth in the request for extradition."[3] Nations adopting this variation of the specialty doctrine retain control over the scope of prosecution rather than allowing the asylum country to dictate its scope. It is this version of the specialty doctrine that is expressly incorporated into the United States/Brazil extradition treaty: "A person extradited by virtue of the present Treaty may not be tried or punished by the requesting State for any crime or offense committed prior to the request for his extradition, other than that which gave rise to the request."[4] But both versions of the rule accomplish the purpose of the specialty doctrine: protection against indiscriminate prosecution of separate crimes unrelated to the extradition request.
In suggesting that the specialty doctrine must be implied into the United States/Brazil extradition treaty, the majority assumes, without support, that the specialty doctrine is solely defined as limiting prosecution to offenses for which extradition was granted. But, as the First Circuit Court of Appeals pointed out:
Specialty ... is not a hidebound dogma, but must be applied in a practical, commonsense fashion. Thus, obeisance to the principle of specialty does not require that... the prosecution always be limited to specific offenses enumerated in the surrendering state's extradition order....[[5]]
In the present case, the specialty doctrine does not need to be implied for it is already expressly incorporated into the United States/Brazil extradition treaty, albeit in a form that is not conducive to the majority's desired result. Thus, the question is not whether the specialty doctrine should be implied in the United States/Brazil extradition treaty, but whether this court can imply additional limitations on prosecution beyond the express specialty provisions agreed upon by the United States and Brazil.
A COURT MAY NOT IMPLY ADDITIONAL LIMITATIONS ON PROSECUTION IN THE FACE OF EXPRESS LIMITATIONS INCLUDED IN THE TREATY
The majority relies on United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886) for the proposition that an implied term of every extradition treaty is that an extradited fugitive may be prosecuted only for crimes for which he was surrendered. Yet, the majority, by its own analysis, demonstrates that Rauscher is not applicable in the present case.
In Rauscher, an American merchant ship officer who was accused of murdering a crewmember fled to Great Britain. The United States, pursuant to its first extradition treaty, requested the fugitive's extradition for murder; the request was subsequently granted. The defendant, however, was subsequently tried and convicted of inflicting cruel and unusual punishment instead of murder. The Supreme Court vacated the sentence and held that the defendant could be tried only for an offense "with which he is charged in the extradition proceedings and for which he was delivered up...."[6] Moreover, the Court rejected the State's argument that the treaty's silence on the issue indicated that the United States and Great Britain intended that there be no limitations on prosecution. Instead, the Court implied such a limitation into the treaty.
*1328 At first blush, it might appear as though the Court had announced a rule that such a limitation is implied in all extradition treaties as a matter of course. Yet, the Court strictly limited its holding as an interpretation of the extradition treaty with Great Britain:
"The right of one government to demand and receive from another the custody of an offender who has sought asylum upon its soil, depends upon the existence of treaty stipulations between them, and in all cases is derived from, and is measured and restricted by, the provisions, express or implied, of the treaty."[[7]]
Consistent with the rule that the treaty defines the scope of the specialty doctrine, the Court initially looked to the text of the treaty itself.[8] It was only after determining that the treaty was silent on this issue that the Court looked beyond the express treaty terms to determine whether the parties intended to limit the scope of post-extradition prosecution. Thus, it was only in the absence of express specialty provisions that the Court turned to the comity principles in general, the specific history between the United States and Great Britain on this issue in particular, and the statutory references to limitations on prosecution, in order to resolve this question.
The majority correctly identifies a treaty's silence on the issue as an essential prerequisite for the Court to inquire beyond the language of the treaty itself. "The Court examined the treaty and the history of relations between the United States and Great Britain to determine whether the parties, in the absence of express incorporation, nevertheless intended the doctrine of specialty to be part of the treaty."[9] Crucial to the Court's decision was the fact that the very issue had been the subject of much dispute between the nations, with Great Britain making very clear that it expected that the scope of prosecution would be limited by the grant of extradition.[10] The Court also looked to a statute, now codified at 18 U.S.C. § 3192, that authorizes the President to provide for an extradited fugitive's transportation and safekeeping "until the final conclusion of his trial for the crimes or offences specified in the warrant of extradition."[11] Yet, the court resorted to this language only to resolve "any doubt upon this construction of the treaty."[12]
Thus, Rauscher stands for the proposition that a court's overriding task is to determine what the signatory nations to the extradition treaty intended to include in the way of limitations on prosecution. Only when the text of the treaty fails to provide expressly for such limitations is the court then authorized to look beyond the treaty. Lastly, when there is evidence that the signatory nations expected that prosecution would be limited to charges for which surrender is granted, the court may then imply this term into the treaty.
Curiously, the majority concedes that Rauscher authorizes courts to imply prosecution limitations only when the treaty fails to provide expressly for such limitations:
Under Rauscher the specialty doctrine may be implied where a treaty is silent on the issue and there is no reason to assume the signatory nations did not abide by the principles of comity.[[13]]
Indeed, the majority must concede this point. Were it the case that Rauscher prohibits the prosecution of any extradited fugitive for offenses *1329 other than those for which extradition was granted, the majority would need to explain, and indeed has failed to offer any explanation for, the numerous circuit court decisions upholding such convictions against alleged specialty doctrine violations.[14]
Unlike the treaty at issue in Rauscher, most United States extradition treaties, including the one with Brazil, now expressly define the limits of post-extradition prosecution. Again, the majority concedes that "[i]n determining whether there has been a violation to the specialty doctrine, courts have consistently examined the terms of the treaty for any limitations on prosecution."[15] Indeed, the majority cites a formidable list of federal extradition cases in which the courts, rather than implying limitations into the applicable treaties, had confined themselves to the specialty doctrine as expressly provided for in the treaties at issue.[16]
The majority, having identified an overwhelming number of cases in which the courts confined their specialty doctrine analysis to the express limitations in the relevant treaties, fails to offer a single case in which a court implied prosecution limitations beyond the express limitations included in the relevant treaty. This failure is understandable since it is well settled that the only limitations on post-extradition prosecution are those contained in the applicable extradition treaty. "To determine the nature and extent of the right we must look to the treaty which created it."[17]
*1330 Although the majority is correct that international law is incorporated into domestic law,[18] "extradition is `not uniformly recognized as part of customary international law.'"[19] "[B]ecause United States extradition practice is based solely on the existence of a treaty," the Supreme Court has rejected the suggestion that extradition cases are governed by customary international law and has "limited the practice to a strict interpretation of the applicable treaty."[20]
This view comports with Brazil's understanding with respect to any limitations on prosecution:
[L]egally binding international acts are the only legal instruments capable of binding two or more sovereign States together. Thus, provided that the terms of the Treaty of Extradition ... are respected, it will be incumbent upon the justice system of the United States of America to establish a suitable punishment for the crime of arson in the first degree, resulting in four deaths and the consequences thereof, under U.S. law.[[21]]
Thus, the question of whether the State may prosecute Pang for felony murder depends on the express specialty provisions of the United States/Brazil extradition treaty.
THE UNITED STATES/BRAZIL EXTRADITION TREATY PROHIBITS PROSECUTION ONLY FOR CHARGES THAT ARE NOT INCLUDED IN THE EXTRADITION REQUEST
The United States/Brazil extradition treaty provides that: "A person extradited by virtue of the present Treaty may not be tried or punished by the requesting State for any crime or offense committed prior to the request for his extradition, other than that which gave rise to the request...."[22] "[T]reaties are to be interpreted in accordance with the plain meaning of the words."[23] The State requested Pang's extradition on arson and first degree felony murder charges arising out of his act of intentionally setting a fire that resulted in death. It is undisputed that this act is an extraditable offense. Since Pang is not being prosecuted for any offenses other than those that gave rise to the request for extradition, the State's prosecution of Pang for murder does not violate the United States/Brazil extradition treaty and fully complies with the express limitations negotiated by the United States and Brazil.
Giving effect to the plain language of the treaty and refusing to imply additional limitations finds ample case support. The majority itself concedes that two circuit court decisions have affirmed convictions on charges other than those for which extradition was granted based on the express language of the treaties at issue.[24] The majority never explains how these cases could have been decided consistent with a rule that purportedly prohibits such prosecutions in every extradition case.
For example, in Fiocconi the defendants were extradited from Italy to the United States on charges of conspiring to import narcotics. They were later additionally charged and convicted of substantive narcotics crimes. They appealed their convictions, arguing that under Rauscher there was an implicit prohibition against prosecution for charges other than the conspiracy charge for *1331 which they were extradited. In upholding their convictions the circuit court looked to the United States/Italy extradition treaty, which provided, much like the United States/Brazil extradition treaty, that: "the person ... delivered up for the crimes enumerated... shall in no case be tried for any... crime, committed previously to that for which his ... surrender is asked."[25] The court observed:
If the countries had intended that the requesting government could not try the accused for any crime committed before the time of his surrender other than the crime for which he was extradited, they could have accomplished this by adopting one of the standard clauses to that end.[[26]]
In doing so, the court expressly rejected the suggestion that under Rauscher greater limitations on prosecution may be implied in the face of express treaty limitations.
Another example is United States v. Sensi, 879 F.2d 888 (D.C.Cir.1989), in which the defendant was convicted of charges other than those for which he was extradited. The court upheld the convictions on the basis that the treaty prohibited prosecution only for offenses other than those "established by the facts in respect of which his extradition has been granted."[27] The court acknowledged that the crimes charged were not those for which extradition was granted. The crimes were based, however, on the same underlying facts and, therefore, complied with the specialty provisions in the treaty. Thus, there was no violation of the specialty doctrine.[28] Similarly, had the United States and Brazil intended to limit prosecution of fugitives to crimes for which the asylum country agrees to extradite, they could have used language to that end. Such limitation is included in many of our extradition treaties.[29]
Indeed, the majority cites only a single post-Rauscher case in which a court held that a fugitive cannot be prosecuted for offenses other than those for which extradition was granted. Yet, that case was based on the express language of the treaty, which included just such a limitation. In United States v. Khan, 993 F.2d 1368 (9th Cir. 1993), the United States requested that Pakistan extradite a fugitive charged with conspiracy to import heroin and with using a communication facility to facilitate the conspiracy. Pakistan directed that the defendant could be "surrendered ... for trial under the relevant American Law,"[30] yet the Pakistani extradition materials referred only to the conspiracy charge.[31] The court held that because Pakistan did not unambiguously agree to extradite the defendant on the communications facility charge, the specialty doctrine had been violated and the conviction on that charge should be reversed.[32] Yet, the court did so because "[t]he operative treaty in this case contains the following language: `A person surrendered can in no case be [prosecuted] ... for any other crime or offence, or on account of any other matters, than those for which the *1332 extradition shall have taken place.'"[33] The court acknowledged that the Sensi court had held that the specialty doctrine is satisfied as long as the defendant is charged with crimes arising out of the same facts for which his extradition was granted. However, the court clarified that that holding was based on the more expansive version of the specialty doctrine expressly incorporated into the treaty at issue in that case.[34]
Thus, an extraditee may challenge his prosecution for crimes other than those for which extradition was granted when the express specialty provisions limit prosecution to those offenses. When the extradition treaty expressly provides for lesser protection, however, the extraditee may assert only the limits of any rights as expressed in the treaty. Since the United States requested that Pang be extradited on four felony murder counts as well as arson, and the extradition treaty with Brazil limits the offenses that may be prosecuted only to those "which gave rise to the request," there is simply no violation of the treaty terms.
A GOOD FAITH READING OF THE UNITED STATES/BRAZIL EXTRADITION TREATY IS CONSISTENT WITH THE PLAIN MEANING OF THE EXPRESS SPECIALTY TERMS
I agree with the majority that we must interpret treaties in good faith.[35] However, the Johnson Court's admonition that we construe extradition treaties in good faith is fully met by giving effect to the plain language of the United States/Brazil extradition treaty.
In Johnson, the defendant was indicted on federal charges of fraud and conspiracy to commit fraud; yet, the United States proceeded upon only the conspiracy charge. After the defendant was convicted, he fled to Canada and the United States requested his extradition. Canada refused to extradite, having determined that conspiracy to commit fraud was not an extraditable offense. The United States recharged the substantive fraud count, requested extradition for that offense, and Canada extradited the fugitive. The United States then imprisoned the defendant for the conspiracy conviction. In affirming a lower court order discharging the defendant, the Supreme Court emphasized that an extradition treaty:
should be construed in accordance with the highest good faith, and that it should not be sought by doubtful construction of some of its provisions to obtain the extradition of a person for one offense and then punish him for another and different offense.[[36]]
The Court was rightly concerned with the government's blatant manipulation of the extradition process to obtain extradition for one offense as a ruse for obtaining jurisdiction for another that "is entirely different from the one for which he was extradited."[37] As discussed earlier, this is the unifying purpose underlying the various versions of the specialty doctrine.
In the present case, however, the United States requested and Brazil granted extradition for the same criminal act: the intentional burning of a building that resulted in death. The majority mistakenly assumes that the relevant inquiry is whether the two nations criminalize the act in the same way. Yet, the Supreme Court has made clear that:
The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions.[[38]] *1333 Extradition treatises universally recognize this distinction.[39]
Thus, allowing the State to prosecute Pang for murder does not find us engaging in "doubtful construction" in order to allow prosecution for "another and separate" offense from that for which Pang was extradited. Pang is accused of intentionally setting a fire that resulted in death. Under both Washington and Brazilian law this act is criminal and is more severely punished than simple arson because of the resulting death. Although the act is differently codified in the two countries, as Collins makes clear, the dispositive inquiry is whether the act is criminal in both jurisdictions. Therefore, giving effect to the plain meaning of the United States/Brazil extradition treaty does not violate our obligation to construe treaties in good faith.
THE "REAL FACTS" DOCTRINE PROHIBITS THE TRIAL COURT FROM CONSIDERING THE DEATHS AS AGGRAVATING FACTORS IN SENTENCING
The majority attempts to mitigate the injustice of its decision with the suggestion that, whether or not Pang is convicted for the felony murders, the trial court could depart from the standard range arson sentence and impose the statutory maximum of life imprisonment.[40] The majority's unstated assumption is that the firefighters' deaths could be used as aggravating factors justifying the imposition of an exceptional sentence. Indeed, as the majority points out, the Brazilian Supreme Court assumed that Pang could be as severely punished whether the firefighters' deaths served as the basis for an exceptional arson sentence or separate felony murder sentences.[41]
However, despite the trial court's discretion to depart from the standard range based on the presence of aggravating circumstances, this discretion is sharply limited by the "real facts doctrine." As Justice Smith pointed out in State v. Johnson, 124 Wash.2d 57, 71 n. 33, 873 P.2d 514 (1994): "The `real facts' concept of RCW 9.94A.370(2) excludes consideration of either uncharged crimes or crimes charged but later dismissed."[42] RCW 9.94A.370(2) provides, in part:
Facts that establish the elements of a more serious crime or additional crimes may not be used to go outside the presumptive sentence range except upon stipulation or when specifically provided for in RCW 9.94A.390(2)(c), (d), (f), and (g).[[43]]
In the present case, the arson deaths cannot be used to depart from the standard range because they establish an essential element of first degree felony murder.[44] And there can be no dispute that felony murder is both a separate and more serious crime since it is precisely because Washington penalizes Pang's alleged act as two separate crimes that we are deciding this case at all. With the murder charges dismissed and the trial court's inability to otherwise consider the deaths, the trial court will have no *1334 choice but to enter a standard range sentence for first degree arson, which, as the majority points out, would be approximately two years in Pang's case.[45]

CONCLUSION
The majority's decision to dismiss the murder charges defeats the very purpose of extradition:
The law of extradition is ... founded upon the broad principle that it is to the interest of civilized communities that crimes, acknowledged to be such, should not go unpunished, and it is part of the comity of nations that one state should afford to another every assistance towards bringing persons guilty of such crimes to justice.[[46]]
Yet, under the majority's holding, the deaths of four innocent victims will go unpunished, even though the laws of both Brazil and Washington recognize arson resulting in death as a more serious crime than arson alone. Thus, rather than furthering the ends of justice, the majority rewards Pang's calculated flight and ensures that neither nation's will is done by immunizing Pang from any liability for the deaths he may have caused. Because Pang's prosecution for murder would be wholly consistent with both our treaty obligations toward Brazil and the overwhelming weight of authority, Pang should stand trial for murder and arson.
DOLLIVER and TALMADGE, JJ., concur.
ALEXANDER, Justice (concurring in dissent).
I am in complete agreement with the chief justice's conclusion in dissent that Martin Pang should stand trial for four counts of first degree murder and one count of arson. I write this concurrence simply to express my view that the dissent and majority opinions should not speculate on whether or not the real facts doctrine would preclude the trial judge from imposing a sentence on Pang for first degree arson that would exceed a standard range sentence for that offense. In my view, it is entirely inappropriate for this court to pass judgment on the propriety of a sentence that has not yet and may never be imposed. Sentencing bridges need to be crossed only if and when an individual is convicted of an offense. Any speculation about the validity of a sentence that has not or may never be imposed is dicta of the first order and should not be a part of either the majority or dissenting opinion.

OPINION APPENDIX A

FEDERAL SUPREME COURT
11/30/95
FULL SESSION
EXTRADITION No. 00006541/120
ORIGIN: UNITED STATES OF AMERICA
ASSIGNED: JUSTICE NÉRI DA SILVEIRA
REQUESTED BY: THE GOVERNMENT OF THE UNITED STATES OF AMERICA
PERSON SOUGHT: MARTIN SHAW PANG
REPORT
JUSTICE NÉRI DA SILVEIRA (ASSIGNED): The Embassy of the United States of America contacted the Brazilian Government through the Ministry of Foreign Affairs, and citing Diplomatic Note No. 083, of March 7, 1995, as well as The Brazil-United States Extradition Treaty of January 13, 1961 Article VIII and Additional Protocol of June 18, 1962, requested the provisional arrest, for extradition purposes, of MARTIN SHAW PANG, a.k.a. MARK WONG, a.k.a. SUEN HING WAH, an American citizen, born November 12, 1955, following arrest warrant issued on March 3, 1955, [ 1 ] by Judge Bill Stream, [ 2 ] of King County Court, Seattle, State of Washington, to be tried for [crimes] in the first degree by the Superior Court of said County, according to *1335 the facts described in the above mentioned Note No. 83, fls. 5-6 PPE 217, attached:
The facts of this case indicate that on January 5th, 1995, a little after 19:03, the Seattle Fire Department responded to a fire at the Mary Pang Food Warehouse, Inc. While fighting the fire several firemen got to the first floor in the flooded warehouse. Without any warning whatsoever, the floor gave in, tumbling the firemen to the basement. Four firemen died in the fire.
On December 13, 1994 an agent of the Bureau of Alcohol Tobacco and Firearms (ATF) was contacted by a witness who said that the "Mary Pang" warehouse was going to be "burned". The witness told the agent that Pang was advised to remove his personal belongings from the warehouse.
On another occasion, Pang told the witness, in detail, how the fire would occur and it really happened that way. On another occasion, Pang also removed his personal belongings from the building.
In December, Pang took a close friend to the warehouse and told him that the food company was not doing well. He said that the warehouse would burn down in January and that it would look like transients set the fire. Pang told a number of other people that the warehouse would burn down.
Translator's Note: This is an obvious typing error in the original. It should read: 1995.
"Judge" Bill Stream should instead be identified as "Deputy Clerk Bill Stream."
After the fire Pang told another witness that it looked like some transient had set the warehouse on fire and described how it had happened. Pang described how the fire happened even before the information had been announced by the investigators. Inevitably, Pang's statements to his friends came very close to a confession. Arson Investigators announced that the fire had been intentionally set, causing the death of four fire-fighters.
Murder is described in Article II Paragraph I of the Treaty of Extradition Between the United States of America and the United States of Brazil. Seizure of Assets is described in Article XX of the [same] treaty.
Because the request for the provisional arrest for purposes of extradition of MARTIN SHAW PANG, a.k.a. MARK WONG, a.k.a. SUEN HING WAH, had been sufficiently documented, I ordered the provisional arrest of the above mentioned alien, according to Article 81Estatuto do Estrangeiro [Foreign National Statutes] and according to what had been decided on the Question of the Order for Extradition Request No. 478-6, which determined that an arrest warrant be issued, to be executed by the Federal Police Department, according to fls. 12 of writ, PPE documents No. 217-3 / 420, attached.
On May 15, 1995, the Minister of Justice, through Dispatch / GM / MJ / No. 00435, expedited probable cause and other formal documents for the extradition of Martin Shaw Pang, which had been sent by the American Embassy, through diplomatic channels, according to Diplomatic Note No. 169 fls. 6 / 7, where it reads (fls. 6):
Pang is sought by the State of Washington to be tried for Intentional Homicide and Arson. He is the object of Criminal Information 95-1-00473-0, presented on March 17, 1995, at the King County Superior Court, Seattle, Washington, accusing him of: (1) Murder in the First Degree, in violation of RCW [Revised Code of the State of Washington] Section 9A.32.030; and (2) Negligent Fire-Setting [i.e. Arson] in the First Degree, in violation of Section 9A.48.020. An arrest warrant was issued by Judge Bill Stream [2] of King [County] Court, on March 3, 1995.
After capture [and] in the custody of the Federal Police Department, in the State of Rio de Janeiro, I entrusted the Federal Justice [System] of that State with the interrogation of the person sought (fls.261).
The person sought for extradition was interrogated in the presence of his counsel, Dr. Paulo Freitas Ribeiro. The content of his statements are to be found on pgs. 274 / 277, which I cite (fls.275-276):
... has knowledge of the penalties that may be imposed for the crimes [he] is being accused of; that a few months before *1336 the fire the insurance premium had been reduced, and besides, he was not going to be one of the beneficiaries of the insurance; that, [he] adds, [he] is not in need of money, due to the sale of real-estate property he has sufficient funds in hand; that it is true that he has signed a confession of the crimes, but that he had done so under duress; that this confession was given at the Rio de Janeiro Federal Police facilities, in the presence of American police officers only; that those agents said they were FBI; that this happened at night; that the American agents requested a room from the [Brazilian] federal police solely to interrogate him, which the local police declined; that he did not suffer any type of bad treatment, but that, as he was under intense pressure, worried about the welfare of his family, he opted to sign, because the agents promised they would reduce the pressure being applied on his family in the USA; that, at the time he signed his confession there were no Brazilian federal agents nearby; that, according to the FBI agents, this was the best solution.
In his defense, fls. 280 / 300, the lawyers for the person sought for extradition, affirm: "The Defendant does not want to avoid extradition, because he wishes to return to his Country to establish his innocence", affirming that the Defense "will not attack the extradition request, but that the extradition be done in a partial manner, and also that conditions be imposed on the penalty to be eventually carried out, to the extent that Brazilian Law does not permit life imprisonment." It is alleged, to sum it up, that the Defense will be structured in the following manner:
a) According to Article 85 Par. 2 of Law No. 6.815 / 90, instead of a trial, that a judicial order be entered, so that the requesting State send to this Court the text of the alleged violated law.
b) That the extradition be denied as to Intentional Homicide, because of lack of elements in this respect.
c) Denial of Extradition for the Crime of Arson with Risk of Loss of Life, [but] deferment of extradition for the crime of Arson in the Second Degree.
d) That the hand-over [of the Defendant] be conditioned to the promise of limiting the penalty eventually given to the Defendant to the maximum allowed by Brazilian law and that the other conditions contained in the Foreign National Statutes be adhered to.
In a writ, fls. 321, I determined that the requesting State provide, within twenty days, a set of authenticated copies of law texts invoked in the case, including the order, which has been done by Diplomatic Notes Nos. 359 and 415, and documents accompanying them (fls. 329 / 359 to 379 / 399).
The Office of the Attorney-General of the Republic, in its opinion on fls. 362 / 373, deemed to grant the extradition, with no exceptions. This is my report. [signed] J. Néri
ALM
FEDERAL SUPREME COURT
EXTRADITION No. 00006541 / 120

VOTE
JUSTICE NÉRI DA SILVEIRA (ASSIGNED): The charge of 3 / 3 / 1995 before the King County Court against the person sought, with the State of Washington as the Plaintiff and Martin Shaw Pang as the Defendant is to be found in fls. 150-159, with the following counts of Murder in the First Degree (fls. 150 / 152):
I, Norm Maleng, Prosecuting Attorney for King County, in the name and by the authority of the State of Washington, do accuse MARTIN S. PANG of the crime of Murder in the First Degree, committed as follows:
That the Defendant MARTIN S. PANG, together with another, in King County, Washington, on or about January 5, 1995, while committing and attempting to commit the crime of Arson in the First Degree, and in the course of and in the furtherance of said crime and in immediate flight therefrom, did cause the death of Lieutenant Walter Kilgore, a human being who was not a participant in the crime, and who died on or about January 5, 1995; *1337 Contrary to RCW 9A.32.030 (1)(c), and against the peace and dignity of the State of Washington.
And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse MARTIN S. PANG of the crime of Murder in the First Degree, a crime of the same or similar character as another crime charged herein, and committed as follows:
That the defendant MARTIN S. PANG, together with another, in King County, Washington, on or about January 5, 1995, while committing and attempting to commit the crime of Arson in the First Degree, and in the course of and in the furtherance of said crime and in immediate flight therefrom, did cause the death of Lieutenant Gregory A. Shoemaker, a human being who was not a participant in the crime, and who died on or about January 5, 1995;
Contrary to RCW 9A.32.030 (l)(c), and against the peace and dignity of the State of Washington.
And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse MARTIN S. PANG of the crime of Murder in the First Degree, a crime of the same or similar character as another crime charged herein, and committed as follows:
That the Defendant MARTIN S. PANG, together with another, in King County, Washington, on or about January 5, 1995, while committing and attempting to commit the crime of Arson in the First Degree, and in the course of and in the furtherance of said crime and in immediate flight therefrom, did cause the death of Fire-fighter James T. Brown, a human being who was not a participant in the crime, and who died on or about January 5, 1995;
Contrary to RCW 9A.32.030 (1)(c), and against the peace and dignity of the State of Washington.
And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse MARTIN S. PANG of the crime of Murder in the First Degree, a crime of the same or similar character as another crime charged herein, and committed as follows:
That the defendant MARTIN S. PANG, together with another, in King County, Washington, on or about January 5, 1995, while committing and attempting to commit the crime of Arson in the First Degree, and in the course of and in the furtherance of said crime and in immediate flight therefrom, did cause the death of Fire-fighter Randall R. Terlicker, a human being who was not a participant in the crime, and who died on or about January 5, 1995;
Contrary to RCW 9A.32.030 (1)(c), and against the peace and dignity of the State of Washington.
Afterwards, on 3 / 17 / 1995, the Information was amended, accusing the Defendant, now the person sought, of Arson in the First Degree [Count V], a crime of similar character, a class "A" felony (intentional crime), "for which", according to fls. 134, "there is the possibility of life in prison". Fls. 178 / 179 describe Count V as follows:
And I, Norm Maleng, Prosecuting Attorney aforesaid further do accuse MARTIN S. PANG of the crime of Arson in the First Degree, a crime of the same or similar character and based on a series of acts connected together with another crime charged herein, which crimes were part of a common scheme or plan, and which crimes were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the other, committed as follows:
That the Defendant MARTIN S. PANG in King County, Washington on or about January 5, 1995, did knowingly and maliciously cause a fire or explosion located at 811 Seventh Avenue South (the Mary Pang Warehouse), Seattle, which was manifestly dangerous to any human life, including firemen;
Contrary to RCW 9A.48.020 (1)(a), and against the peace and dignity of the State of Washington.
Therefore, according to the amended Information, the person sought is charged with four counts of Murder in the First Degree and one count of Arson in the First Degree. These crimes, [now] under scrutiny, correspond *1338 [to crimes] found in the Brazilian Criminal Law Code, in Arts. 121, as to Murder, "caput" [first sentence]Intentional Homicide, and 250, "caput" Intentional Fire-Setting.
In a preliminary manner, after the fire and death of the fire-fighters, who intervened while carrying out their duties, occurred, at the beginning of January of the year mentioned, there is no [reason] here to talk about extinction of punishment, through the imposition of punitive action, whether according to State of Washington legislation, or Brazilian criminal law. The State of Washington sentencing guidelines, according to the Revised Code of Washington are found in fls. 356-358. References concerning the Brazilian Criminal Law Code, are found in Article 109, I, as to the homicide found in Article 121, "caput", and in Article 109, III, for Intentional Fire-Setting (Article 250).
Arson in the First Degree has the following definition in Section 9A.48.020 (fls.135):
9A.48.020. Arson in the First Degree.
(1) A person is guilty of Arson in the First Degree if he knowingly and maliciously:
(a) Causes a fire or explosion which is manifestly dangerous to any human life, including firemen.
Murder in the First Degree is defined in Section 9A.32.030, cited (fls.134):
(1) A person is guilty of Murder in the First Degree when:
..........
(c) He or she commits or attempts to commit the crime of either: (1) Robbery in the First or Second Degree, (2) Rape in the First or Second Degree, (3) Burglary in the First Degree, (4) Arson in the First or Second Degree, or (5) Kidnapping in the First or Second Degree, and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants: except that in any prosecution under this subdivision (1)(c) in which the defendant was not the only participant in the underlying crime, if established by the defendant by a preponderance of the evidence, it is a defense that the defendant:
(i) Did not commit the homicidal act or in anyway solicit, request, command, importune, cause or aid the commission thereof; and
(ii) Was not armed with a deadly weapon, or any instrument, article; or substance readily capable of causing death or serious physical injury; and
(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article or substance; and
(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.
Counsel for the person sought states that deferment of extradition for Arson in the First Degree with risk of life is impossible, because it would result in double punishment for the same act, a bis in idem. [The Defense] states that extradition [should] be granted only for Arson in the Second Degree. And states (fls. 287):
It is understood, then, that we are dealing with a bis in idem. How can someone be accused, simultaneously, of causing damage to a person's health, and also of bringing him / her into danger? Obviously, damage always involves risk, which is a necessary step to accomplish the other. Mutatis mutandis, it would be the same as to attempt to convict someone of murder and of bodily injury, because before killing someone, damage was done to the physical integrity of the victim.
In fact, there is an apparent conflict of norms in this case, which can be solved by the "principle of absorption."
Further, the Defense adds (fls.288):
If deaths occurred and if the charge deals, equally, with the crimes of Murder, it seems clear that this more serious event absorbs the crime of endangerment. Otherwise, one act would be generating double punishment, which is inadmissible, according to Brazilian law.
Furthermore, counsel for the person sought understands that the Federal Supreme Court *1339 Jurisprudence has ruled that bis in idem cases are barred in extraditions, quoting what happened in Extradition No. 543, assigned to the Honorable Justice Moreira Alves, where it was decided that the crime of illegal coercion would be absorbed by the crime of Robbery. Therefore, the request for extradition was granted for the crime of Robbery only.
Moreover, concerning Intentional Homicide, it is important to mention that "the absolute inexistence of elements as to the intent to kill renders the request faulty in that respect unless, according to American Law, the intent has no bearing ( ... ). In this event, however, it would be a case of objective responsibility, which would render the agent's action atypical, according to Brazilian Law and therefore, it would impede the granting of extradition" (fls.293). Along the same lines, the Defense finishes, by citing (fls.295):
Therefore, the motion is for granting partial extradition for the crime of Arson in the Second Degree and denial [of extradition] for the charges of Murder.
Finally, the Defense states, that the requesting State must stipulate that the Defendant must not receive a sentence of more than thirty (30) years, according to the Criminal Law Code, Article 75.
As to granting extradition, "only for the crime of Arson in the Second Degree", the opinion of the Brazil's Attorney General reads (fls.370): "Now, Arson in the Second Degree is not an issue [here].
According to document (fls.302), not translated, attached by the Defense Attorney, one can infer that Arson in the Second Degree is that which results only in material damages".
Further, regarding Non-Intentional Homicide, the Federal Attorney General's opinion reads (fls. 370 / 371):
The Attorney's proposition that the extradition must be granted only for Non-Intentional Homicide and not for Intentional Homicide is also irrelevant. The Federal Supreme Court is not judging the extradites at this time.
Therefore, I don't think it is possible, in this particular case, to lower the charges against the person sought at the extradition hearing, [charges] brought by the Justice System in King County, Seattle, State of Washington, from Intentional Homicide to Non-Intentional Homicide and from Intentional Fire-Setting to Negligent Fire-Setting, according to the Brazilian criminal [law] system, as the Defense intends.
Charged as Arson in the First Degree and Murder in the First Degree (four counts), based on legislation [now] in force in the requesting State, the requested State, which has the corresponding crimes of Intentional Fire-setting and Intentional Homicide has no right to condition the granting of extradition, so that the trial process of the person sought in the Requesting State, occur in conformity with the specific legal parameters of the Requested State's legislation, i.e., according to Article 258 of the Brazilian Criminal Law Code, as cited:
Article 258. If serious bodily harm results from an intentional crime of common danger, the prison sentence is increased by half; if it results in death, it is doubled. In the case of negligence, if bodily harm results from the act, the penalty would be increased by half, if it results in death, the sentence imposed for Non-Intentional Homicide is increased by one third.
Concerning the above, Celso Delmanto remarks in the Criminal Law Code Annotated, pgs. 449-450: "It is a case of praeter dolus, because the results are not desired by the agent, in which case there may be formal conflict of Article 121 or 129 with the crime of common danger. ( ... ) In the case of injury or death of several persons, the enhancement is applied only once, and it is not applied in formal conflict. Therefore, if the crime of Intentional Fire-Setting results in four deaths, due to the agent's negligence, it will be classified as only one."
I understand, however, that the debate of what we call, among ourselves, the "classified forms of common danger crimes", cannot take place during the extradition process, if it results in dual criminality, where the facts are typical not only in the laws of the requesting State but also in the laws of the requested State.
*1340 The analysis of the quaestio juris is also recommended in this case, concerning the impracticality of granting extradition, as to crimes of Murder in the First Degree, because it deals with the hypothesis of objective responsibility, prohibited within the Brazilian criminal law system, according to Article 19 of the criminal law code, citing:
Article 19. The agent only answers for the result that specifically aggravates the penalty if [he] is, at least, negligent in causing it.
Celso Delmanto comments on this device introduced by Law No. 7209 / 1984 (Op.Cit., pg.34):
With Article 19, the criminal [law] revision of '84 wanted to impede the punishment of someone for mere objective criminal responsibility. It determined that the agent is responsible for the result that "specifically" aggravates the penalty, only when he caused it, "at the very least by negligence". It is explained by the [following] example: In the crime of Robbery, Article 157 Par. 3 determines that, if serious injury or death results from the violence, the penalty is especially aggravated. In implementing Article 19, the aggravating [clause] will only apply to the agent if he has caused that result (serious injury or death), at least by negligence. Therefore, if the result of the aggravating act was not due to the agent's intent or negligence he will be responsible for the Robbery, but not for the aggravating result in Article 157 Par. 3, because of the restriction in Article 19. However, it is important to note that the objective of the device in Article 19 is to limit the penalty. It should not be used to unduly exacerbate it. Therefore, intent cannot be dispensed with (substituting it for negligence) in the other qualifying and aggravating clauses, which must be present due to the agent's intent (direct or circumstantial).
The Explanation of Motives which accompanies the new Revised Criminal Law Code remarks that "the rule covers all enhancement clauses found in the causal separation of the action" (No. 16). Celso Delmanto observes, in turn: "It is important to notice that it only affects crimes qualified (or aggravated) by the result, i.e., the ones with a result that especially aggravate the penalty. It is not applied to qualifying or aggravating clauses that are covered by the agent's intent (and not only by negligence)'" (op.Cit., pg.36).
It is important to observe that, in this particular case, the charge of Murder in the First Degree in the Court of origin, against the person sought for extradition, is found in Section 9A.32.030 (1)(c), which states as guilty of Murder in the First Degree the person who commits or attempts to commit the crime of either: (1) to (3)omitted; (4) Arson in the First Degree, ( ... ) and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants: except that in any prosecution under this subdivision (1)(c) in which the defendant was not the only participant in the underlying crime, if established by the defendant by a preponderance of the evidence, it is a defense that the defendant:
(i) Did not commit the homicidal act or in anyway solicit, request, command, importune, cause or aid the commission thereof; and
(ii) Was not armed with a deadly weapon, or any instrument, article; or substance readily capable of causing death or serious physical injury; and
(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article or substance; and
(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.
Therefore, it is understood that the law of the Requesting State considers as autonomous the crime of Murder in the First Degree, the death of a person during the practice of the crimes of Robbery, Rape, Burglary with Felonious Intent, in the First Degree, Arson in the First Degree or Kidnapping, and in furtherance of said crime and in immediate flight therefrom.
*1341 In our system, praeter dolus crimes are compounded, as Celso Delmanto writes in the above mentioned work, pg. 36 "because the agent is punished due to criminal intent, for he acted with that end in mind. And he is sanctioned for negligence, for having caused a result other than what he wanted. Example: Article 129, Par. 3, in which the agent is punished for criminal intentional conduct (injury) and for the non-intentional result (death)".
Regarding the crime of Arson, according to Article 250, "caput", of the Criminal Law Code, among the causes that increase penalties by one third, listed in the above mentioned Article (1) there is no express mention of resulting serious injury or death. There is, however, [mention] that the subject is defined in the CC [Criminal Code] Article 258 in the same Chapter "Of Common Danger Crimes" (Article 250 to 259), with this general rule concerning "qualified forms of crimes of common danger":
Article 258. If serious bodily injury results from an intentional crime of common danger the prison sentence is increased by half, if it results in death, it is doubled. In the case of negligence, if it results in bodily injury, the penalty is increased by half; if it results in death, the penalty imposed is the one used for Non-Intentional Homicide, increased by one third.
Celso Delmanto observes that it is a case of praeter dolus, "because the results are not desired by the agent, in which case there could be formal conflict with Article 121 or 129 with the crime of common danger. According to CC, Article 19, it is essential that the resulting injury or death was caused by the agent, at least by negligence. If the result was not due to negligence, but only because of a causality relation, only the simple sentence for crimes [of common] danger will apply and not the qualifying enhancement."
One can see then, that in our system, the resulting death in the case of a crime of common danger, among them, Arson, acts as an enhancement, aggravating the penalty; but in the Requesting State's system, it is [an] autonomous [crime].
However, I do not see this difference in the legal system, as an obstacle in granting extradition.
Still we need to evaluate whether the principle of subsidiarity, admitted in our jurisprudence should be applied here in such a way that the crime of Arson be absorbed by the [crime] of Murder in the First Degree, for which, in this case, it is supposed to be the Arson which occurred in the commercial building [that belonged] to the parents of the person sought for extradition, charging him with the responsibility for the criminal wrong.
In Extradition No. 543Federal Republic of Germany, assigned to the Honorable Justice Moreira Alves, this court decided, applying the principle of subsidiarity which His Honor analyzed in the following manner in his learned opinion (RTJ 138-428):
5. The Defense is equally correct, when it states that the extradition request cannot further be granted for the crime of illegal imprisonment contained in the German Criminal Code Par. 239(1).
In fact, concerning crimes of Robbery and Illegal Coercion (which would be how the charged deed could be framed by the prison sentence, as a crime of deprivation of freedom), there is an apparent conflict of rules solved by the implied principle of subsidiarity, because it deals with compounded Robbery, one of its elements being Illegal Coercion, as Heleno Cláudio Fragoso writes (Lições de Direito Penal) [Criminal Law Lessons], General Part, No. 361, pgs. 352 353, Forense, Rio de Janeiro (1983):
Subsidiarity is implied when the crime defined by one of the rules is an element or a legal circumstance of another crime. There is subsidiarity in the case of a complex crime (CC, Article 103). It is said to be complex a crime which has as element or aggravating circumstance, a fact which on its own constitutes a crime. So, Robbery (CC, Article 157) includes Theft (Article 155) and Illegal Coercion (CC, Article 146) or Threat (CC, Article 147) ... these rules leave no room for formal conflict, because there is an implied subsidiarity.
It happens that, in this case, the crime of Arson in the First Degree is an element of *1342 the crime of Murder in the First Degree, according to Section 9A.32.030 (1)(c) of the Revised Code of Washington [RCW]. Also, it must be considered that the Original Information did not mention a charge for Arson in the First Degree, but only four counts of Murder in the First Degree, according to the attached transcript. Only in the Amended Information, fls. 178-179, there appears "Count V" in which the accused Martin S. Pang is accused of the crime of Arson in the First Degree. The Amended Information considered such "crime of the same or similar character and based on a series of acts connected together with another crime charged herein, which crimes were part of a common scheme or plan, and which crimes were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the other, committed as follows:
(omitted)."
It is my opinion, however, that in this particular case, we cannot invoke the subsidiarity principle.
In fact, if the extradition is granted without including the crime of Arson in the First Degree, due to the subsidiarity rule, the eventual characterization of Murder in the First Degree in the Requesting State, will not be possible, because there wouldn't be a way to have the extraditee as the perpetrator of the crime of Arson in the First Degree, an element of the crime of Murder in the First Degree. If the criminal responsibility of the person sought is not definitely ascertained by Arson in the First Degree, the charge of Murder in the First Degree is vacated.
It is then, like the case now being examined: The subsidiarity rule cannot be invoked, in order to exclude a certain crime from the extradition deferment, when its examination is the basis for trying another crime, which is the object of the charge.
If the charge of Arson in the First Degree is upheld or not, or if it will be reduced to Arson in the Second Degreewhich is what the Defense wantscannot be taken into consideration in this extradition hearing. The competent Court in the Requesting State must rule on this issue. What I understand here is that it is not possible to frustrate the trial of extraditee in the Requesting State for the basic crime of Arson in the First Degree, invoking, in this case, the principle of subsidiarity, in order to remove the base crime from the extradition grant, i.e., Arson in the First Degree. If it [the crime of Arson in the First Degree] cannot be investigated, because the extradition would not include it, its consequence would be the eventual infeasibility of also imputing responsibility to the extraditee for the crimes of Murder in the First Degree, according to Section 9A.32.030, which assumes guilty of Murder in the First Degree, one who commits or attempts to commit, among others Arson in the First Degree.
Well, in this particular case, if Extradition will not be granted to allow the extraditee to stand trial also for Arson in the First Degree, according to the Amended Information, it is certain that the trial for Murder in the First Degree will not be possible, which, in this particular case, is intimately connected with the crime of Arson in the First Degree.
Therefore, I feel that in this situation, the crimes which are the object of the Information and the Amended Information in the Requesting State, cannot be separated, in order to grant the extradition as to some and deny it as to the other, [which] is the basis of the former.
Finally, concerning the sentences to be imposed for crimes with counterparts in the laws of both States, the only matter of consequence, is to keep in mind the limitations rendered sacred in our jurisprudence, where the extradition is not conditioned to the non-imposition of a life sentence. I have stressed this in a hearing of December 2, 1993, Extradition No. 599 -5/120, where I was the Assigned Justice:
6. Nor is there room for any restriction as to the fact that the law of the Requesting State allows for a life sentence as a maximum punishment for the crime charged against the extraditee (Extradition No. 426, RTJ [expansion unknown] 115(3)): 969, Mar. 86 ("leading case"); Extradition No. 429 assigned to Just. Djaci Falcão, RTJ 119(1): Jan. 22, 87; Extradition No. 472, 1, 72, assigned to Just. Moreira *1343 Alves, DJU [expansion unknown].05.89; Extradition 486, assigned to Just. Galvão Gallotti, RTJ [expansion unknown] 132(3): 1.083, Jun. 90; Extradition No. 507, assigned to Just. Ilmar Galvão, DJU [expansion unknown] (03.09.93).
For better clarity, the annotation for Extradition Hearing 507, also requested by Argentina and assigned to the Honorable Justice Ilmar Galvão (hearing held in full session on September 25, 1991) is hereby transcribed:
EXTRADITION. A [FOREIGN] NATIONAL FROM THE REQUESTING STATE, WITH DECREED ARREST WARRANT, ACCUSED OF QUALIFIED ATTEMPTED ROBBERY, WHICH RESULTED IN THE DEATH OF THE VICTIM. LEGAL POSSIBILITY OF A LIFE SENTENCE. COMPLETE ADHERENCE TO REQUIREMENTS, ACCORDING TO THE LAW AND THE TREATY.
Petition granted, without restrictions as to the life sentence, which was considered improper, according to STF [expansion unknown] jurisprudence, according to Extradition No. 426 (09.04.85) and according to our legal charter, reaffirmed for almost a century, which is clear as a bell about the necessity for the commutation of only corporal punishment and death sentences (Law No. 2.416/1911, DL No. 394 38 and Law No. 6.815/801). (DJU 09.03.93)
Moreover, fls. 391 makes it clear that the gradual increase or decrease of the penalty is possible under the following conditions:
6. In the case of Murder in the First Degree, the scope of the standard sentencing range, established by the State of Washington Sentencing Guidelines is from 240 to 320 months. In fact, the judge can depart from this standard only if he decides that there are special aggravating circumstances. To order a sentence beyond the standard range the judge must conclude that there are compelling and substantial reasons to do so. Any sentence beyond this range cannot be excessive and must be established by strong evidence. All sentences for Murder in the First Degree will run consecutively.
Therefore, once the difficulties presented by the Defense are removed and taking into consideration that the arrest warrant against the person sought for extradition was issued by a competent Judge, and the request [for the extradition] was well documented, and the charges against the person sought for extradition have corresponding laws in the Brazilian Criminal Law Code, and it is true that the alleged criminal acts occurred in the requesting State's territorial jurisdiction, and if it is inappropriate to speak of penalties, it must be concluded that the extradition can be granted, without restrictions.
Based on the above, I grant the request for extradition, without restrictions, therefore affirming the opinion of the Office of Brazil's Attorney-General.
[signed] J. Néri
ALM
PLENARY
EXCERPT FROM THE MINUTES
EXTRADITION NO. 654-1
ORIGIN: THE UNITED STATES OF AMERICA
ASSIGNED TO: JUST. NÉRI DA SILVEIRA
REQUESTED BY: THE GOVERNMENT OF THE UNITED STATES OF AMERICA
EXTRADITEE: MARTIN SHAW PANG
ATTORNEYS: PAULO FREITAS RIBEIRO, ET AL
Decision: Just. Maurício Corrêa requested the documents, after the vote by Justice Néri da Silveira (Assigned), granting, in its entirety the request for the extradition, without any restrictions whatsoever. Dr. Cassiano Pereira Viana represented the Requesting State and Dr. Arthur Levigne represented the person sought for extradition. Plenary Session 11.30.95.
[approximately 14 blank lines]
Presided by the Honorable Justice Celso de Mello, Vice-President. Present at the session were: The Honorable Justices Moreira Alves, Néri da Silveira, Sydney Sanches, Octávio Gallotti, Carlos Velloso, Marco Aurélio, Francisco Rezek and Maurício Corrêa.
*1344 Excused absences: Honorable Justices Sepúlveda Pertence, President, and Ilmar Galvão.
Brazil's Attorney-General Dr. Geraldo Brindeiro.
 [signature illegible]
 Luiz Tominatsu
 Secretary
12 /18 / 95
FULL SESSION
EXTRADITION No. 654-1

UNITED STATES OF AMERICA

VOTE

REVISION
THE HONORABLE JUSTICE MAURÍCIO CORRÊA:After the Honorable Justice Néri da Silveira's vote, stated on the record, during Extradition Hearing No. 654, I requested a revision, even though I agreed with his vote. I thought it would be prudent to ponder on the quaestio juris, regarding the restriction issue, as to the life sentence allowed by the criminal laws of the Requesting Member-State.
To refresh the memory of the [members] of the Plenary as to the facts, I indulge in reading Diplomatic Note No. 83, contained in fls. 5-6 of PPE 217, enclosed:
The facts of this case indicate that on January 5th, 1995, a little after 19:03, the Seattle Fire Department responded to a fire at the Mary Pang Food Warehouse, Inc. While fighting the fire several firemen got to the first floor in the flooded warehouse. Without any warning, whatsoever, the floor gave in, tumbling the firemen to the basement. Four firemen died in the fire.
On December 13, 1994 an agent of the Bureau of Alcohol Tobacco and Firearms (ATF) was contacted by a witness who said that the "Mary Pang" warehouse was going to be "burned". The witness told the agent that Pang was advised to remove his personal belongings from the warehouse. On another occasion, Pang told the witness, in detail, how the fire would occur and it really happened in that manner. Pang also removed his personal belongings from the building on another occasion.
In December, Pang took a close friend to the warehouse and told him that the food company was not doing well. He said that the warehouse would burn down in January and that it would look like transients set the fire. Pang told a number of other people that the warehouse would burn down.
After the fire Pang told another witness that it looked like some transient had set the warehouse on fire and described how it had happened. Pang described how the fire happened even before the information had been announced by the investigators. Inevitably, Pang's statements to his friends came very close to a confession. Arson investigators announced that the fire had been intentionally set, causing the death of four fire-fighters.
Murder is described in Article II Paragraph I of the Treaty of Extradition Between the United States of America and the United States of Brazil. Seizure of Assets is described in Article XX of the [same] treaty.
Due to the commission of these crimes, an arrest warrant was issued for Murder in the First Degree and Arson in the First Degree (fls. 133, 134 and 163). The crimes answerable by the person sought for extradition are punishable with a life sentence in Washington, American territorial jurisdiction, where the crimes were committed (fls.134-6).
After stressing the issue of restriction, which the evolution of this Court's jurisprudence no longer allows, the Assigned Justice concluded, as to the question of a life sentence:
Therefore, once the difficulties presented by the Defense are removed and taking into consideration that the arrest warrant against the person sought for extradition was issued by a competent Judge, and that the request for the extradition was well documented, and that the charges against the person sought for extradition have corresponding laws in the Brazilian Criminal Law Code, and being true that the alleged criminal acts occurred in the requesting *1345 State's territorial jurisdiction, and since it is inappropriate to speak of penalties, it must be concluded that the extradition can be granted, without restrictions.
Based on the above, I grant the request for extradition, without restriction, therefore affirming the opinion of the Office of Brazil's Attorney-General.
I have tried to follow, as much as possible, the predominant jurisprudence of this Court, especially concerning internal economy, outside the realm of laws that deal with citizens' freedom, due to the inconvenience and uneasiness that a change of direction can cause in the lives of people, budgets, criteria and organizational charts of state agencies, and activities of private enterprises.
In this case, the situation reveals that the person sought for extradition, and not yet tried, only with an arrest warrant issued against him, came to live in Brazil. It seems to me that due to the above, I have an opportunity to state what I think about the thema decidendum. Especially because, as far as I know, there is a difference of opinion about this subject, in view of what Justice Pertence himself stressed, in extradition Hearing No. 598 (RTJ 152) (431-438), underlining that "safeguarding my opinion in the [above] referred preceding case overruled by Justice Paulo Brossard, until conditions exist for the reexamination of the problem and I refer to the demand of the commutation of life sentencesaccording to our jurisprudence. I agree with the Honorable Justice Assigned [to this case], not granting extradition".
Justice Néri da Silveira also voted for the restriction in that Hearing, alleging that in Extradition 507, "I also adopted the position of establishing a restriction in granting the request, so that the life sentence be commuted to a maximum sentence of thirty years".
In Extradition Hearing No. 426 of May 22, 1985 requested by the United States, where the assigned Justice Rafael Mayer was overruled, Just. Rezek observed that the law dealing with extraditions at no time restricts a life sentence from an extradition decree. It [the law] refers specifically to death penalty cases. And even if that were the case, says His Honor, because the treaty with the United States dates from the 60's, the treaty and the supervenient law would be placed in conflict. And [he] ends [by saying], "I ask myself if we would not be led by logic to one day deny extradition, if we ascertained that during the process in which the person sought for extradition was convicted, [later] there was evidence that there had been a breach of the confidentiality rule (being that Par. 9 of the same constitutional Article prohibits that); or because in the requesting State there is no guarantee of a contradictory criminal element; or because there [in that State] there is no provision for [trial by] jury for intentional crimes against life." The list in Article 153, with all due respect, does not seem to be feasible to me as a set of parameters to be imposed on the requesting State in the extradition process.
Once the Assigned Justice was overruled in that extradition, all the other Justices voted along with Justice Rezek, and this resulted in the new direction adopted by the Court, which no longer restricts a life sentence. I would like to point out that there were some opposing votes, because it dealt with the issue that the person sought for extradition had already been sentenced to life in prison in the requesting Country. This happened, for instance, in the case of Justice Passarinho, who added: "However, the situation before us is extremely unique. The person to be extradited received a life sentence, escapes to Brazil and attempts to get his sentence changed. Based on that, I do not believe that he can find himself under our protection in that case."
I cannot, Mr. President, lend to a treaty or to an ordinary law the greatness and import of the constitutional rule. The Federal Constitution of '88, as an example of the old text, reaffirmed as dogma, in its Article 5, clause XLVII (b), that there will be no life sentence in Brazil, and CC, Article 75 decreed that a prison sentence cannot go beyond thirty years. This Article limits the prison sentence time, conforming exactly with the present constitutional dictamen, as it was the case with the Constitutions of '37 (Article 122, 13), '46 (Article 41 Par. 31 and '69 Article *1346 153 Par. 1) which prohibited life sentences. Now, if that is the case, how can we give up a constitutional precept in face of a request for the extradition of an individual who one way or another, subjects himself to Brazilian Laws?
It is not a matter of doing a favor to an escaping criminal, but preserving the integrity of Brazilian sovereignty, whose Greater Law established, in a solid clause, the inexistence of life sentences within [our] national territory to all Brazilians and to all who live in this jurisdiction.
It is true that Law No. 6.815 of 08.19.80, in Article 91, clause III, restricts the handing over of the person sought for extradition to the Requesting Country, unless it is conditioned to a stipulation of commutation of the physical punishment or death sentence. It does not speak of a life sentence, and because of that omission I do not see that implicitly it [life sentence] is being contemplated, due to the origin of the same constitutional guarantees which do not reinstate the penalties of life sentence or death.
I do not think that if the Constitution did not speak of forced labor or death penalty, that our jurisprudence could be interpreted as putting its seal of approval on extraditions so that sentences of that nature could be served. Under the `aegis' of the constitution, there is no distinction between them. Because the death penalty (except in case of declared war, according to Art. 84, XIX), forced labor, exile and cruel [punishment], are irrelevant and inapplicable, just like life sentences, the former as to chronological scale, the latter, [because it is] mentioned in the list of exceptions. Because the ordinary law did not mention life sentences, that does not mean that it can be included in the extradition hearing, in order to be implemented in the requesting Country. It is because the Federal Constitution prohibits life sentences, in the list of penalties that do not exist in Brazil.
I'm not worried about the treaty. It can say what it wants, but it cannot override the constitutional ban, which does not allow life sentences in this Country, and for that very reason the Alien who lives here [is protected by it], and extradited he may be, but it will have to be with the restriction of a life sentence in the Country where he will serve his sentence.
I do not see where a comparison can be made concerning identity of situations, [or] if we can argue about breach of confidentiality, when it caused someone to be convicted, or on another aspect, [if we can debate] the right of cross examination in criminal procedures, or why there is no provision for a trial by jury in a given State. [I cannot see how] such cases equally compare with the issue of life imprisonment. While those are concepts which, no doubt, can be elevated to constitutional decisions, just the same they cannot be defined individually, as life imprisonment, which touches, by its very nature, on the status libertatis of persons. These other principles are of constitutional nature, but they are not intrinsically invested with the form and physical characteristics of the penalty, thus comprised by genesis, and banned, repeatedly by the last Federal Constitutions, as they have been expunged from our penal tradition. I would say it is true that they are more rites of process, solemn and of a higher legislative degree, [as they] deal with human rights, but they do not directly and in a straight forward manner refer to the type of penalty, as defined by Article 5 clause XLVII (b) of the Public Charter.
It is one thing to respect the working mechanism of constitutional guaranteesthe Jury, the precepts of confidentiality and cross examinationand another [to respect] the penalty to be implemented. While those are implemented in the fulfillment of prerogatives inherent to all citizens, the penalty is the result of State interference to punish the perpetrator. The State that guarantees the practice of law is different from the State that repeals the death penalty. Brazilian Law repeals life imprisonment, thus its elevation to the heights of constitutional dogma.
A citizen who is being judged for extradition purposes is under the protection of the constitutional guarantee clause that does not allow life imprisonment, and to grant it under those conditions, in my opinion, would be to *1347 attack an absolute precept resulting from this constitutional guarantee.
In Extradition Hearing No. 426 a "leading case" which established a divisory line on the restriction, it must be emphasized that the extradition mentioned dealt with an American Escapee who was serving a life sentence, and in this procedure we verified that the person sought for extradition was only under deferred provisional arrest, but subject to a life sentence penalty.
As this subject has been discussed and reiterated a number of times, so that everyone is familiar with it, I refrain from expounding on it in greater detail.
With the above considerations [in mind] I vote with the Hon. [Justice] Assigned [to the case], concerning the portion related to granting the extradition request. I oppose him, with all due respect, only with the proviso that the Requesting State, in the event that the person sought for extradition is condemned to life in prison, that his prison sentence be limited to a maximum of thirty years.
[Signature illegible]
12 /18 / 95
FULL SESSION
EXTRADITION No. 654-1

UNITED STATES OF AMERICA

VOTE
THE HONORABLE JUSTICE FRANCISCO REZEKIn opening, with all due respect, I would like to disagree with the Honorable Justice Maurício Corrêa where His Honor disagrees with the Assigned Justice as to the 30 year restriction, in lieu of life imprisonment.
Try as I might, the philosophical distinction established by His Honor in his learned vote, makes no sense to me. I cannot fully comprehend what could be this intrinsic virtue of the constitutional rule which prohibits life sentences in Brazil, to the point of differentiating such rule from others that, in the very same Constitution, talk about other characteristics of the criminal process, of punishment and imprisonment of persons within the jurisdictional territory of this Republic.
The Brazilian legislature provides a long list of guarantees in the name of the Brazilian State. It promises the people certain guidelines of criminal procedure and consequences for criminal acts, assuming that in Brazil, due to our jurisdiction and action of our [law enforcement] authorities, someone is being judged. I do not know under what pretext the Brazilian Constitution can make guarantees of a constitutional level to the person undergoing a [legal] procedure in another sovereign [State]. I also do not know on what technical, scientific or moral grounds, a certain person, because he / she was in a given moment of his / her life in Brazilian territory, would be covered by the [same] guarantees that the Federal Constitution allows a Defendant going through the criminal process in Brazil, even if [this person] is sent to another sovereign State, due to a decision of this Court, so that notwithstanding, the jurisdiction [of that Country] be imposed and not ours.
Our legal system is clear when it says what needs to be asked of the Requesting State as a compromise, when the Extradition Act is brought to completion: That it [the Requesting State] abstain from imposing the death penalty, physical punishment and degrading or humiliating penalties; that it give credit for the time served in Brazil, and certain other things. Absolutely not, the commutation of a life sentence; absolutely not, overseas, under another flag, a prison restriction that the Brazilian legislature established to be valid only among us.
It seems to me that in this case, the Court should preserve its jurisprudence, established the moment the opinion of the Attorney-General, Professor Cláudio Fontelles was refused, in the sense that the 30 year limit should be imposed on the foreign sovereignty as a condition of the extradition, because it dealt with a rule somehow vested with transcendence.
I would like to ponder [the fact] that, in this case, the Defendant is being accused by the Justice [System] of the State of Washington, in the United States of America, of Arson, which occurred in the city of Seattle.
*1348 The laws are clear that the penalties are severe. Arson in the First Degree, as described in the report, may lead in itself, to a life sentence. Murder in the First Degree, only one charge may lead, in itself, to a life sentence. As valid as the accusation of the United States of America may be, we would have a possibility of an accumulation of five life sentences, being that the Information, after univocal description of the facts says, however, that he is guilty of Arson, but that he is also guilty of Murder in the First Degreefour times.
He is being accused of having caused the fire of his own store, in order to obtain certain security or insurance advantages. There is a candid aspect in the report: The very Arsonist would have leaked out, ahead of time, that the store would burn down at that time, in order to avoid that [the lives] of innocent persons be exposed. But it is clear that whoever causes Arson, assumes the risks of his deed. And it happened that, in rendering assistance, four firemen who were on the top floor of the building saw the wooden floor collapse under them and died in the fall.
For a long time the Court is aware that I oppose the practice of imposing restrictions on an extradition. I have been saying this since the seventies. It seems to me that it was never the intention of the Brazilian legislature to maintain a restrictive posture. What the law wants, as I was saying, is that no one be extradited due to acts that are not criminal, according to our [law] or if the acts are not punishable, according to general rules. But when the main fact, when the brunt of the accusation justifies the extradition, I believe we should not scrutinize valid criminal process of the requesting Country as to accidental events, parallel crimes, in order to detect, in the perimeters of the charges, a lack of dual criminality rules or irrelevancy, [therefore] opposing restrictions to the measure.
I was overruled here. The Court decided, unanimously that these restrictions can and should be applied, under the pretext of a clearer, more detailed view of lack of dual criminality. The accusation must be examined considering its entire context; and we will do so, step by step, number by number, topic by topic, detecting the occurrence of dual criminality without which extradition cannot be granted, or it is only partially granted.
Overruled, I must obey the jurisprudence which for years has prevailed by the majority rule. What grieves me in this particular case, and renders the decision difficult is not the issue of the thirty year restriction, but [the manner which] the conduct of the person sought for extradition fits the criminal law of the Requesting State and our own legal system. What the charge does, in this case, after describing the human conduct to be studied, is to say that it falls under Arson in the First Degree and also in Murder in the First Degree, once, twice, three and four times. Concerning the severity of the penalties expected by the Prosecution in its charging efforts, this does not make a lot of difference, being that each one of the five charges herein accumulated would justify, in itself, a life sentence.
What I cannot see is dual criminality in the case of Murder in the First Degree. State of Washington Law says:
Arson in the First Degree: A person is guilty of Arson in the First Degree if he knowingly and maliciously causes a fire or explosion which is manifestly dangerous to any human life, including firemen.
This is exactly what happened. And for Arson in the First Degree, depending on the circumstances, and obviously, on the consequences, the prison [term] can be either moderate in its chronological duration, or life, according to the law of the Requesting State.
Brazilian law, in Article 250 says with respect to Arson:
To cause a fire, risking life, physical integrity or property of another:
Penaltyconfinement from three to six years, and fine ( ... ).
Penalty enhancement
Par. 1Penalties increase by one-third:
IIf the crime is committed with the intent of gaining monetary advantage for personal or third party gain.
*1349 We have here exactly the hypothesis described on the report. Finally, Brazilian law, in Article 258 says that, if death results from the intentional crime of personal danger the penalty doubles.
According to Brazilian law the hypothetical case presented in the documents would lead to something like sixteen years of confinement. But I am not worried about the question of quantity. I agree with the extradition, aware that the Arson, which resulted in death, can accrue, according to American law, a life sentence.
But it is true that, on the other hand the law of the Requesting State talks about Murder in the First Degree: 1. A person is guilty of Murder in the First Degree when: (here we have many possibilities) c. He or she commits or attempts to commit the crime of either: (item IV) Arson in the First Degree, and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person.
This is the picture I cannot see mirrored, in any way, in the narrative that the Prosecuting Attorney's Office of Seattle itself has written.
What I see is an impeccable hypothesis of Arson in the First Degree, according to American law, which fits, like a glove, Article 250 of our Criminal Law Code, combined with Par. 1, clause I and with Article 258, because the result was death.
Completely omitting the penalty issue, which varies greatly from country to country and keeping in mind that I do not place this restriction in relation to the length of the prison sentence, with all due respect, I am unable to see in the narrative, a crime other than Arson in the First Degree, which resulted in the death of four people. In the scene described herein we cannot speak of a case of Intentional Fire [arson] followed by death, added to four separate Murders in the First Degree.
My vote grants the extradition, without any restriction whatsoever as to the possibility of a life sentence, only for the crime of Arson with its results, with all its consequences, according to American law; however, without the added charge of four counts of Murder in the First Degree.
[Signature illegible]
12 /18 / 95
FULL SESSION
EXTRADITION No. 654-1

UNITED STATES OF AMERICA

VOTE
THE HONORABLE JUSTICE MARCO AURÉLIOMr. President, as was well reported by the Honorable Justice Néri da Silveira, the American Government is asking us for the extradition of the person sought, following precise charges against him. He is being accused of having set fire to a commercial facility, maybe, who knows, to escape civil demise. Having acted in that manner, once the fire-fighters arrived at the scene, according to American law, he would have caused the death of four of them.
In opening, Mister President, I see, just like you, Your Honor, that the Diplomatic Note contains a double heading, occurring from the same facts. The first, alluding to Arson in the First Degree, which, in itself once charged as a class "A" felony, in itself is enough to accrue a sentence of life in prison. The second, concerns the four other crimes of Murder in the First Degree. Therefore, there are five charges against the Person Sought for Extradition.
Mr. President, the extradition, according to Law 6.815, of August 19, 1980, assumes the symmetry, and I take this legal precept to mean what it says. Article 77 decrees:
Article 77 Extradition will not be granted when the fact motivating the request is not considered a crime in Brazil or in the Requesting State.
The question is: Can we fit Murder in the First Degree on the heading of our Criminal Law Code, Article 121, Intentional Homicide? In my opinion, as to symmetry, the vital dual criminality does not exist.
The Honorable Justice Francisco Rezek underlined perfectly, with great acumen, that the facts in the narrative lead to the charges, *1350 according to the Criminal Law Code, Article 250:
... to cause a fire, exposing to risk of life, the physical integrity or the property of another:
Penaltyconfinement, from three to six years, ...
In considering the resulting "death", there is the qualifying [clause] included in the first portion of Article 258, which says:
... If serious bodily harm results from an intentional crime of common danger, the prison sentence is increased by halfthe penalty of Article 250if it results in death, it is doubled. In the case of non-intentional [crime] [illegible] and then by lack of prudence, negligence and lack of skillif bodily harmas it relates to fireresults from the act, the penalty would be increased by half, if it results in death, the sentence imposed for Non-Intentional Homicide is increased by one third.
Now, looking at the facts in the narrative, my opinion is that the case, from the point of view of dual criminality, taking into consideration Brazilian legislation, fits in the first portion of Article 258 of our Criminal Law Code. Therefore I agree, on this, with Justice Francisco Rezek.
There is the issue of life sentence. The established jurisprudence of this Court, I believe, unless I am mistaken, is to lay down conditions for granting the Extradition, when there is the risk of the Person Sought being sentenced to death. Therefore, we proceed with the utmost care in clause XLVII of the list of basic guarantees, as included in the Constitution, Article 5's "caput", pertaining to foreign nationals living in Brazil. The question is: Is it possible to distinguish; is it possible to establish the application of the clause, obstructing certain procedure, if it implies in "death", and not proceed in exactly the same way, when there is risk of a life sentence? What would be the basis for the divergence, if guarantees are placed in the same clause of Article 5?
Article 5 is categorical, in clause XLVII:
XLVIIthere will be no sentences:
a) of death, unless war has been declared, according to Article 84, XIX;
b) of life [in prison];
c) of forced labor;
d) of exile;
e) of cruelty;
I do not see how this Court's Jurisprudence can make a stand as to the restriction, concerning paragraph "a" and not continue in the same vein, since the basis is the same, as to paragraph "b", concerning the impossibility of a life sentence, as it exists in American law.
First, I am unableand in this respect I am one of Justice Francisco Rezek's disciples to place the Treaty above the Political Document of the Republic [Constitution]. I look at its content and I place the treaties at the same level as our ordinary laws.
Second, concerning specific law, which some think it is demanded by constitutional rule, we do have that. Our Criminal Law Code states that no one will remain in prison for more than thirty years. Thus, the requirement defined in our jurisprudence is being echoed by the very Brazilian Criminal Law Code.
Therefore, in this case, I remove the possibility for the Person sought for Extradition to answer for Murder in the First Degree having in mind the material conflict, the four counts, the four Murdersand, further, I also exclude the possibility of [this person] receiving a life sentence, therefore establishing that he cannot remain under the State's custody for more than thirty years.
I grant the Request [for Extradition] on these terms, therefore, partially.
[Signature illegible]
FULL SESSION
EXTRADITION No. 654-1 USA

VOTE
JUSTICE CARLOS VELLOSO: Mr. President, in examining the request for extradition, the Brazilian judge must verify if the mentioned criminal acts, according to the laws of the Requesting State, are also typical here, [dual criminality] i.e., if they *1351 equally conform, in object, to Brazilian Criminal Law. This is the task we must perform, as to the Request for Extradition.
In this [particular] case, according to what I was able to discern from the debates, the description is as follows: The person sought caused a fire, which resulted in four deaths. Is that an objective act the same as in Brazilian Criminal law? I have no doubt, in this case, that the objective conduct described in Article 250 of the Penal Code took place in the qualified form described in Article 258 of the same Code. It seems to me that there is no way to escape that. In other words, you cannot have, according to Brazilian law, a crime of Arson and a crime of Murder independently. I cannot fail to exert this control, in view of the request for extradition.
Therefore, I would like to apologize to the Assigned Justice, whose votes I have the habit of following to grant the extradition, exactly as it was done by Justice Francisco Rezek, concerning the crime of qualified Arson (Criminal Law Code, Article 250 with qualifying clauses from Article 258Arson followed by death).
Following I review the second issue in debate: The question of restricting a life sentence. In Extraditions Nos. 426 and 486, the Federal Supreme Court implicitly dispensed with the restriction. In Extradition No. 507Argentina, my vote was following that [same] jurisprudence. I do not know if we should alter a jurisprudence already stratified and ratified in this Court.
Therefore, with all due respect to the Honorable Justices who believe otherwise, especially Justice Maurício Corrêa, who opened this debate, I vote in this case, with the Assigned Justice, except for the restriction.
I grant the extradition request.
[Signature illegible]
12 / 18 / 95
FULL SESSION
EXTRADITION No. 654-1

UNITED STATES OF AMERICA

VOTE CORRECTION
THE HONORABLE JUSTICE MAURÍCIO CORRÊAMr. President, I examined the documentation, particularly from the point of view of a life sentence and I thought it would be prudent to explain my position after my first vote.
I confess that during the debates I was somewhat convinced that I should grant the extradition in its merit, except for the restriction, according to Justice Néri da Silveira's vote. However, I see that this deals with an autonomous crime, and the Foreign National Law demands [the existence] of dual criminality in Brazil. Indeed, the request concerning this point does not specifically conform with Article 250, specially when combined with CC, Article 258.
Because of this, with all due respect to the Honorable Justice Néri da Silveira I will follow the vote of Justice Francisco Rezek, only as it pertains to that, granting partial extradition.
[Signature illegible]
12 / 18 / 95
FULL SESSION
EXTRADITION No. 654-1

UNITED STATES OF AMERICA

VOTE
THE HONORABLE JUSTICE CELSO DE MELLOThe crimes that motivated this extradition requestMurder and Arson in the First Degreeare wrongful acts subject to a penal sanction constitutionally barred in our legal system (life sentence). Thus, the criminal acts in question within the legal system currently in use in the State of Washington, justify the legal possibility of imposing the penalty qualified by a life sentence on the extraditee.
The issue now being raised by Justice Maurício Corrêa assumes indisputable legal relevance, because it consists in defining the theme pertinent to the relationship between two regulation standards, within the emerging context of the present cause,one, intimately *1352 joined in international treaties, and another based on constitutional statute standard regulations that are clearly revealed as unmatched in degree of validity, efficacy and authority.
It is necessary to accentuate, in this respect, that the standard derived from international treaties, within the Brazilian legal system, allows the placement of these acts of public international law, in the hierarchy of sources, in the same plane and degree of efficacy given to internal laws of an infra-constitutional character. (JOSÉ ALFREDO BORGES, in Revista de Direito Tributário [Taxation Law Magazine], vol. 27-28, pg. 170-173; FRANCISCO CAMPOS, in RDA [expansion unknown] 47 / 452; ANTONIO ROBERTO SAMPAIO DORIA, "Da Lei Tributária no Tempo" [Of Taxation Law in Time], pg. 41, 1968; GERALDO ATALIBA, "Apontamento de Ciencia das Finançes, Direito Financeiro e Tributário" [Finance Science Finance and Taxation Law Code, Annotated], pg. 110, 1969, RT [expansion unknown]; IRINEU STRENGER, "Curso de Direito International Privado" [Private International Law Course], pg. 108-112, 1978, Forense; JOSÉ FRANCISCO REZEK, "Direito dos Tratados" [Treaty Laws], pg. 470-475, items 393-395, 1984, Forense, v.g.).
Indeed, there is no hierarchic-standard precedence or priority of these international acts, compared to internal positive law, specially according to clauses contained in the Constitution of the Republic, since the external standard practice is not superimposed on what is found in our Basic Law level.
I know, Mr. President that in 1985 this Court changed its orientation as far as the jurisprudence is concerned, which conditioned the handing over of the person sought for extradition to the existence of a formal agreementpreviously done by the requesting Stateconcerning the commutation of the life sentence penalty in temporary sanction of prison sentences (RTJ 108 / 18RTJ 111 / 16).
In fact, Extradition Hearing No. 426-3, requested by the Government of the United States of America, led the Federal Supreme Court, per majority vote to declare "... irrelevant the allegation for the restriction of life sentence commutation in prison sentences, due to lack of provision in the Law or in the treaty" (RTJ 115 / 969).
Despite the current prevailing orientation in this Court, I do not seeconsistent with the votes in previous extradition hearings (Ext. 486The Monarchy of Belgium, for instance)how to give precedence to penalty rules only present in formal agreements (international treaties) or simply of a legal nature as far as rules contained in the Constitution, which prohibit, absolutely, the imposition of any penalty of a lifelong character (CC, Article 5, clause XLVII, b).
This constitutional prohibition, absolute and impossible to bypass, contains, in reality, the very basis of the legal norm consolidated by Article 75 of the Brazilian Criminal Code, which limits the maximum prison sentence to 30 (thirty) years (DAMÁSIO E. DE JESUS, "Código Penal Anotado" [Criminal Law Code Annotated] pg. 212, 5th Edition, 1995, Saraiva; CELSO DELMANTO "Código Penal Comentado" [Comments on the Criminal Law Code], pg. 121, 3rd ed., 1991, Renovar; JULIO FABRINI MIRABETE, "Manual de Direito Penal" [Criminal Law Manual], vol. I/320, item 7.6.7, 9th ed., 1995, Atlas; ÁLVARO MAYRINK DA COSTA, "Direito PenalParte Geral" [Criminal LawGeneral Part], vol. I, tome II / 579, 4th ed., 1992, Forense; JORGE ALBERTO ROMEIRO, "Curso de Direito Penal Militar" [Military Criminal Law Course], p. 196, item No. 114, 1994, Saraiva; LUIZ VICENTE CERNICHIARO / PAULO JOSÉ DA COSTA JÚNIOR, "Direito Penal na Constituição" [Criminal Law in the Constitution], p. 112-114, 1990, RT).
From the teachings of CELSO RIBEIRO BASTOS (Comentário à Constituição do Brasil" [Comments on the Brazilian Constitution], vol. 2 / 242, 1989, Saraiva) for whom the Brazilian criminal legislature "... grasped very well the sense of the Greater Law precept", because in fixing the limit of time mentioned (CC, Article 75), it defined the maximum penalty legally possible in our country.
*1353 Having in mind the above reasons, and being loyal to the position assumed by the Brazilian Government position which was rendered sacred in its very own constitutionwith all due respect I grant the request now under examination, with the restriction, which I consider necessary, of commuting the life sentence to a prison sentence not to exceed 30 (thirty) years, agreeing completely with the learned vote of the Honorable Maurício Corrêa.
It is my vote.
[Signature illegible]
/csf
12 /18 / 95
FULL SESSION
EXTRADITION No. 654-1 USA
[Signature illegible]

VOTE
HONORABLE JUSTICE SYDNEY SANCHES:Mr. President, concerning the question related to life in prison, my viewpoint has already been affirmed in preceding actions, already mentioned. The Constitution does not regulate extradition. And, when it restricts sentences of death and life in prison, it is obviously regulating what should happen within the Brazilian territory. Yet, it does not impede, nor can it impede that other nations have their own opposing rules.
On the other hand, Brazilian law, which regulates extradition, is explicit in considering it inadmissible, when the requesting State prescribes the death penalty to a crime. Now, as to a life sentence it does not have any prohibition, whatsoever. Thus, I apply the Brazilian law which regulates extradition and which is not incompatible with our Constitution.
As to the remainder, I believe the crime in question is a qualified form of a common danger crime, Fire-Setting, resulting in death. Therefore, the fact described is a crime in Brazil, and it is enough for me.
Concerning classification, if it is a matter that enhances the penalty or if it is a separate crime, I believe that the issue must be resolved, according to the law of the Requesting State.
It does not seem possible, for instance, that this Tribunal can deny an extradition, just because in Brazilian law there is a provision of trial by jury, according to the Federal Constitution, while in the requesting State the trial can be a bench trial or by jury, of a different nature and composition. Nor demand that, in this or that situation, the Requesting State has to concede "sursis", shelter detention or house arrest, just because in our Law such measures exist, inspired by constitutional law.
I am not prepared to extend our competence that far, unless the Court's jurisprudence changes.
Therefore, I grant the extradition in its entirety.
[Signature illegible]
12 / 18 / 95
FULL SESSION
EXTRADITION NO. 654-1

UNITED STATES OF AMERICA

VOTE
THE HONORABLE JUSTICE MOREIRA ALVES:Mr. President, in this case, keeping in mind the peculiarities described by the assigned Justice, it does not seem to me that they can be applied to the precedents invoked as to the issue of dual criminality raised in the requesting State.
Therefore, I follow The Honorable Assigned Justice, including as to the issue of a life sentence, observing in this manner our current jurisprudence.
I grant the extradition in its entirety.
[Signature illegible]
12 / 18 / 95
*1354 FULL SESSION
EXTRADITION No. 654-1

UNITED STATES OF AMERICA

VOTE
THE HONORABLE JUSTICE SEPÚLVEDA PERTENCE (PRESIDENT): My vote, with the utmost respect to the Assigned Justice and all the others who voted with him, follows the Honorable Justice Maurício Corrêa's vote, His Honor's corrected vote, that is.
Concerning the object of the extradition, I do not doubt this Court's power to restrict it in this case. The dual criminality decision, the most basic one, [and] one of the first tasks of this hearing's passive judgment, is applied to the fact described in the charge to which it answers, or to the sentence imposed on the person sought. Not on the coincidence of legal systems, taken in abstracts (v.g. Extr. 605, Celso de Mello).
What do we know about the case? Clearly, in the note requesting extradition, it says that, having committed the crime of Arson, during this fire, the collapsing of one of the slabs caused the death of four firemen. The case, to me, is typical of Arson, with the special enhancement clausethe resulting death, mentioned in the Penal Code, Article 258. And, furthermore, it seemed to me during the discussion, that not even in American Law there would be the concurrence of Arson with Murder in the First Degree. It is much more than clear, that in American Law, Murder in the First Degree, in the event of Intentional Fire-Setting, presupposes that the agent kill someone to commit the Arson, or in escaping, after setting the fire. A typical case would be someone who wants to gain entry into a building to set a fire and kills the watchman; or, after setting the fire [the agent] kills the watchman who tries to arrest him, when he was leaving. Obviously, this is not the case, as described by the Requesting State in its Diplomatic Note, now the object of this extradition hearing.
But, I am not going to venture into the extremely delicate areaalthough [a matter over which] the passive extradition court has competence to verify dual criminality in the original State; the Brazilian Law is sufficient for me, where, besides Arson qualified by the resulting death, there can also be Arson concurrent Homicide; if Homicide is committed, according to Article 121, Par. 2, no. 5 "to ensure the execution, cover-up, impunity or advantage of another crime".
The other questioneligibility or not of the commutation of a life sentenceexpected to be exciting, wasn't, because the Court's majority preferred to maintain its established jurisprudence.
My position is known. I was overruled, and I reaffirm my opinion. I understand that we must demand commutation of penalties forbidden by the Constitution in Brazil. I am not going to debate the entire issue over again, but I understand that the problem does not conform with the other constitutional guarantees.
An extradition is an international cooperation for penal suppression and, according to me, the imposition of penalties that were found to be offensive to human dignity or to the very function of the penalty as conceived by the Constitution, which for this reason, clearly forbade it, must be excluded from this cooperation.
Therefore, agreeing with the votes of the Honorable Justices Maurício Corrêa, Marco Aurélio and Celso de Mello, I also would demand the commutation of the penalties.
[Signature illegible]

OPINION APPENDIX B

TREATY OF EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND THE UNITED STATES OF BRAZIL[1]
The United States of America and the United States of Brazil, desiring to make more effective the cooperation of their respective countries in the repression of crime, have resolved to conclude a treaty of extradition and for this purpose have appointed the following Plenipotentiaries:
*1355 The President of the United States of America: His Excellency John Moors Cabot, Ambassador of the United States of America to Brazil, and
The President of the United States of Brazil: His Excellency Horacio Lafer, Minister of State for External Relations,
Who, having communicated to each other their respective full powers, found to be in good and due form, agree as follows:

Article I
Each Contracting State agrees, under the conditions established by the present Treaty and each in accordance with the legal formalities in force in its own country, to deliver up, reciprocally, persons found in its territory who have been charged with or convicted of any of the crimes or offenses specified in Article II of the present Treaty and committed within the territorial jurisdiction of the other, or outside thereof under the conditions specified in Article IV of the present Treaty: provided that such surrender shall take place only upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his commitment for trial if the crime or offense had been there committed.

Article II
Persons shall be delivered up according to the provisions of the present Treaty for prosecution when they have been charged with, or to undergo sentence when they have been convicted of, any of the following crimes or offenses:
1. Murder (including crimes designated as parricide, poisoning and infanticide, when provided for as separate crimes); manslaughter when voluntary.
2. Rape; abortion; carnal knowledge of (or violation of) a girl under the age specified by law in such cases in both the requesting and requested States.
3. Malicious wounding; willful assault resulting in grievous bodily harm.
4. Abduction, detention, deprivation of liberty, or enslavement of women or girls for immoral purposes.
5. Kidnapping or abduction of minors or adults for the purpose of extorting money from them or their families or any other person or persons, or for any other unlawful end.
6. Bigamy.
7. Arson.
8. The malicious and unlawful damaging of railways, trains, vessels, aircraft, bridges, vehicles, and other means of travel or of public or private buildings, or other structures, when the act committed shall endanger human life.
9. Piracy, by the law of the nations; mutiny on board of vessel or an aircraft for the purpose of rebelling against the authority of the Captain or Commander of such vessel or aircraft; or by fraud or violence taking possession of such vessel or aircraft.
10. Burglary, defined to be the breaking into or entering either in day or night time, a house, office, or other building of a government, corporation, or private person, with intent to commit a felony therein; housebreaking.
11. Robbery.
12. Forgery or the utterance of forged papers.
13. The forgery, falsification, theft or destruction of the official acts or public records of the government or public authority, including Courts of Justice, or the uttering or fraudulent use of the same.
14. The fabrication or the utterance, circulation or fraudulent use of any of the following objects: counterfeit money, whether coin or paper; counterfeit titles or coupons of public debt, created by national, state, provincial, territorial, local, or municipal governments; counterfeit bank notes or other instruments of public credit; and counterfeit seals, stamps, dies, and marks of State or public administration.
15. The introduction of instruments for the fabrication of counterfeit coins or bank notes or other paper currency as money.
*1356 16. Embezzlement by any person or persons hired, salaried or employed, to the detriment of their employers or principals.
17. Larceny.
18. Obtaining money, valuable securities or other property by false pretenses, or by threats of injury.
19. Receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained.
20. Fraud or breach of trust by a bailee, factor, trustee, executor, administrator, guardian, director or officer of any company or corporation or by anyone in any fiduciary capacity.
21. Willful non-support or willful abandonment of a minor or other dependent person when death or serious bodily injury results therefrom.
22. Perjury (including willfully false expert testimony); subornation of perjury.
23. Soliciting, receiving, or offering bribes.
24. The following offenses when committed by public officials: extortion; embezzlement.
25. Crimes or offenses against the bankruptcy laws.
26. Crimes or offenses against the laws of both countries for the suppression of slavery and slave trading.
27. Crimes or offenses against the laws relating to the traffic in, use of, or production or manufacture of, narcotic drugs or cannabis.
28. Crimes or offenses against the laws relating to the illicit manufacture of traffic in substances injurious to health, or poisonous chemicals.
29. Smuggling, defined to be the act of willfully and knowingly violating the customs laws with intent to defraud the revenue by international traffic in merchandise subject to duty.
30. Aiding the escape of a prisoner by force of arms.
31. Use of explosives so as to endanger human life or property.
32. Procuration, defined as the procuring or transporting of a woman or girl under age, even with her consent, for immoral purposes, or of a woman or girl over age, by fraud, threats, or compulsion, for such purposes with a view in either case to gratifying the passions of another person; profiting from the prostitution of another.
33. The attempt to commit any of the above crimes or offenses, when such attempt is made a separate offense by the laws of the Contracting States.
34. Participation in any of the above crimes or offenses.

Article III
Except as otherwise provided in the present Treaty, the requested State shall extradite a person accused or convicted of any crime or offense enumerated in Article II only when both of the following conditions exist:
1. The law of the requesting State, in force when the crime or offense was committed, provides a possible penalty of deprivation of liberty for a period of more than one year; and
2. The law in force in the requested State generally provides a possible penalty of deprivation of liberty for a period of more than one year which would be applicable if the crime or offense were committed in the territory of the requested State.

Article IV
When the crime of offense has been committed outside the territorial jurisdiction of the requesting State, the request for extradition need not be honored unless the laws of the requesting State and those of the requested State authorize punishment of such crime or offense in this circumstance.
The words "territorial jurisdiction" as used in this Article and in Article I of the present Treaty mean: territory, including territorial waters, and the airspace therefor, belonging to or under the control of one of the Contracting States; and vessels and aircraft belonging *1357 to one of the Contracting States or to a citizen or corporation thereof when such vessel is on the high seas or such aircraft is over the high seas.

Article V
Extradition shall not be granted in any of the following circumstances:
1. When the requested State is competent, according to its laws, to prosecute the person whose surrender is sought for the crime or offense for which that person's extradition is requested and the requested State intends to exercise its jurisdiction.
2. When the person whose surrender is sought has already been or is at the time of the request being prosecuted in the requested State for the crime or offense for which his extradition is requested.
3. When the legal proceedings or the enforcement of the penalty for the crime or offense committed has become barred by limitation according to the laws of either the requesting State or the requested State.
4. When the person sought would have to appear, in the requesting State, before an extraordinary tribunal or court.
5. When the crime or offense for which the person's extradition is requested is purely military.
6. When the crime or offense for which the person's extradition is requested is of a political character. Nevertheless
a. The allegation by the person sought of political purpose or motive for the request for his extradition will not preclude that person's surrender if the crime or offense for which his extradition is requested is primarily an infraction of the ordinary penal law. In such case the delivery of the person being extradited will be dependent on an undertaking on the part of the requesting State that the political purpose or motive will not contribute toward making the penalty more severe.
b. Criminal acts which constitute clear manifestations of anarchism or envisage the overthrow of the bases of all political organizations will not be classed as political crimes or offenses.
c. The determination of the character of the crime or offense will fall exclusively to the authorities of the requesting State.

Article VI
When the commission of the crime or offense for which the extradition of the person is sought is punishable by death under the laws of the requesting State and the laws of the requested State do not permit this punishment, the requested State shall not be obligated to grant the extradition unless the requesting State shall not be obligated to grant the extradition unless the requesting State provides assurances satisfactory to the requested State that the death penalty will not be imposed on such person.

Article VII
There is no obligation upon the requested State to grant the extradition of a person who is a national of the requested State, but the executive authority of the requested State shall, subject to the appropriate laws of that State, have the power to surrender a national of that State if, in its discretion, it be deemed proper to do so.

Article VIII
The Contracting States may request, one from the other, through the channel of their respective diplomatic or consular agents, the provisional arrest of a fugitive as well as the seizure of articles relating to the crime or offense.
The request for provisional arrest shall be granted provided that the crime or offense for which the extradition of the fugitive is sought is one for which extradition shall be granted under the present Treaty and provided that the request contains:
1. A statement of the crime or offense of which the fugitive is accused or convicted;
2. A description of the person sought for the purpose of identification;
3. A statement of the probable whereabouts of the fugitive, if known; and
*1358 4. A declaration that there exist and will be forthcoming the relevant documents required by Article IX of the present Treaty.
If, within a maximum period of 60 days from the date of the provisional arrest of the fugitive in accordance with this Article, the requesting State does not present the formal request for his extradition, duly supported, the person detained will be set at liberty and a new request for his extradition will be accepted only when accompanied by the relevant documents required by Article IX of the present Treaty.

Article IX
The request for extradition shall be made through diplomatic channels or, exceptionally, in the absence of diplomatic agents, it may be made by a consular officer, and shall be supported by the following documents:
1. In the case of a person who has been convicted of the crime or offense for which his extradition is sought: a duly certified or authenticated copy of the final sentence of the competent court.
2. In the case of a person who is merely charged with the crime or offense for which his extradition is sought: a duly certified or authenticated copy of the warrant of arrest or other order of detention issued by the competent authorities of the requesting State, together with the depositions upon which such warrant or order may have been issued and such other evidence or proof as may be deemed competent in the case.
The documents specified in this Article must contain a precise statement of the criminal act of which the person sought is charged or convicted, the place and date of the commission of the criminal act, and they must be accompanied by an authenticated copy of the texts of the applicable laws of the requesting State including the laws relating to the limitation of the legal proceedings or the enforcement of the penalty for the crime or offense for which the extradition of the person is sought, and data or records which will prove the identity of the person sought.
The documents in support of the request for extradition shall be accompanied by a duly certified translation thereof into the language of the requested State.

Article X
When the extradition of a person has been requested by more than one State, action thereon will be taken as follows:
1. If the requests deal with the same criminal act, preference will be given to the request of the State in whose territory the act was performed.
2. If the requests deal with different criminal acts, preference will be given to the request of the State in whose territory the most serious crime or offense, in the opinion of the requested State, has been committed.
3. If the requests deal with different criminal acts, but which the requested State regards as of equal gravity, the preference will be determined by the priority of the requests.

Article XI
The determination that extradition based upon the request therefor should or should not be granted shall be made in accordance with the domestic law of the requested State, and the person whose extradition is desired shall have the right to use such remedies and recourses as are authorized by such law.

Article XII
If at the time the appropriate authorities of the requested State shall consider the documents submitted by the requesting State, as required in Article IX of the present Treaty, in support of its request for the extradition of the person sought, it shall appear that such documents do not constitute evidence sufficient to warrant extradition under the provisions of the present Treaty of the person sought, such person shall be set at liberty unless the requested State or the proper tribunal thereof shall, in conformity with its own laws, order an extension of time for the submission by the requesting State of additional evidence.

Article XIII
Extradition having been granted, the surrendering State shall communicate promptly *1359 to the requesting State that the person to be extradited is held at its disposition.
If, within 60 days counting from such communication-except when rendered impossible by force majeure or by some act of the person being extradited or the surrender of the person is deferred pursuant to Articles XIV or XV of the present Treaty-such person has not been delivered up and conveyed out of the jurisdiction of the requested State, the person shall be set at liberty.

Article XIV
When the person whose extradition is requested is being prosecuted or is serving a sentence in the requested State, the surrender of that person under the provisions of the present Treaty shall be deferred until the person is entitled to be set at liberty, on account of the crime or offense for which he is being prosecuted or is serving a sentence, for any of the following reasons: dismissal of the prosecution, acquittal, expiration of the term of the sentence or the term to which such sentence may have been commuted, pardon, parole, or amnesty.

Article XV
When, in the opinion of competent medical authority, duly sworn to, the person whose extradition is requested cannot be transported from the requested State to the requesting State without serious danger to his life due to grave illness, the surrender of the person under the provisions of the present Treaty shall be deferred until such time as the danger, in the opinion of the competent medical authority, has been sufficiently mitigated.

Article XVI
The requesting State may send to the requested State one or more duly authorized agents, either to aid in the identification of the person sought or to receive his surrender and to convey him out of the territory of the requested State.
Such agents, when in the territory of the requested State, shall be subject to the applicable laws of the requested State, but the expenses which they incur shall be for the account of the State which has sent them.

Article XVII
Expenses related to the transportation of the person extradited shall be paid by the requesting State. The appropriate legal officers of the country in which the extradition proceedings take place shall, by all legal means within their power, assist the officers of the requesting State before the respective judges and magistrates. No pecuniary claim, arising out of the arrest, detention, examination and surrender of fugitives under the terms of the present Treaty, shall be made by the requested State against the requesting State other than as specified in the second paragraph of this Article and other than for the lodging, maintenance, and board of the person being extradited prior to his surrender.
The legal officers, other officers of the requested State, and court stenographers in the requested State who shall, in usual course of their duty, give assistance and who receive no salary or compensation other than specific fees for services performed, shall be entitled to receive from the requesting State the usual payment for such acts or services performed by them in the same manner and to the same amount as though such acts or services had been performed in ordinary criminal proceedings under the laws of the country of which they are officers.

Article XVIII
A person who, after surrender by either of the Contracting States to the other under the terms of the present Treaty, succeeds in escaping from the requesting State and takes refuge in the territory of the State which has surrendered him, or passes through it in transit, will be detained, upon simple diplomatic request, and surrendered anew, without other formalities, to the State to which his extradition was granted.

Article XIX
Transit through the territory of one of the Contracting States of a person in the custody of an agent of the other Contracting State, and surrendered to the latter by a third *1360 State, and who is not of the nationality of the country of transit, shall, subject to the provisions of the second paragraph of this Article, be permitted, independently of any judicial formalities, when requested through diplomatic channels and accompanied by the presentation in original or in authenticated copy of the document by which the State of refuge has granted the extradition. In the United States of America, the authority of the Secretary of State of the United States of America shall be first obtained.
The permission provided for in this Article may nevertheless be refused if the criminal act which has given rise to the extradition does not constitute a crime or offense enumerated in Article II of the present Treaty, or when grave reasons of public order are opposed to the transit.

Article XX
Subject to the rights of third parties, which shall be duly respected:
1. All articles, valuables, or documents which relate to the crime or offense and, at the time of the arrest, have been found in the possession of the person sought or otherwise found in the requested State shall be surrendered, with him, to the requesting State.
2. The articles and valuables which may be found in the possession of third parties and which likewise are related to the crime or offense shall also be seized, but may be surrendered only after the rights with regard thereto asserted by such third parties have been determined.

Article XXI
A person extradited by virtue of the present Treaty may not be tried or punished by the requesting State for any crime or offense committed prior to the request for his extradition, other than that which gave rise to the request, nor may he be re-extradited by the requesting State to a third country which claims him, unless the surrendering State also agrees or unless the person extradited, having been set at liberty within the requesting State, remains voluntarily in the requesting State for more than 30 days from the date on which he was released. Upon such release, he shall be informed of the consequences to which his stay in the territory of the requesting State would subject him.

Article XXII
The present Treaty shall be ratified and the ramifications thereof shall be exchanged at Washington, as soon as possible.
The present Treaty shall enter into force one month after the date of exchange of ratification. It may be terminated at any time by either Contracting State giving notice of termination to the other Contracting State, and the termination shall be effective six months after the date of such notice.
IN WITNESS WHEREOF the respective Plenipotentiaries have signed the present Treaty and have affixed hereunto their seals.
DONE in duplicate, in the English and Portuguese languages, both equally authentic, at Rio de Janeiro, this thirteenth day of January, one thousand nine hundred sixty-one.
[SEAL] JOHN M. CABOT
[SEAL] HORACIO LAFER
ADDITIONAL PROTOCOL TO THE TREATY OF EXTRADITION OF JANUARY 13, 1961, BETWEEN THE UNITED STATES of America and the United States of Brazil
The United States of America and the United States of Brazil,
Having concluded at Rio de Janiero, on January 13, 1961, a Treaty of Extradition for the purpose of making more effective the cooperation between the two countries in the repression of crime,
And desiring to make clear that their respective nationals will be subject to extradition only if the constitutional and legal provisions in force in their territories permit it,
Have resolved to sign an Additional Protocol to the aforementioned Treaty of Extradition and, to this end, have appointed the following Plenipotentiaries:
The president of the United States of America: His Excellency Lincoln Gordon, Ambassador Extraordinary and Plenipotentiary to Brazil, and *1361 The President of the Republic of the United States of Brazil: His Excellency Francisco Clementino de San Tiango [sic] Dantas, Minister of State for External Relations,
Who, having communicated to each other their respective full powers, found to be in good and due form, agree as follows:

Article I
Article VII of the Treaty of Extradition concluded between the countries at Rio de Janeiro, on January 13, 1961, shall be interpreted as follows:
"The Contracting Parties are not obliged by this Treaty to grant extradition of their nationals. However, if the Constitution and laws of the requested State do not prohibit it, its executive authority shall have power to surrender a national if, in its discretion, it be deemed proper to do so."

Article II
The present Protocol shall enter into force on the same date as the Treaty of Extradition of January 13, 1961, and shall cease to be effective on the date of termination of the Treaty.
In WITNESS hereof, the respective Plenipotentiaries have signed the present Additional Protocol and have fixed hereunto their seals.
DONE in duplicate, in the English and Portuguese languages, both equally authentic, at Rio de Janeiro, on this eighteenth day of June, one thousand nine hundred sixty-two.

LINCOLN GORDON

FC DE SAN TIAGO [SIC] DANTAS
[SEAL]
WHEREAS the Senate of the United States of America by their resolution of May 16, 1961, two-thirds of the Senators present concurring therein, did advise and consent to the ratification of the treaty and by their resolution of October 22, 1963, two thirds of the Senators present concurring therein, did advise and consent to the ratification of the additional protocol;
WHEREAS the President of the United States of America ratified the treaty on May 29, 1961 and the additional protocol on October 29, 1963, in pursuance of the advice and consent of the Senate, and the Government of the United States of Brazil has duly ratified the treaty and the additional protocol;
WHEREAS the respective instruments of ratification of the treaty and the additional protocol were duly exchanged at Washington on November 17, 1964;
AND WHEREAS it is provided in Article XXII of the treaty that the treaty shall enter into force one month after the date of exchange of ratification, and it is provided in Article II of the additional protocol that the additional protocol shall enter into force on the same date as the treaty;
NOW, THEREFORE, be it known that I, Lyndon B. Johnson, President of the United States of America, do hereby proclaim and make public the said treaty and additional protocol, to the end that the same and every article and clause thereof may be observed and fulfilled in good faith on and after December 17, 1964, one month after the day of exchange of instruments of ratification, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.
IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Seal of the United States of America to be affixed.
DONE at the city of Washington this twentieth day of November in the year of our Lord one thousand nine hundred sixty-four and of the independence of the United States of America the one hundred eighty-ninth.
[SEAL]

Lyndon B. Johnson
By the President:
 GEORGE W. BALL
 Acting Secretary of State
NOTES
[1] See Certification for Determination of Probable Cause, Clerk's Papers at 4.
[2] See Warrant for Arrest, United States District Court Case Number 95-38m, signed by Judicial Officer David E. Wilson on February 3, 1995; see also Arrest Warrant, King County Superior Court Cause Number XX-X-XXXXX-X, signed by Deputy Clerk Bill Stream. The dateline on the warrant states "Witness my hand and Seal this March 3, 1995 day of January, 1995."
[3] Clerk's Papers at 1-3.
[4] See Clerk's Papers at 4-8.
[5] See Record of Surrender of Person Being Extradited, Number 02/96, Clerk's Papers at 363.
[6] Amended Information, Clerk's Papers at 9-11.
[7] See Affidavit in Support of Request for Extradition, King County Cause Number XX-X-XXXXX-X.
[8] Id. at 1-17 (exhibits omitted) (emphasis added).
[9] Supplemental Affidavit in Support of Request for Extradition, King County Cause Number XX-X-XXXXX-X, at 1-3 (attachments omitted).
[10] See Federal Supreme Court of Brazil decision on the Extradition, Number 00006541/120. Opinion Appendix "A." English translation from original Portuguese. See Clerk's Papers at 159-211 for opinion in Portuguese.
[11] Clerk's Papers at 321-23 (emphasis added).
[12] Letter from the United States Embassy to the Brazil Ministry of Foreign Affairs dated February 22, 1996. RCW 9A.32.030(1)(c) is the Washington statute relating to murder in the first degree.
[13] Id.
[14] Letter from the Brazil Ministry of Foreign Affairs to the United States Embassy dated February 27, 1996.
[15] Id. (italics ours).
[16] See Record of Surrender of Person Being Extradited, No. 02/96, Clerk's Papers at 362-63.
[17] See Request for Declaration [sic: Clarification] (Embargo Declaracao [sic]).
[18] State's Answer to Motion for Discretionary Review to the Supreme Court, filed January 8, 1997, Exhibit K.
[19] See Appeal for Clarification,Extradition No. 00006545/122, Clerk's Papers at 312-316. English translation from the original Portuguese.
[20] Id. at 312-16 (italics ours).
[21] Clerk's Papers at 131-32 (emphasis added).
[22] Affidavit of Timothy A. Bradshaw in Support of State's Response to Motion to Dismiss, Clerk's Papers at 145-148A (emphasis added).
[23] See Memorandum in Opposition to Defendant's Alternative Motion for Dismissal of Counts 1 through 4; and a Writ of Habeas Corpus, filed April 5, 1996, Clerk's Papers at 133-43 ("The Brazilian executive branych [sic] has verbally waived Brazil's specialty rights under the extradition treaty and may elect to provide the United States with a written waiver at any time prior to the trial of this matter.") Clerk's Papers at 139 (footnote omitted) ("A representative of the Brazilian executive branch has verbally waived the rule [of specialty]." Clerk's Papers at 141.); see also Memorandum in Opposition to Defendant's Alternative Motions to Dismiss Counts I-IV; Require an Offer of Proof; Expedite Pre-Trial Hearings and for Discovery, filed July 8, 1996, Clerk's Papers at 229-48 ("The affidavit outlined formal and personal meetings with Brazilian officials. The affidavit remains true and valid." Clerk's Papers at 231. "As was stated at the April 09 hearing, a verbal waiver was in fact obtained." Clerk's Papers at 236.); see also State's Opening Memorandum of Points and Authorities Re: Extradition; the Rule of Specialty; Waiver and Defendant's Motion to Dismiss Counts 1-4, filed on July 25, 1996, Clerk's Papers at 374-390 ("The Brazilian government would not object, according to multiple statements made by Justice Minister to members of the U.S. delegation are accurately recited in the previously filed affidavit of Timothy Bradshaw." Clerk's Papers at 382); see also Opposition to Motion to Dismiss, filed on Nov. 4, 1996 Clerk's Papers at 428-64 ("A United States delegation traveled to Brasilia on January 23, 1996 and met with The [sic] Minister of Justice. See filed Affidavit of Tim [sic] Bradshaw." Clerk's Papers at 433. "It is interesting to note, however, that the Brazilian executive, through its Minister of Justice (the equivalent of the United States Attorney General) has indicated that it will not object to a decision by the United States to try the defendant for Murder in the First Degree." Clerk's Papers at 441.).
[24] Hearing Before the Honorable Larry A. Jordan, November 12, 1996, Transcript at 16.
[25] See State's Answer to Motion for Discretionary Review, Exhibit G. We observe with criticism that there were significant representations made in the affidavit which were either not based upon fact supported by the record or were made with a reckless disregard for whether they were based upon fact. Those questionable representations were made not only in the affidavit, but were substantially repeated by counsel for the State in proceedings before the King County Superior Court. Zealous prosecution of a criminal case is highly to be commended. But zealousness to the point of misleading, misrepresentation, or fabrication is greatly to be condemned.
[26] Letter from William J. Clinton, President of the United States, to Fernando Henrique Cardoso, President of Brazil, dated May 21, 1996.
[27] Id.
[28] Id.
[29] Letter from Nelson A. Jobim, Minister of State for Justice of Brazil to Janet Reno, United States Attorney General dated September 26, 1996 (emphasis added). English translation from original Portuguese.
[30] (Emphasis added.) The first Amended Information did not include the "valued at ten thousand dollars" or the "intent to collect insurance proceeds" which corresponds with RCW 9A.48.020(1)(d).
[31] Letter from Fernando Henrique Cardoso, President of Brazil, to William J. Clinton, President of the United States, dated October 29, 1996.
[32] Id.
[33] Reporter's Verbatim Report of Court's Oral Decision, November 12, 1996, at 4.
[34] Article XXI states: "A person extradited by virtue of the present Treaty may not be tried or punished by the requesting State for any crime or offense committed prior to the request for his extradition, other than that which gave rise to the request, nor may he be re-extradited by the requesting State to a third country which claims him, unless the surrendering State also agrees or unless the person extradited, having been set at liberty within the requesting State, remains voluntarily in the requesting State for more than 30 days from the date on which he was released. Upon such release, he shall be informed of the consequences to which his stay in the territory of the requesting State would subject him."
[35] Reporter's Verbatim Report of Court's Oral Decision, November 12, 1996, at 10.
[36] Clerk's Papers at 592-93.
[37] See Dr. Spitzcovsky's and Dr. Dias' letter of January 14, 1997 to Brazil Justice Minister Jobim, Clerk's Papers at 654-55. In the letter they state they are in the "capacity of advocates of Martin S. Pang's interests in Brazil." This is generally equivalent to "legal counsel" in our State. Clerk's Papers at 655. English translation from original Portuguese.
[38] Id.
[39] See Clerk's Papers at 659 (emphasis added). English translation from original Portuguese.
[40] United States v. Najohn, 785 F.2d 1420, 1422 (9th Cir.1986).
[41] See United States v. Cuevas, 847 F.2d 1417, 1426 (9th Cir.1988), cert. denied, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989).
[42] United States v. Puentes, 50 F.3d 1567, 1575 (11th Cir.), cert. denied, ___ U.S. ___, 116 S.Ct. 341, 133 L.Ed.2d 239 (1995); accord United States v. Fowlie, 24 F.3d 1059, 1064 (9th Cir. 1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 742, 130 L.Ed.2d 643 (1995); Leighnor v. Turner, 884 F.2d 385, 389 (8th Cir.1989).
[43] See United States v. Saccoccia, 58 F.3d 754, 767 n. 6 (1st Cir.1995) ("[W]hile we take no view of the [standing] issue, ... the side that favors individual standing has much to commend it." (citations omitted)), cert. denied, ___ U.S. ___, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996); see also Casey v. Department of State, 980 F.2d 1472, 1476 n. 4 (D.C.Cir.1992) ("it remains an open question in this circuit whether [the defendant] has `standing' to raise his claims after extradition") (citing United States v. Sensi, 879 F.2d 888, 892 n. 1 (D.C.Cir.1989) (reserving question of standing)); United States v. Davis, 954 F.2d 182, 186 (4th Cir.1992) (declining to address the standing issue); United States v. Herbage, 850 F.2d 1463, 1466 (11th Cir.1988) ("For purposes of this case, we assume, without deciding, that an individual has standing to allege a violation of the specialty principle."), cert. denied, 489 U.S. 1027, 109 S.Ct. 1158, 103 L.Ed.2d 217 (1989).
[44] Fiocconi v. Attorney General, 462 F.2d 475 (2d Cir.), cert. denied, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972) and United States v. Kaufman, 858 F.2d 994 (5th Cir.1988).
[45] Demjanjuk v. Petrovsky, 776 F.2d 571, 584 (6th Cir.1985) ("The right to insist on application of the principle of specialty belongs to the requested state, not to the individual whose extradition is requested.") (citing Berenguer v. Vance, 473 F.Supp. 1195, 1197 (D.D.C.1979)); accord Kaiser v. Rutherford, 827 F.Supp. 832, 835 (D.D.C.1993) ("therefore he has no standing to raise this issue.... Even assuming, arguendo, that the Plaintiff had standing to assert a claim in this regard, the doctrine of specialty simply requires that the prosecution be based on the same facts as set forth ...." (citations omitted)).
[46] See Najohn, 785 F.2d at 1422 (two letters from the Swiss government asking for prosecution and agreeing that the doctrine of specialty be waived); see also United States v. Riviere, 924 F.2d 1289, 1301 n. 13 (3d Cir.1991) ("the waiver was executed by the Dominican Attorney General contemporaneously with the extradition.")
[47] Letter from State Ministry of Justice Nelson A. Jobim to Dr. Celso Spitzcowsky [sic] /Dr. Roberto B. Dias da Silva, dated February 26, 1997, Clerk's Papers at 659. English translation from original Portuguese.
[48] See Puentes, 50 F.3d at 1575; Fowlie, 24 F.3d at 1064; Leighnor, 884 F.2d at 389.
[49] Verbatim Report of Court's Oral Decision at 8-10.
[50] Letter from Nelson A. Jobim, Minister of State for Justice of Brazil, to Janet Reno, United States Attorney General, dated September 26, 1996.
[51] Summary of Extradition, Clerk's Papers at 323.
[52] See Opinion Appendix "A." English translation from original Portuguese.
[53] See United States v. Riviere, 924 F.2d 1289 (3d Cir.1991) (express waiver precluded extraditee's assertion of treaty rights).
[54] United States v. Najohn, 785 F.2d 1420, 1422 (9th Cir.1986).
[55] United States v. Khan, 993 F.2d 1368, 1372 (9th Cir.1993) (citing United States v. Van Cauwenberghe, 827 F.2d 424, 428 (9th Cir.1987), cert. denied, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 859 (1988)); see United States v. Merit, 962 F.2d 917 (9th Cir.1992).
[56] Restatement (Third) of the Foreign Laws of Nations, Ch. 7, at 557-58.
[57] I.A. Shearer, Extradition in International Law 146 (1971).
[58] Restatement (Third) of Foreign Relations Law of the United States § 477(cmt.b) (1987).
[59] Khan, 993 F.2d at 1373 (citing United States v. Van Cauwenberghe, 827 F.2d 424, 428 (9th Cir. 1987) (quoting Quinn v. Robinson, 783 F.2d 776, 783 (9th Cir.1986))).
[60] United States v. Cuevas, 847 F.2d 1417, 1426 (9th Cir.1988).
[61] 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886).
[62] Rauscher, 119 U.S. at 424, 7 S.Ct. at 243.
[63] See id. at 419-21, 7 S.Ct. at 240-42.
[64] See id. at 422, 7 S.Ct. at 242.
[65] See id. at 420, 7 S.Ct. at 240-41.
[66] See id. at 420, 7 S.Ct. at 240-41.
[67] Id. at 430, 7 S.Ct. at 246.
[68] 18 U.S.C. § 3192.
[69] 504 U.S. 655, 660, 112 S.Ct. 2188, 2191-92, 119 L.Ed.2d 441 (1992) (citing Rauscher, 119 U.S. at 423, 7 S.Ct. at 242-43).
[70] Rauscher, 119 U.S. at 424, 7 S.Ct. at 243.
[71] Id. at 419, 7 S.Ct. at 240.
[72] See id.
[73] See id at 411-12, 7 S.Ct. at 236-37; see also Alvarez-Machain, 504 U.S. at 659, 112 S.Ct. at 2191 (noting how the court in Rauscher "carefully examined the terms and history of the treaty; the practice of nations in regards to extradition treaties; the case law from the States").
[74] See Rauscher, 119 U.S. 407, 7 S.Ct. 234.
[75] See, e.g., United States v. Puentes, 50 F.3d 1567, 1575 (11th Cir.) (citing Treaty on Extradition and Cooperation in Penal Matters, Apr. 6, 1973, U.S.-Uru., art. XIII, P.I.A.S. 10850), cert. denied, ___ U.S. ___, 116 S.Ct. 341, 133 L.Ed.2d 239 (1995); United States v. Fowlie, 24 F.3d 1059, 1064 n. 2, 1065 (9th Cir.1994) (citing Extradition Treaty Between U.S. and Mex., May 4, 1978, U.S.-Mex., 31 U.S.T. 5059, T.I.A.S. 9656), cert. denied, 513 U.S. 1086, 115 S.Ct. 742, 130 L.Ed.2d 643 (1995); United States v. Andonian, 29 F.3d 1432, 1435 (9th Cir.1994) (citing Treaty on Extradition and Cooperation in Penal Matters, Apr. 6, 1973, U.S.-Uru., art. 13, T.I.A.S. 10850), cert. denied, 513 U.S. 1128, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995): United States v. Khan, 993 F.2d 1368, 1373 (9th Cir.1993) (citing Extradition Treaty, Dec. 22, 1931, U.S.-Pak., art 7, 47 Stat. 2124); United States v. Levy, 905 F.2d 326, 328 (10th Cir.1990) (citing Extradition Treaty, June 8, 1972, U.S.-U.K., art. XII(1), 28 U.S.T. 227), cert. denied, 498 U.S. 1049, 111 S.Ct. 759, 112 L.Ed.2d 778 (1991); Leighnor v. Turner, 884 F.2d 385, 386 T.S. No. 354 (8th Cir.1989) (citing Treaty Concerning Extradition, June 20, 1978, U.S.-F.R.G., 32 U.S.T. 1485, T.I.A.S. No. 9785); United States v. Sensi, 879 F.2d 888, 895 (D.C.Cir.1989) (citing Extradition Treaty, June 8, 1972, U.S.-U.K., art. XII, 28 U.S.T. 227, T.I.A.S. 8468); United States v. Herbage, 850 F.2d 1463, 1465 (11th Cir.1988) (citing Extradition Treaty, June 8, 1972/Oct. 21, 1976, U.S.-U.K., art. XII, 28 U.S.T. 227, T.I.A.S. No. 8468), cert. denied, 489 U.S. 1027, 109 S.Ct. 1158, 103 L.Ed.2d 217 (1989); United States v. Cuevas, 847 F.2d 1417, 1427 (9th Cir.1988) (citing Treaty on Extradition, U.S.-Switz., May 14, 1900, 31 Stat. 1928, T.S. No. 354, Art. IX), cert. denied, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); United States v. Thirion, 813 F.2d 146, 151 (8th Cir. 1987) (citing Treaty Respecting Extradition, Feb. 15, 1939, U.S.-Monaco, 54 Stat. 1780); United States v. Najohn, 785 F.2d 1420, 1422 (9th Cir. 1986) (citing Treaty on Extradition, May 14, 1900, U.S.-Switz., Art. IX, 31 Stat.1928, T.S. No. 354); Fiocconi v. Attorney General, 462 F.2d 475, 481 (2d Cir.) (citing Extradition Convention between U.S.-Italy, (1868), Art. III, 15 Stat. 631), cert. denied, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972).
[76] Andonian, 29 F.3d at 1435; accord United States v. Diwan, 864 F.2d 715, 721 (11th Cir.) ("[T]he objective of the rule [of specialty] is to insure that the treaty is faithfully observed by the contracting parties.... The extradited individual, therefore, can rise only those objections to the extradition process that the surrendering country might consider a breach of the extradition treaty." (citations omitted)), cert. denied, 492 U.S. 921, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989).
[77] 15 U.S.T.2093; T.I.A.S. No. 5691, Article XXI, Clerk's Papers at 58. See Opinion Appendix "B" for the complete text of the Treaty.
[78] See United States v. Verdugo-Urquidez, 939 F.2d 1341, 1351 (9th Cir.1991).
[79] See id. at 1351 n. 10.
[80] Baramdyka, 95 F.3d at 845.
[81] Summary of Extradition, Clerk's Papers at 323.
[82] Summary of Extradition, Appeal for Clarification, Clerk's Papers at 314 (emphasis added).
[83] Id. (emphasis added).
[84] Reporter's Verbatim Report of Court's Oral Decision, November 12, 1996, at 4.
[85] Andonian, 29 F.3d at 1438.
[86] See The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320, 328-29 (1900).
[87] See U.S. Const. art. VI, cl. 2; Rauscher, 119 U.S. at 418, 7 S.Ct. at 239-40.
[88] See Johnson v. Browne, 205 U.S. 309, 321, 27 S.Ct. 539, 542-43, 51 L.Ed. 816 (1907); Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331, T.S. no. 58 (1980), 81 I.L.M. 679 (1969), entered into force Jan. 27, 1980, Article 31 (although the United States has not ratified this treaty, it is accepted as the authoritative guide to treaty law and practice and declaratory of customary international law, S. Exec. Doc., 92 Cong., 1st Sess. 1 (1971); Marian L. Nash, Contemporary Practice of the United States Relating to International Law, 75 Am. J. Int'l L. 142, 147 (1981)).
[89] Johnson, 205 U.S. 309, 27 S.Ct. 539.
[90] Id. at 321, 27 S.Ct. at 542-43.
[91] Quinn v. Robinson, 783 F.2d 776, 782 (9th Cir.), cert. denied, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).
[92] See id. at 791.
[93] See id. at 783; see also In re Extradition of Russell, 789 F.2d 801, 803 (9th Cir.1986).
[94] 15 U.S.T. 2112; T.I.A.S. No. 5691, art. I, Clerk's Papers at 50. See Opinion Appendix "A."
[95] Id. art. II, at 50-52.
[96] Id. art. XI, at 55.
[97] United States v. Van Cauwenberghe, 827 F.2d 424, 429 (9th Cir.1987) (citations omitted).
[98] Treaty of Extradition Between the United States of America and the United States of Brazil, January 13, 1961, art. XXI, 15 U.S.T.2093, T.I.A.S. 5691. See Opinion Appendix "B."
[99] 462 F.2d 475 (2d Cir.), cert. denied, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972).
[100] Id. at 481 (quoting Extradition Convention between U.S. and Italy, 1868, Art. III, 15 Stat. 631).
[101] Fiocconi 462 F.2d at 481 (citing 1 John B. Moore, A Treatise in Extradition and Interstate Rendition §§ 148-49, at 194-96 (1891)); see e.g., Extradition Treaty, Mar. 19, 1924, U.S.-Bulg., art. IV, 43 Stat. 1886 ("No person shall be tried for any crime or offense other than that for which he was surrendered."); Treaty Providing for the Extradition of Fugitives from Justice, Apr. 17, 1900, U.S.-Chile, art. VIII, 32 Stat. 1850 ("No person surrendered ... shall ... be triable or tried or be punished for any crime of offense committed prior to his extradition, other than that for which he was delivered up...."); Treaty on Extradition, Dec. 3, 1971, U.S.-Can., art. 12, 27 U.S.T. 983 ("A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted....").
[102] 879 F.2d 888 (D.C.Cir.1989).
[103] Id. at 895 (quoting Extradition Treaty, June 8, 1972, U.S.-U.K., art XII, 28 U.S.T. 227, T.I.A.S. 8468).
[104] Id. at 895-96.
[105] 993 F.2d 1368 (9th Cir.1993).
[106] Id. at 1374.
[107] Id. at 1375.
[108] Id. at 1374 (some alteration in original) (quoting Extradition Treaty, Dec. 22, 1931, art. 7, 47 Stat. 2124).
[1] United States v. Rauscher, 119 U.S. 407, 411-12, 7 S.Ct. 234, 236-37, 30 L.Ed. 425 (1886); Factor v. Laubenheimer, 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933).
[2] See Fiocconi v. Attorney Gen., 462 F.2d 475, 481 (2d Cir.1972).
[3] Restatement (Third) of Foreign Relations Law of the United States § 477 cmt. a (1987) (emphasis added); accord David B. Sweet, Annotation, Application of Doctrine of Specialty to Federal Criminal Prosecution of Accused Extradited from Foreign Country, 112 A.L.R. Fed. 473, 517 (1993) ("[I]n order to avoid a violation of the doctrine of specialty ..., the prosecution must be based upon the same evidence, facts, or acts as set forth in the request for extradition.") (emphasis added); Mary-Rose Papandrea, Comment, Standing to Allege Violations of the Doctrine of Specialty: An Examination of the Relationship between the Individual and the Sovereign, 62 U. Chi. L.Rev. 1187, 1187 (1995) ("The doctrine of specialty dictates that once the asylum state extradites an individual to the requesting state under the terms of an extradition treaty, that person can be prosecuted only for the crimes specified in the extradition request.") (emphasis added).
[4] Treaty of Extradition Between the United States of America and the United States of Brazil, Jan. 13, 1961, U.S.-Braz., art. XXI, 15 U.S.T. 2093 (emphasis added).
[5] United States v. Saccoccia, 58 F.3d 754, 767 (1st Cir.1995) (citations omitted).
[6] Rauscher, 119 U.S. at 424, 7 S.Ct. at 243.
[7] Rauscher, 119 U.S. at 429, 7 S.Ct. at 245 (quoting Commonwealth v. Hawes, 76 Ky. 697, 13 Bush 697 (1878)).
[8] Rauscher, 119 U.S. at 410-11, 7 S.Ct. at 235-36.
[9] Majority at 1320 (emphasis added); see also United States v. Alvarez-Machain, 504 U.S. 655, 659, 112 S.Ct. 2188, 2191, 119 L.Ed.2d 441 (1992) (noting how the Rauscher court "carefully examined the terms and history of the treaty").
[10] Rauscher, 119 U.S. at 415, 7 S.Ct. at 238; see also Fiocconi v. Attorney Gen., 462 F.2d 475, 480 (2d Cir.1972) (observing that the Rauscher Court had concluded based on Great Britain's prior objections that Great Britain had interpreted the treaty as prohibiting prosecution for crimes other than those for which extradition was granted).
[11] Rauscher, 119 U.S. at 423, 7 S.Ct. at 242 (quoting United States Rev. Stat. § 5275).
[12] Rauscher, 119 U.S. at 423, 7 S.Ct. at 242 (emphasis added).
[13] Majority at 1320.
[14] See, e.g., United States v. Andonian, 29 F.3d 1432, 1435 (9th Cir.1994), cert. denied, 513 U.S. 1128, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995); United States v. Riviere, 924 F.2d 1289 (3d Cir. 1991); Leighnor v. Turner, 884 F.2d 385 (8th Cir.1989); United States v. Sensi, 879 F.2d 888 (D.C.Cir.1989); United States v. Levy, 905 F.2d 326, 328 (10th Cir.1990), cert. denied, 498 U.S. 1049, 111 S.Ct. 759, 112 L.Ed.2d 778 (1991); United States v. Diwan, 864 F.2d 715 (11th Cir. 1989); United States v. Kaufman, 858 F.2d 994 (5th Cir.1988); United States v. Cuevas, 847 F.2d 1417, 1427 (9th Cir.1988), cert. denied, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); United States v. Najohn, 785 F.2d 1420, 1422 (9th Cir.1986); Fiocconi v. Attorney Gen., 462 F.2d 475 (2d Cir.), cert. denied, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972).
[15] Majority at 1320.
[16] Majority at 1320-1321 n. 75. See, e.g., United States v. Baramdyka, 95 F.3d 840, 845 n. 3 (9th Cir.1996) (citing Treaty Providing for the Extradition of Fugitives from Justice, Apr. 17, 1900, U.S.-Chile, art. VII, 32 Stat. 1850), cert. denied, ___ U.S. ___, 117 S.Ct. 1282, 137 L.Ed.2d 357 (1997); United States v. Puentes, 50 F.3d 1567, 1575 (11th Cir.) (citing Treaty on Extradition and Cooperation in Penal Matters, Apr. 6, 1973, U.S.-Uru., art. XIII, P.I.A.S. 10850), cert. denied, ___ U.S. ___, 116 S.Ct. 341, 133 L.Ed.2d 239 (1995); United States v. Fowlie, 24 F.3d 1059, 1064 n. 2, 1065 (9th Cir.1994) (citing Extradition Treaty Between the United States and Mexico, May 4, 1978, U.S.-Mex., 31 U.S.T. 5059), cert. denied, 513 U.S. 1086, 115 S.Ct. 742, 130 L.Ed.2d 643 (1995); United States v. Andonian, 29 F.3d 1432, 1435 (9th Cir.1994) (citing Treaty on Extradition and Cooperation in Penal Matters, Apr. 6, 1973, U.S.-Uru., art. 13, T.I.A.S. 10850), cert. denied, 513 U.S. 1128, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995); United States v. Khan, 993 F.2d 1368, 1373 n. 4 (9th Cir.1993) (citing Extradition Treaty, Dec. 22, 1931, U.S.-Pak., art. 7, 47 Stat. 2124); United States v. Levy, 905 F.2d 326, 328 (10th Cir.1990) (citing Extradition Treaty, June 8, 1972, U.S.-U.K., art. XII(1), 28 U.S.T. 227), cert. denied, 498 U.S. 1049, 111 S.Ct. 759, 112 L.Ed.2d 778 (1991); Leighnor v. Turner, 884 F.2d 385, 386 (8th Cir.1989) (citing Treaty Concerning Extradition, June 20, 1978, U.S.-F.R.G., 32 U.S.T. 1485); United States v. Sensi, 879 F.2d 888, 895 (D.C.Cir.1989) (citing Extradition Treaty, June 8, 1972, U.S.-U.K., art. XII, 28 U.S.T. 223); United States v. Herbage, 850 F.2d 1463, 1465 (11th Cir.1988) (citing Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972/Oct. 21, 1976, U.S.-U.K., art. XII, 28 U.S.T. 227) cert. denied, 489 U.S. 1027, 109 S.Ct. 1158, 103 L.Ed.2d 217 (1989); United States v. Cuevas, 847 F.2d 1417, 1427 (9th Cir.1988) (citing Treaty on Extradition, U.S.-Switz., art. IX, May 14, 1900, 31 Stat.1928, T.S. No. 354), cert. denied, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); United States v. Thirion, 813 F.2d 146, 151 (8th Cir.1987) (citing Treaty Respecting Extradition, Feb. 15, 1939, U.S.-Monaco, 54 Stat. 1780); United States v. Najohn, 785 F.2d 1420, 1422 (9th Cir.1986) (citing Treaty on Extradition, May 14, 1900, U.S.-Switz., art. IX, 31 Stat.1928); Fiocconi v. Attorney Gen., 462 F.2d 475, 481 (2d Cir.) (citing Extradition Convention, 1868, U.S.-Italy, art. III, 15 Stat. 631), cert. denied, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972).
[17] Factor v. Laubenheimer, 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933); accord United States v. Andonian, 29 F.3d 1432, 1435 (9th Cir.1994) ("We look to the language of the applicable treaty to determine the protection an extradited person is afforded under the doctrine of specialty."), cert. denied, 513 U.S. 1128, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995).
[18] See majority at 1322.
[19] Eric P. Wempen, Note, United States v. Puentes: Re-Examining Extradition Law and the Specialty Doctrine, 1 J. Int'l Legal Stud. 151, 153 (1995) (quoting 1 M. Cherif Bassiouni, International Extradition: United States Law and Practice 319 (2d rev. ed.1987)).
[20] M. Cherif Bassiouni, International Extradition: United States Law and Practice 404-05 (3d rev. ed.1996).
[21] Letter from Nelson A. Jobim, Minister of State for Justice, Braz., to Janet Reno, Att'y Gen., U.S. (Sept. 26, 1996).
[22] Treaty of Extradition Between the United States of America and the United States of Brazil, Jan. 13, 1961, U.S.-Braz., art. XXI, 15 U.S.T. 2093 (emphasis added).
[23] Bassiouni, supra, at 411.
[24] Majority at 1324 (discussing Fiocconi v. Attorney Gen., 462 F.2d 475 (2d Cir.), cert. denied, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972) and United States v. Sensi, 879 F.2d 888 (D.C.Cir. 1989)).
[25] Fiocconi, 462 F.2d at 481 (quoting Extradition Convention, 1868, U.S.-Italy, art. III, 15 Stat. 631) (emphasis added) (omissions in original).
[26] Fiocconi, 462 F.2d at 481 (citing 1 John B. Moore, A Treatise on Extradition and Interstate Rendition §§ 148-49, at 194-96 (1891)).
[27] Sensi, 879 F.2d at 895 (quoting Extradition Treaty, June 8, 1972, U.S.-U.K., art. XII, 28 U.S.T. 233) (emphasis altered).
[28] Sensi, 879 F.2d at 895-96.
[29] See, e.g., Extradition Treaty, Mar. 19, 1924, U.S.-Bulg., art. IV, 43 Stat. 1886 ("No person shall be tried for any crime or offense other than that for which he was surrendered.") (emphasis added); Treaty Providing for the Extradition of Fugitives from Justice, Apr. 17, 1900, U.S.-Chile, art VIII, 32 Stat. 1850 ("No person surrendered... shall ... be triable or tried or be punished for any crime or offense committed prior to his extradition, other than that for which he was delivered up....") (emphasis added); Treaty on Extradition Between the United States of America and Canada, Dec. 3, 1971, U.S.-Can., art. 12, 27 U.S.T. 983 ("A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted....") (emphasis added).
[30] Khan, 993 F.2d at 1374.
[31] Khan, 993 F.2d at 1373.
[32] Khan, 993 F.2d at 1375.
[33] Khan, 993 F.2d at 1374 (emphasis added) (alteration in original).
[34] Khan, 993 F.2d at 1374.
[35] See Majority at 1322 (quoting Johnson v. Browne, 205 U.S. 309, 321, 27 S.Ct. 539, 542-43, 51 L.Ed. 816 (1907)).
[36] Johnson, 205 U.S. at 321, 27 S.Ct. at 543 (emphasis added).
[37] Johnson, 205 U.S. at 316, 27 S.Ct. at 540 (emphasis added).
[38] Collins v. Loisel, 259 U.S. 309, 312, 42 S.Ct. 469, 470-71, 66 L.Ed. 956 (1922).
[39] See Geoff Gilbert, Aspects of Extradition Law 106 (1991) ("It is the facts of the case that are all important.... [S]pecialty allows the fugitive to be prosecuted for any charge made out by the facts on which surrender was ordered."); I.A. Shearer, Extradition in International Law 146 (1971) ("[T]he only question is whether the acts constituting the offence charged would, if committed in the requested State, constitute an offence (not necessarily the offence charged) by the law of that State and made extraditable in the treaty.") (emphasis in original).
[40] Majority at 1315.
[41] See Majority at 1315.
[42] Accord State v. Houf, 120 Wash.2d 327, 332, 841 P.2d 42 (1992); State v. McAlpin, 108 Wash.2d 458, 466, 740 P.2d 824 (1987).
[43] RCW 9.94A.390 was amended by Laws of 1996, ch. 248, § 2 and by Laws of 1996, ch. 121, § 1 changing subsection (2)(c), (d), (f), and (g) to subsection (2)(d), (e), (g), and (h) respectively. These statutory exceptions, which are for certain major economic offenses, violations of the Uniform Controlled Substances Act, sexual abuse, or domestic violence, would not apply in the present case.
[44] A person is guilty of murder in the first degree when:

. . .
(c) He or she commits or attempts to commit the crime of ...
(4) arson in the first or second degree ... and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants
. . . .
RCW 9A.32.030(1)(c).
[45] Majority at 1315 (citing RCW 9.94A.310).
[46] Mary-Rose Papandrea, Comment, Standing to Allege Violations of the Doctrine of Specialty: An Examination of the Relationship between the Individual and the Sovereign, 62 U.Chi.L.Rev. 1187, 1192 (1995) (quoting In re Arton, 1 QB 108, 111 (1896)).
[1] Signed on January 13, 1961, entered into force on December 17, 1964, 15 U.S.T.2093; T.I.A.S. No. 5691; Additional Protocol to Treaty, signed on June 18, 1962, entered into force on December 17, 1964, 15 U.S.T. 2112; T.I.A.S. No. 5691, Clerk's Papers at 50-60.